**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| ROLLIE BUCHANAN, DAVIN CARD, KIM AND FRED MARTIN FERGUSON, KEVIN FLYNN, PHILIPPE GEYSKENS, ROBERT HOFFMAN, ERIC and MARIELA KOTOUN, ARTHUR KRICHEVSKY, ELSIE SAKS, STEVEN SALHANICK, MARK SILBER, ROBERT and TONI TUBBE, DONNA URBEN, CHRISTOPHER and MELISSA JOHNSON, and KIMBERLY MADEJA, individually and on behalf of all others similarly situated,<br><br>    Plaintiffs,<br><br>  v.<br><br>Volvo Car USA, LLC, Volvo Cars of North America, LLC, and Volvo Personvagnar AB, *et al.*,<br><br>    Defendants. | Case No. 2:22-cv-02227-KM-JSA<br><br>FIRST AMENDED CLASS ACTION COMPLAINT<br><br>JURY TRIAL DEMANDED |

**INTRODUCTION**

1.      Plaintiffs Rollie Buchanan, Davin Card, Kim and Fred Martin Ferguson, Kevin Flynn, Philippe Geyskens, Robert Hoffman, Eric and Mariela Kotoun, Arthur Krichevsky, Elsie Saks, Steven Salhanick, Mark Silber, Robert and Toni Tubbe, Donna Urben, Christopher and Melissa Johnson, and Kimberly Madeja ("Plaintiffs") bring this action for themselves and on behalf of all similarly situated persons ("Class Members") in the United States who purchased or leased any 2013-

2016 Volvo vehicle equipped with 2.0L 4-cylinder or 2.5L 5-cylinder engines ("Class Vehicles") against Volvo Car USA, LLC ("VCUSA"), Volvo Cars of North America, LLC ("VCNA"), and Volvo Personvagnar AB ("Volvo AB") (collectively "Volvo" or "Defendants"). The allegations herein are based on personal knowledge as to Plaintiffs' own experiences and are made as to other matters based on an investigation by counsel, including analysis of publicly available information.

2.      This is a consumer class action concerning a failure to disclose material facts and a safety concern to consumers.

3.      Defendant Volvo AB designed and manufactured the Class Vehicles, Defendant VCUSA imported, manufactured, distributed and marketed the Class Vehicles, and Defendant VCNA imported, distributed, warranted, marketed, and sold the Class Vehicles through its extensive network of authorized dealerships in the United States. Defendant VCNA also provides service and maintenance for the Class Vehicle at dealers and service providers nationwide, and trains dealers and services providers, using information provided by Volvo AB.

4.      Defendants sold, directly or indirectly, through their agent dealers and other retail outlets, the Class Vehicles throughout the United States, without disclosing that the Class Vehicles were equipped with defective 2.0L 4-cylinder or 2.5L 5-cylinders engines ("Subject Engines").

5.      Volvo wrongfully and intentionally concealed a defect in the design, manufacture, and/or workmanship of the piston rings and/or pistons/piston heads in the Subject Engines.  Here, the piston rings cannot properly clear engine oil off the side of the cylinder wall during the downstroke and instead push that oil up where it

2

can coat the top of the piston head, enter the combustion chamber, and ignite ("Piston Defect" or "Defect").  Specifically, the oil control ring, the lowest ring on the piston, is defective and does not properly allow the oil from the cylinder wall to drain. Over time, this continual burning of oil damages the piston rings and piston heads, allowing even more oil to ignite, further destroying the piston head, the cylinder head and other engine components. It also causes the vehicle to lose power, both incrementally over time and catastrophically at one time, because some of the oxygen usually ignited in the combustion chamber which powers the vehicle is being used to burn the excess oil in the cylinder, and as the piston head and cylinder head become damaged, power generated by the combustion is dissipated rather than being used to spin the crankshaft to power the vehicle.

6.     The Piston Defect causes the engine to consume an excessive amount of oil because the pistons are pushing oil from the cylinder up into the combustion chamber.  It also causes the pistons and the engine itself to fail because the pistons and other engine components that require oil to minimize friction are not adequately lubricated. The Piston Defect also results in the shrapnel of the fragments of the piston rings, as they degrade, and/or minute fragments of the piston head, to circulate throughout the engine, damaging other engine components.  For example, cylinder scoring, which results in even more oil loss, is a frequent result of the Piston Defect. As a result of the Piston Defect, Plaintiffs and Class Members incur out of pocket costs to repair or replace the damaged engine parts or their entire engine. A replacement of the piston rings and/or pistons costs thousands of dollars, and the cost for replacing a Subject Engine is well over $10,000.

7.     The Piston Defect in the Subject Engines also presents a safety risk for Plaintiffs and Class Members, because when a piston or pistons suddenly and unexpectedly fail, the Class Vehicles immediately lose engine power. A sudden loss of power poses a clear-cut safety risk - it can prevent the driver from accelerating, maintaining speed, engaging the brakes and even adequately controlling the steering wheel, all of which drastically increase the risk of collisions, and puts other drivers, passengers and pedestrians in danger.

8.     The Piston Defect also causes substantial damage. In addition to destroying critical engine components, it causes further damage throughout the powertrain of the Class Vehicles as shards of the pistons, piston heads and/or piston rings are circulating throughout the engine and fuel system.

9.     By way of explanation, in internal combustion engines, the piston is a fast-moving metal component contained within a cylinder. Piston rings attached at the piston head make the piston gas-tight. A piston's purpose is to transfer force from expanding gas in the cylinder to the crankshaft via a piston rod and/or connecting rod. In most, if not all, mass produced internal combustion car engines, the intake, compression, combustion and exhaust processes take place above the piston in the cylinder head, which forces the piston to move up and down within the cylinder, thereby causing the crankshaft to turn. The piston is subjected to tremendous forces and heat during normal engine operation.

10.     Specifically, the piston rings and/or piston heads in the Class Vehicles' Subject Engines are defective in that they cause excessive oil consumption and crack, fracture, or splinter. The damage to the pistons causes immediate loss of

4

compression within the engine cylinder and causes the remnants of the pistons to circulate throughout the fuel system of the Class Vehicles. These failures often occur before the engine reaches 75,000 miles, resulting in a lifespan well short of the class members' expectations and the industry standard for similar engines.  In fact, the Subject Engines were designed to reach a minimum of 200,000 miles of use with proper maintenance.  As such, the integral engine components such as the piston rings and piston heads, are designed and expected to last the lifetime of the engine.

11.     The Piston Defect is inherent in each Class Vehicle and was present at the time of sale.

12.     Volvo undertook affirmative measures to conceal the Piston Defect through, among other things, Technical Journals ("TJs") that VCNA issued to its authorized repair facilities (but not to the class members themselves).

13.     Volvo was sufficiently aware of the Piston Defect from: pre-production testing; design failure mode analysis; aggregate purchases of replacement piston rings, pistons, and engines; class member calls to its customer service hotline; and customer complaints made directly to its agent dealers. However, this knowledge and information was exclusively in the possession of Volvo and its network of dealers who are Defendants' agents for repairs and, therefore, unavailable to consumers.

14.     The Piston Defect is material because it poses a serious safety concern. As attested by Class Members in scores of complaints to the National Highway Traffic Safety Administration ("NHTSA"), and other online forums, the Piston Defect can impair any driver's ability to control his or her vehicle and greatly

increase the risk of collision, and puts other drivers, passengers and pedestrians in danger.

15.     The Piston Defect is also material because consumers incur significant and unexpected repair costs. Volvo's failure to disclose, at the time of purchase, the pistons' marked tendency to fail is material because no reasonable consumer expects to spend hundreds, if not thousands, of dollars to repair or replace essential engine components expected to last much longer than 75,000 miles of use.

16.     Had Volvo disclosed the Piston Defect, Plaintiffs and Class Members would not have purchased the Class Vehicles or would have paid less for them.

**PARTIES**

**<u>Plaintiff Rollie Buchanan</u>**

17.     Plaintiff Rollie Buchanan is a citizen of New York, domiciled in Jamaica, New York.

18.     On or about November 15, 2018, Plaintiff Buchanan purchased a certified pre-owned 2015 Volvo S60 equipped with a 2.0L 4-cylinder engine with engine code B4204T12 with approximately 34,500 miles on the odometer from Karp Volvo Cars, an authorized Volvo dealership located in Rockville Centre, New York.

19.     Plaintiff Buchanan purchased his vehicle primarily for personal, family, or household use.

20.     Passenger safety and reliability were important factors in Plaintiff Buchanan's decision to purchase his vehicle.  Before purchasing the vehicle,

Plaintiff Buchanan conducted general research including on the CarMax and Kelly Blue Book websites, viewed dealer advertisements and the dealership's website, reviewed the Monroney sticker (the "window sticker") which listed the 2.0L engine as a component, reviewed the sales documentation including a CarFax report, and spoke to the authorized salesperson at the dealership.  Plaintiff Buchanan also took the vehicle for a test drive.  Plaintiff Buchanan selected and ultimately purchased his Class Vehicle because the vehicle was represented to be, and was marketed as, a high-quality vehicle capable of providing safe, reliable transportation.  The purchase was made in part on the advertised safety, reliability, and quality of the vehicle and its components, including its engine.

21.    None of the information provided to Plaintiff Buchanan disclosed any defects in the vehicle or its engine.  Volvo's omissions were material to Plaintiff Buchanan.

22.    Had Volvo disclosed its knowledge of the Piston Defect before he purchased his vehicle, Plaintiff Buchanan would have seen and been aware of the disclosures. Indeed, Volvo's misstatements and omissions were material to Plaintiff Buchanan. Like all members of the Class, Plaintiff Buchanan would not have purchased his Class Vehicle, or would have paid less for the vehicle, had he known of the Piston Defect.

23.     In addition, at the time of Plaintiff Buchanan's vehicle purchase, and in purchasing his vehicle, he relied upon Volvo and its authorized dealerships' representations which he heard from the salesperson and in advertisements, that the vehicle was fully functional, safe, durable, reliable, and that the engine operated correctly and effectively.  Plaintiff Buchanan relied on those representations and the omission of, or failure to disclose, the Piston Defect, in purchasing the vehicle, and absent those representations and omissions, would not have purchased the vehicle, or would have paid less for it.

24.     At the time of his purchase, Plaintiff Buchanan received from Volvo several warranties, including: (1) the remainder of the bumper-to-bumper limited warranty lasting for four years or 50,000 miles, whichever occurred first; and (2) a limited certified pre-owned warranty lasting seven years or 100,000 miles, whichever occurred first.

25.     At all times during his possession of the vehicle, Plaintiff Buchanan has properly maintained and serviced his Class Vehicle according to Volvo's recommended maintenance guidelines.

26.     In the summer of 2020, Plaintiff Buchanan first observed the low oil light illuminating in his vehicle.  He began to add oil as needed and indicated by the vehicle.

27.     In November 2020, Plaintiff Buchanan brought his vehicle to McGuire Volvo Cars, an authorized Volvo dealership located in Ithaca, New York.  The dealership completed the 50,000 miles service on the vehicle at that time.

28.     In the summer of 2021, the low oil light began to illuminate in his vehicle again frequently.  While helping his brother purchase a car from CarMax, Plaintiff Buchanan was informed that his vehicle and others like it had an oil consumption problem.

29.     On or about September 23, 2021, Plaintiff Buchanan called Volvo Cars of North America ("VCNA") to complain about the Piston Defect in his vehicle.  VCNA arranged for his vehicle to be inspected at McGuire Volvo.

30.     Soon after, Plaintiff Buchanan brought his vehicle to McGuire Volvo.  At the time, his vehicle had approximately 60,900 miles on the odometer.  Plaintiff Buchanan specifically requested an oil consumption test, per his conversation with the VCNA representative.  He was instead only given a quote for an oil consumption test and told to make an appointment for a test.

31.     Plaintiff Buchanan returned his vehicle to the dealership approximately a week later in October 2021 for the oil consumption test and additional service on his vehicle.  Instead, the dealership claimed that they had no knowledge of an oil consumption test.  Plaintiff Buchanan allowed the dealership to perform some

service on the vehicle, but did not authorize any engine work.  Despite that, the dealership changed the oil in his vehicle without his consent.

32.     Plaintiff Buchanan's vehicle continues to experience the Piston Defect and he has not received a repair to his vehicle despite requesting the repair within the time limitations of his certified pre-owned warranty.

33.     To date, Plaintiff Buchanan's vehicle remains subject to the Piston Defect and he puts a quart of oil into the car every 300 to 400 miles driven.

34.     As a result of the Piston Defect, Plaintiff Buchanan has lost confidence in the ability of his Class Vehicle to provide safe and reliable transportation for ordinary and advertised purposes.  Further, Plaintiff Buchanan will be unable to rely on Volvo's advertising or labeling in the future, and so will not purchase or lease another vehicle from Volvo in the future, though he would like to do so.

35.     At all times, Plaintiff Buchanan, like other class members, has attempted to drive his vehicle in a manner that was both foreseeable and in which it was intended to be used. At all times, he has not abused his vehicle or used it for purposes unintended by Volvo such as drag racing, for example. The Piston Defect has rendered his vehicle unsafe and unfit to be used as Volvo intended.

**Plaintiff Davin Card**

36.     Plaintiff Davin Card is a citizen of New York, domiciled in Schenectady, New York.

37.     On or about May 10, 2019, Plaintiff Card purchased a used 2016 XC90 equipped with a 2.0L 4-cylinder engine with engine code B4204T27 with approximately 71,467 miles on the odometer from Mercedes Benz of Lancaster, a dealership located in East Petersburg, Pennsylvania.

38.     Plaintiff Card purchased his vehicle primarily for personal, family, or household use.

39.     Passenger safety and reliability were important factors in Plaintiff Card's decision to purchase his vehicle.  Before purchasing the vehicle, Plaintiff Card conducted general research including on the Kelly Blue Book website, reviewed dealer advertisements and the dealership's website, reviewed the Monroney sticker (the "window sticker") which listed the 2.0L engine as a component, reviewed the sales documentation including a CarFax report, and spoke to the authorized salesperson at the dealership.  Plaintiff Card also took the vehicle for a test drive.  Plaintiff Card selected and ultimately purchased his Class Vehicle because the vehicle was represented to be, and was marketed as, a high-quality vehicle capable of providing safe, reliable transportation.  The purchase was made in part on the advertised safety, reliability, and quality of the vehicle and its components, including its engine.

40.     None of the information provided to Plaintiff Card disclosed any defects in the vehicle or its engine.  Volvo's omissions were material to Plaintiff Card.

41.     Had Volvo disclosed its knowledge of the Piston Defect before he purchased his vehicle, Plaintiff Card would have seen and been aware of the

disclosures. Indeed, Volvo's misstatements and omissions were material to Plaintiff Card. Like all members of the Class, Plaintiff Card would not have purchased his Class Vehicle, or would have paid less for the vehicle, had he known of the Piston Defect.

42.     In addition, at the time of Plaintiff Card's vehicle purchase, and in purchasing his vehicle, he relied upon Volvo's communications including the window sticker that the vehicle was fully functional, safe, durable, reliable, and that the engine operated correctly and effectively.   Plaintiff Card relied on those representations and the omission of, or failure to disclose, the Piston Defect, in purchasing the vehicle, and absent those representations and omissions, would not have purchased the vehicle, or would have paid less for it.

43.     At all times during his possession of the vehicle, Plaintiff Card has properly maintained and serviced his Class Vehicle according to Volvo's recommended maintenance guidelines.

44.     When the vehicle had approximately 85,000 miles on the odometer, in 2020, the low oil light illuminated in Plaintiff Card's vehicle.  Shortly thereafter, on or about March 2, 2020, he took the vehicle to Capital Volvo, an authorized Volvo dealership located in Albany, New York.   The dealership recommended an oil consumption test.

45.     The dealership performed an oil consumption test, by changing the oil in Plaintiff Card's vehicle and directing to him return after 1,000 were driven. Plaintiff Card returned after driving 1,000 miles, on approximately December 15, 2020.  At that time, the dealership informed him that his vehicle was consuming oil

and a piston ring replacement was needed, costing over $5,000.  He was also charged a diagnostic fee of $300.

46.     Plaintiff Card asked for the dealership or Volvo to cover the repair cost, due to the fact that this was a known issue with a repair designed by Volvo.  He was first asked to provide proof that his vehicle had been serviced regularly, because he had gotten a single oil change at an independent shop.  Plaintiff Card promptly provided this proof, but had to wait over a month before he received a response from the dealership.

47.     After months of working with the dealership to have Volvo cover the repair, Plaintiff Card eventually reached out to VCNA directly to request coverage for the repair via email or about June 1, 2021.   By that time, the vehicle had been sitting at Capital Volvo for approximately six weeks.

48.     On June 3, 2021, VCNA informed Plaintiff Card that it would cover half the cost of the repair.  Plaintiff Card requested more coverage, because this was a known issue to Volvo and because he had been a twenty-year customer of Volvo cars.  VCNA denied his request shortly thereafter.

49.     Plaintiff Card ultimately was charged approximately $3,200 for the piston ring replacement in his vehicle.

50.     To date, Plaintiff Card's vehicle remains subject to the Piston Defect and the damage the Defect had done to his vehicle.

51.     As a result of the Piston Defect, Plaintiff Card has lost confidence in the ability of his Class Vehicle to provide safe and reliable transportation for ordinary and advertised purposes.  Further, Plaintiff Card will be unable to rely on

Volvo's advertising or labeling in the future, and so will not purchase or lease another vehicle from Volvo in the future, though he would like to do so.

52.     At all times, Plaintiff Card, like other class members, has attempted to drive his vehicle in a manner that was both foreseeable and in which it was intended to be used. At all times, he has not abused his vehicle or used it for purposes unintended by Volvo such as drag racing, for example. The Piston Defect has rendered his vehicle unsafe and unfit to be used as Volvo intended.

**Plaintiffs Kim and Fred Martin Ferguson**

53.     Plaintiffs Kim Ferguson and Fred Martin Ferguson ("Fergusons") are citizens of South Carolina, domiciled in Chapin, South Carolina.

54.     On or about March 20, 2015, Plaintiffs Fergusons purchased a New 2015 Volvo XC60 equipped with a 2.0L 4-cylinder engine with engine code B4204T11 from Dick Dyer and Associates, an authorized Volvo dealership located in Columbia, South Carolina.

55.     Plaintiffs Fergusons purchased their vehicle primarily for personal, family, or household use.

56.     Passenger safety and reliability were important factors in Plaintiffs Fergusons' decision to purchase their vehicle.  Before purchasing the vehicle, Plaintiffs Fergusons reviewed Volvo commercials, researched the vehicle generally on Google, reviewed the Monroney sticker (the "window sticker") which listed the 2.0L engine as a component, visited the dealership's and manufacturer's website, and spoke to the authorized salesperson at the dealership.  Plaintiffs Fergusons also

14

took the vehicle for a test ride. Plaintiffs Fergusons selected and ultimately purchased their Class Vehicle because the vehicle was represented to be, and was marketed as, a high-quality vehicle capable of providing safe, reliable transportation. The purchase was made in part on the advertised safety, reliability, and quality of the vehicle and its components, including its engine.

57.   None of the information provided to Plaintiffs Fergusons disclosed any defects in the vehicle or its engine.  Volvo's omissions were material to Plaintiffs Fergusons.

58.   Had Volvo disclosed its knowledge of the Piston Defect before they purchased their vehicle, Plaintiffs Fergusons would have seen and been aware of the disclosures. Indeed, Volvo's misstatements and omissions were material to Plaintiffs Fergusons.  Like all members of the Class, Plaintiffs Fergusons would not have purchased their Class Vehicle, or would have paid less for the vehicle, had they known of the Piston Defect.

59.   In addition, at the time of Plaintiffs Fergusons' vehicle purchase, and in purchasing their vehicle, they relied upon Volvo and its authorized dealerships' representations, dealership website, commercials, heard from the salesperson, and reviewed on the Monroney sticker, that the vehicle was fully functional, safe, durable, reliable, and that the engine operated correctly and effectively.  Plaintiffs Fergusons relied on those representations and the omission of, or failure to disclose, the Piston Defect, in purchasing the vehicle, and absent those representations and omissions, would not have purchased the vehicle, or would have paid less for it.

60.     At the time of their purchase, Plaintiffs Fergusons' received from Volvo several warranties, including: (1) bumper-to-bumper limited warranty lasting for four years or 50,000 miles, whichever occurred first; and (2) maintenance warranty lasting three years or 36,000 miles, whichever occurred first.

61.     At all times during their possession of the vehicle, Plaintiffs Fergusons have properly maintained and serviced their Class Vehicle according to Volvo's recommended maintenance guidelines.

62.     When the vehicle had approximately 65,000 miles on the odometer, the low oil level light began to illuminate frequently. Twice, Plaintiff Kim Ferguson took the vehicle to Dick Dyer and Associates, where the dealership merely added oil. After, when the vehicle had 76,781 miles on the odometer, in June 2020, Plaintiffs Fergusons returned their vehicle to the dealership for a formal diagnostic. At that time, the dealership recommended a piston repair and quoted approximately $6,000 for that repair. Plaintiff Kim Ferguson spoke to the technician who worked on her vehicle, who informed her that there "is not a recall yet" for her vehicle and that she could simply continue driving the car and adding oil as needed as an alternative to the repair. Plaintiff Kim Ferguson was worried about these recommendations and contacted Volvo Cars of North America, LLC. A customer service representative recommended that she return to the dealership and monitor the oil level. Plaintiffs Fergusons began adding oil every 1,000 miles driven. In December 2021, their vehicle flashed a warning about an engine performance problem. They took their vehicle to Taylor's Auto Service, a local mechanic, and discovered that the valves in their engine were burnt and that the engine was failing.

Plaintiffs Fergusons paid approximately $7,000 to replace the engine in their vehicle. In January 2022, the engine performance problem message again flashed on the vehicle's dashboard. Plaintiffs Fergusons returned their vehicle to the mechanic, who added oil and called Dick Dyer and Associates for a recommendation. The authorized Volvo dealership recommended Plaintiff Kim Ferguson sell the car.

63. To date, Plaintiffs Fergusons' vehicle remains subject to the Piston Defect.

64. As a result of the Piston Defect, Plaintiffs Fergusons have lost confidence in the ability of their Class Vehicle to provide safe and reliable transportation for ordinary and advertised purposes.

65. At all times, Plaintiffs Fergusons, like other class members, have attempted to drive their vehicle in a manner that was both foreseeable and in which it was intended to be used. At all times, they have not abused their vehicle or used it for purposes unintended by Volvo such as drag racing, for example. The Piston Defect has rendered their vehicle unsafe and unfit to be used as Volvo intended.

**<u>Plaintiff Kevin Flynn</u>**

66. Plaintiff Kevin Flynn is a citizen of Massachusetts, domiciled in Springfield, Massachusetts.

67. On or about October of 2013, Plaintiff Flynn purchased a new 2013 Volvo S60 equipped with a 2.5L 5-cylinder engine with engine code B5254T12 from Fathers and Son Volvo, an authorized Volvo dealership located in West Springfield, Massachusetts.

68.   Plaintiff Flynn purchased his vehicle primarily for personal, family, or household use.

69.   Passenger safety and reliability were important factors in Plaintiff Flynn's decision to purchase his vehicle.  Before purchasing the vehicle, Plaintiff Flynn conducted general online research using search engines such as Google and Kelley Blue Book, visited the dealership's websites, reviewed the Monroney sticker (the "window sticker") which listed the 2.5L engine as a component, reviewed the sales documentation, and spoke to the authorized salesperson at the dealership. Plaintiff Flynn also took the vehicle for a test drive.  Plaintiff Flynn selected and ultimately purchased his Class Vehicle because the vehicle was represented to be, and was marketed as, a high-quality vehicle capable of providing safe, reliable transportation.  The purchase was made in part on the advertised safety, reliability, and quality of the vehicle and its components, including its engine.

70.   None of the information provided to Plaintiff Flynn disclosed any defects in the vehicle or its engine.  Volvo's omissions were material to Plaintiff Flynn.

71.   Had Volvo disclosed its knowledge of the Piston Defect before he purchased his vehicle, Plaintiff Flynn would have seen and been aware of the disclosures. Indeed, Volvo's misstatements and omissions were material to Plaintiff Flynn. Like all members of the Class, Plaintiff Flynn would not have purchased his Class Vehicle, or would have paid less for the vehicle, had he known of the Piston Defect.

72.     In addition, at the time of Plaintiff Flynn's vehicle purchase, and in purchasing his vehicle, he relied upon Volvo and its authorized dealerships' representations which he heard from the salesperson, viewed on the dealership's websites, and commercials, that the vehicle was fully functional, safe, durable, reliable, and that the engine operated correctly and effectively.  Plaintiff Flynn relied on those representations and the omission of, or failure to disclose, the Piston Defect, in purchasing the vehicle, and absent those representations and omissions, would not have purchased the vehicle, or would have paid less for it.

73.     At the time of his purchase, Plaintiff Flynn received from Volvo several warranties, including: (1) bumper-to-bumper limited warranty lasting for four years or 50,000 miles, whichever occurred first; and (2) maintenance warranty lasting three years or 36,000 miles, whichever occurred first.

74.     At all times during his possession of the vehicle, Plaintiff Flynn has properly maintained and serviced his Class Vehicle according to Volvo's recommended maintenance guidelines.

75.     In December 2020, when the vehicle had approximately 60,000 miles on the odometer, Plaintiff Flynn was driving on the Massachusetts Turnpike when the "no oil" light illuminated on the dashboard. This immediately prompted Plaintiff Flynn to pull over and check his engine oil. He discovered that his engine indeed had no oil in it. He borrowed a colleague's car to purchase 2 quarts of oil for his vehicle, and then drove his vehicle to Fathers and Sons Volvo for diagnosis and repair. The dealership did not diagnose or repair the vehicle, but instead

19

recommended that he increase the frequency of oil changes from 10,000 mile intervals, as per the vehicle's manuals, to 5,000 mile intervals.

76.   Plaintiff Flynn followed the dealership's instructions and took his vehicle to the dealership for oil changes every 5,000 miles. In 2021, when the vehicle had less than 80,000 miles on the odometer, Plaintiff Flynn took his vehicle to the dealership for another oil change. The technician recommended replacing the piston rings in his vehicle, a repair which would cost thousands of dollars because it requires the engine to be torn down and rebuilt.

77.   Plaintiff Flynn has since taken his vehicle for diagnosis and maintenance to an independent mechanic who has significant experience with Volvos. There, Plaintiff Flynn was informed that the oil consumption issue is a known problem in Volvos. Plaintiff Flynn has spent $500 in extra oil changes due to the Defect.

78.   To date, Plaintiff Flynn's vehicle remains subject to the Piston Defect.

79.   As a result of the Piston Defect, Plaintiff Flynn has lost confidence in the ability of his Class Vehicle to provide safe and reliable transportation for ordinary and advertised purposes.  Further, Plaintiff Flynn will be unable to rely on Volvo's advertising or labeling in the future, and so will not purchase or lease another vehicle from Volvo in the future, though he would like to do so.

80.   At all times, Plaintiff Flynn, like other class members, has attempted to drive his vehicle in a manner that was both foreseeable and in which it was intended to be used. At all times, he has not abused his vehicle or used it for purposes

unintended by Volvo such as drag racing, for example. The Piston Defect has rendered his vehicle unsafe and unfit to be used as Volvo intended.

**Plaintiff Philippe Geyskens**

81.     Plaintiff Phillip Geyskens is a citizen of Illinois, domiciled in Evanston, Illinois.

82.     On or about March 1, 2018, Plaintiff Geyskens purchased a pre-owned 2016 Volvo S60 equipped with a 2.0L 4-cylinder engine code B4204T12 with approximately 35,000 miles from Volvo Cars Lisle, an authorized Volvo dealership located in Lisle, Illinois.

83.     Plaintiff Geyskens purchased his vehicle primarily for personal, family, or household use.

84.     Passenger safety and reliability were important factors in Plaintiff Geyskens's decision to purchase his vehicle.  Before purchasing the vehicle, Plaintiff Geyskens conducted general online research using search engines such as Google, KBB, Edmunds and TrueCar, visited the dealership's and manufacturer's websites, which listed the 2.0L engine as a component, reviewed the sales documentation, and spoke to the authorized salesperson at the dealership.  Plaintiff Geyskens also took the vehicle for a test drive.  Plaintiff Geyskens selected and ultimately purchased his Class Vehicle because the vehicle was represented to be, and was marketed as, a high-quality vehicle capable of providing safe, reliable transportation.  The purchase was made in part on the advertised safety, reliability, and quality of the vehicle and its components, including its engine.

85.     None of the information provided to Plaintiff Geyskens disclosed any defects in the vehicle or its engine.  Volvo's omissions were material to Plaintiff Geyskens.

86.     Had Volvo disclosed its knowledge of the Piston Defect before he purchased his vehicle, Plaintiff Geyskens would have seen and been aware of the disclosures. Indeed, Volvo's misstatements and omissions were material to Plaintiff Geyskens. Like all members of the Class, Plaintiff Geyskens would not have purchased his Class Vehicle, or would have paid less for the vehicle, had he known of the Piston Defect.

87.     In addition, at the time of Plaintiff Geyskens's vehicle purchase, and in purchasing his vehicle, he relied upon Volvo and its authorized dealerships' representations which he heard from the salesperson, and viewed on the dealership's and manufacturer's websites, that the vehicle was fully functional, safe, durable, reliable, and that the engine operated correctly and effectively.  Plaintiff Geyskens relied on those representations and the omission of, or failure to disclose, the Piston Defect, in purchasing the vehicle, and absent those representations and omissions, would not have purchased the vehicle, or would have paid less for it.

88.     At the time of his purchase, Plaintiff Geyskens received from Volvo several warranties, including: (1) the remainder of the bumper-to-bumper limited warranty lasting for four years or 50,000 miles, whichever occurred first; and (2) a limited certified pre-owned warranty lasting seven years or 100,000 miles, whichever occurred first.

89.     At all times during his possession of the vehicle, Plaintiff Geyskens has properly maintained and serviced his Class Vehicle according to Volvo's recommended maintenance guidelines.

90.     In December 2019, Plaintiff Geyskens was driving his vehicle when the low oil light illuminated. At the time, his vehicle had just over 60,000 miles on the odometer. He took the vehicle to E & J Foreign Cars, an independent mechanic in Chicago, Illinois, which diagnosed the vehicle as having excessive oil consumption. The mechanic recommended he follow up with Volvo.

91.     In January 2020, Plaintiff Geyskens took his vehicle to Volvo Cars Lisle, which initiated an oil consumption test, telling him to return when the low oil light illuminated. In or around March 2020, Plaintiff Geyskens returned his vehicle to the dealership when the low oil light illuminated, after driving approximately 3,000 miles. He was informed that Volvo had issued a new technical service bulletin regarding oil consumption testing and that a new test would have to done. Plaintiff Geyskens contacted Volvo customer service directly and verified that this was accurate.

92.     In or around July 2020, the low oil light illuminated again, after Plaintiff Geyskens had driven approximately another 3,000 miles. He took his vehicle to the dealership, where the firepan was replaced. After driving another 3,000 miles, the low oil light illuminated again. Plaintiff Geyskens again returned his vehicle to the dealership for diagnosis and repair. At that time, the dealership replaced the oil sensor.

93.     After driving another 3,000 miles, the low oil light illuminated again. Plaintiff Geyskens returned his vehicle to the dealership again for diagnosis and repair. The dealership technician told Plaintiff Geyskens to drive another 1,200 miles and if the vehicle had the same level of oil consumption, the dealership would make a case to Volvo for a free repair of his engine. Plaintiff Geyskens called the dealership after he had driven another 1,200 miles and was told he had to make an appointment, the soonest being in 2 months.

94.     Two months later, Plaintiff Geyskens returned his vehicle to the dealership for the appointment, expecting a repair. Instead, he was told that all the metrics were in the expected range. In frustration, Plaintiff Geyskens reached out to Volvo customer service again on or about October 30, 2021. Volvo customer service directed him to a dealership for an oil consumption test, then when informed he had done so repeatedly, told him that being one quart low was within specifications. Volvo further stated that the test results were "proprietary" to the dealership. At no time did Plaintiff Geyskens' vehicle receive a repair for the Piston Defect.

95.     To date, Plaintiff Geyskens' vehicle remains subject to the Piston Defect.

96.     As a result of the Piston Defect, Plaintiff Geyskens has lost confidence in the ability of his Class Vehicle to provide safe and reliable transportation for ordinary and advertised purposes.  Further, Plaintiff Geyskens will be unable to rely on Volvo's advertising or labeling in the future, and so will not purchase or lease another vehicle from Volvo in the future, though he would like to do so.

97.     At all times, Plaintiff Geyskens, like other class members, has attempted to drive his vehicle in a manner that was both foreseeable and in which it was intended to be used. At all times, he has not abused his vehicle or used it for purposes unintended by Volvo such as drag racing, for example. The Piston Defect has rendered his vehicle unsafe and unfit to be used as Volvo intended.

**Plaintiff Robert Hoffman**

98.     Plaintiff Robert Hoffman is a citizen of Pennsylvania, domiciled in Pittsburg, Pennsylvania.

99.     On or about September 1, 2016, Plaintiff Hoffman purchased a new 2016 Volvo XC70 equipped with a 2.5L 5-cylinder engine with engine code B5254T12 from Star Volvo (currently Delaney Volvo), an authorized Volvo dealership located in Greensburg, Pennsylvania.

100.   Plaintiff Hoffman purchased his vehicle primarily for personal, family, or household use.

101.   Passenger safety and reliability were important factors in Plaintiff Hoffman's decision to purchase his vehicle.  Before purchasing the vehicle, Plaintiff Hoffman conducted general online research using search engines such as Google and Edumunds.com, visited the dealership's websites, reviewed the Monroney sticker (the "window sticker") which listed the 2.5L engine as a component, reviewed the sales documentation, and spoke to the authorized salesperson at the dealership.  Plaintiff Hoffman also took the vehicle for a test ride.  Plaintiff Hoffman selected and ultimately purchased his Class Vehicle because the vehicle was

represented to be, and was marketed as, a high-quality vehicle capable of providing safe, reliable transportation. The purchase was made in part on the advertised safety, reliability, and quality of the vehicle and its components, including its engine.

102. None of the information provided to Plaintiff Hoffman disclosed any defects in the vehicle or its engine. Volvo's omissions were material to Plaintiff Hoffman.

103. Had Volvo disclosed its knowledge of the Piston Defect before he purchased his vehicle, Plaintiff Hoffman would have seen and been aware of the disclosures. Indeed, Volvo's misstatements and omissions were material to Plaintiff Hoffman. Like all members of the Class, Plaintiff Hoffman would not have purchased his Class Vehicle, or would have paid less for the vehicle, had he known of the Piston Defect.

104. In addition, at the time of Plaintiff Hoffman's vehicle purchase, and in purchasing his vehicle, he relied upon Volvo and its authorized dealerships' representations which he heard from the salesperson, and viewed on the dealership's websites, that the vehicle was fully functional, safe, durable, reliable, and that the engine operated correctly and effectively. Plaintiff Hoffman relied on those representations and the omission of, or failure to disclose, the Piston Defect, in purchasing the vehicle, and absent those representations and omissions, would not have purchased the vehicle, or would have paid less for it.

105. At the time of his purchase, Plaintiff Hoffman received from Volvo several warranties, including: (1) bumper-to-bumper limited warranty lasting for

four years or 50,000 miles, whichever occurred first; and (2) maintenance warranty lasting three years or 36,000 miles, whichever occurred first.

106.   At all times during his possession of the vehicle, Plaintiff Hoffman has properly maintained and serviced his Class Vehicle according to Volvo's recommended maintenance guidelines.

107.   In September 2020, when the vehicle had approximately 66,500 miles on the odometer, the low oil level light illuminated on the dashboard. Plaintiff Hoffman checked the oil level and found that it was low. He added oil to the engine and made an appointment at Star Volvo. On October 6, 2020, the dealership initiated an oil consumption test and told Plaintiff Hoffman to return his vehicle after driving 1,000 miles.

108.   On November 23, 2020, Plaintiff Hoffman returned his vehicle to the dealership, where he was informed that his vehicle was not exceeding the oil consumption rate that Volvo Cars of North America, LLC ("VCNA") had deemed excessive. The dealership also informed Plaintiff Hoffman that they had seen similar problems on other vehicles and a potential fix for the issue would be replacement of the piston rings, a repair which would cost $4,800. Having been given conflicting information, Plaintiff Hoffman chose to monitor the oil level in his vehicle and made sure that the oil level remained above the recommended level by adding a quart of oil every thousand miles.

109.   On October 30, 2021, Plaintiff Hoffman was driving on I-95 in Connecticut when his vehicle experienced a sudden loss of power. In addition, the check engine light illuminated. Plaintiff Hoffman managed to drive his vehicle to

Bobby Rahal Volvo Cars South Hills, an authorized dealership located in McMurray, Pennsylvania for diagnosis and repair on November 4, 2021. At the time, his vehicle had 83,462 miles on the odometer. The dealership found that there was a loss of compression in cylinders #3 and #5, problems with the valve fuel injectors, and burnt exhaust valves. The dealership also agreed that the piston rings should be replaced. Ultimately, Plaintiff Hoffman paid $4,251.24 for the engine repair, as well as $64 in car rental fees.

110.   To date, Plaintiff Hoffman's vehicle remains subject to the Piston Defect.

111.   As a result of the Piston Defect, Plaintiff Hoffman has lost confidence in the ability of his Class Vehicle to provide safe and reliable transportation for ordinary and advertised purposes.  Further, Plaintiff Hoffman will be unable to rely on Volvo's advertising or labeling in the future, and so will not purchase or lease another vehicle from Volvo in the future, though they would like to do so.

112.   At all times, Plaintiff Hoffman, like other class members, has attempted to drive his vehicle in a manner that was both foreseeable and in which it was intended to be used. At all times, he has not abused his vehicle or used it for purposes unintended by Volvo such as drag racing, for example. The Piston Defect has rendered his vehicle unsafe and unfit to be used as Volvo intended.

**Plaintiffs Eric and Mariela Kotoun**

113.   Plaintiffs Eric Kotoun and Mariela Kotoun ("Kotoun") are citizens of California, domiciled in Chula Vista, California.

28

114.   In or around June 2016, Plaintiffs Kotoun purchased a pre-owned 2015 Volvo XC60 equipped with a 2.0L 4-cylinder engine with engine code B4204T11 with approximately 14,00 miles from Start Motor Cars Volvo (now known as Volvo Cars Southwest Houston), an authorized Volvo dealership located in Houston, Texas.

115.   Plaintiffs Kotoun purchased their vehicle primarily for personal, family, or household use.

116.   Passenger safety and reliability were important factors in Plaintiffs Kotouns' decision to purchase their vehicle.   Before purchasing the vehicle, Plaintiffs Kotoun reviewed Volvo commercials, researched the vehicle generally on Google and KBB, reviewed the vehicle's Carfax report, reviewed the Monroney sticker (the "window sticker") which listed the 2.0L engine as a component, visited the dealership's website, and spoke to the authorized salesperson at the dealership. Plaintiffs Kotoun selected and ultimately purchased their Class Vehicle because the vehicle was represented to be, and was marketed as, a high-quality vehicle capable of providing safe, reliable transportation.   The purchase was made in part on the advertised safety, reliability, and quality of the vehicle and its components, including its engine.

117.   None of the information provided to Plaintiffs Kotoun disclosed any defects in the vehicle or its engine.   Volvo's omissions were material to Plaintiffs Kotoun.

118.   Had Volvo disclosed its knowledge of the Piston Defect before they purchased their vehicle, Plaintiffs Kotoun would have seen and been aware of the

disclosures. Indeed, Volvo's misstatements and omissions were material to Plaintiffs Kotoun.  Like all members of the Class, Plaintiffs Kotoun would not have purchased their Class Vehicle, or would have paid less for the vehicle, had they known of the Piston Defect.

119.   In addition, at the time of Plaintiffs Kotouns' vehicle purchase, and in purchasing their vehicle, they relied upon Volvo and its authorized dealerships' representations, dealership website, commercials, heard from the salesperson, and reviewed on the Monroney sticker, that the vehicle was fully functional, safe, durable, reliable, and that the engine operated correctly and effectively.  Plaintiffs Kotoun relied on those representations and the omission of, or failure to disclose, the Piston Defect, in purchasing the vehicle, and absent those representations and omissions, would not have purchased the vehicle, or would have paid less for it.

120.   At the time of their purchase, Plaintiffs Kotoun received from Volvo several warranties, including the remainder of the: (1) bumper-to-bumper limited warranty lasting for four years or 50,000 miles, whichever occurred first; and (2) maintenance warranty lasting three years or 36,000 miles, whichever occurred first.

121.   At all times during their possession of the vehicle, Plaintiffs Kotoun have properly maintained and serviced their Class Vehicle according to Volvo's recommended maintenance guidelines.

122.   In or around March 2020, while Plaintiff Eric Kotoun was stationed in Japan during the course of his military service, Mariela Kotoun reported to him that that the low oil light on the dashboard was illuminating every 1,000 to 1,100 miles. At the time, the vehicle had approximately 75,000 miles on the odometer. She was

adding oil each time. When Plaintiff Eric Kotoun returned from his overseas military service in the fall of 2020, he called Volvo Cars of San Diego, an authorized Volvo dealership located in San Diego, California. The dealership scheduled his vehicle for an oil consumption test and cautioned Plaintiffs Kotoun not to add oil to the car before the test in approximately three weeks from the date of the call. During this three-week period, the low oil light illuminated but Plaintiffs Kotoun did not add oil. The dealership performed the oil consumption test and confirmed the oil consumption and inspected the cylinders. The dealership found that piston ring failure had caused cylinder scoring and recommended that Plaintiffs Kotoun replace the short block for $14,000. The service representative reached out to Volvo on Plaintiffs Kotoun's behalf and ultimately, they had to pay $7,150 for the engine rebuild.

123.   To date, Plaintiffs Kotoun's vehicle remains subject to the Piston Defect.

124.   As a result of the Piston Defect, Plaintiffs Kotoun have lost confidence in the ability of their Class Vehicle to provide safe and reliable transportation for ordinary and advertised purposes.  Further, Plaintiffs Kotoun will be unable to rely on Volvo's advertising or labeling in the future, and so will not purchase or lease another vehicle from Volvo in the future, though they would like to do so.

125.   At all times, Plaintiffs Kotoun, like other class members, have attempted to drive their vehicle in a manner that was both foreseeable and in which it was intended to be used. At all times, they have not abused their vehicle or used it

for purposes unintended by Volvo such as drag racing, for example. The Piston Defect has rendered their vehicle unsafe and unfit to be used as Volvo intended.

**Plaintiff Arthur Yakov Krichevsky**

126.   Plaintiff Arthur Yakov Krichevsky is a citizen of Missouri, domiciled in St. Louis, Missouri.

127.   On or about August 26, 2016, Plaintiff Krichevsky purchased a preowned 2015 Volvo V60 equipped with a 2.0L 4-cylinder engine with engine code B4204T11 with approximately 28,446 miles on the odometer from Suntrup West County Volvo (now known as Volvo Cars West County), an authorized Volvo dealership located in Manchester, Missouri.

128.   Plaintiff Krichevsky purchased his vehicle primarily for personal, family, or household use.

129.   Passenger safety and reliability were important factors in Plaintiff Krichevsky's decision to purchase his vehicle.  Before purchasing the vehicle, Plaintiff Krichevsky conducted general online research using search engines such as Google, viewed several television commercials, visited the manufacturer's and dealership's websites, reviewed the brochures and the Monroney sticker (the "window sticker") which listed the 2.0L engine as a component, reviewed the sales documentation, and spoke to the authorized salesperson at the dealership.  Plaintiff Krichevsky also took the vehicle for a test drive.  Plaintiff Krichevsky selected and ultimately purchased his Class Vehicle because the vehicle was represented to be, and was marketed as, a high-quality vehicle capable of providing safe, reliable

transportation.  The purchase was made in part on the advertised safety, reliability, and quality of the vehicle and its components, including its engine.

130.   None of the information provided to Plaintiff Krichevsky disclosed any defects in the vehicle or its engine.  Volvo's omissions were material to Plaintiff Krichevsky.

131.   Had Volvo disclosed its knowledge of the Piston Defect before he purchased his vehicle, Plaintiff Krichevsky would have seen and been aware of the disclosures. Indeed, Volvo's misstatements and omissions were material to Plaintiff Krichevsky. Like all members of the Class, Plaintiff Krichevsky would not have purchased his Class Vehicle, or would have paid less for the vehicle, had he known of the Piston Defect.

132.   In addition, at the time of Plaintiff Krichevsky's vehicle purchase, and in purchasing his vehicle, he relied upon Volvo and its authorized dealerships' representations which he heard from the salesperson, viewed on both the dealership's and manufacturer's websites, and commercials, that the vehicle was fully functional, safe, durable, reliable, and that the engine operated correctly and effectively.  Plaintiff Krichevsky relied on those representations and the omission of, or failure to disclose, the Piston Defect, in purchasing the vehicle, and absent those representations and omissions, would not have purchased the vehicle, or would have paid less for it.

133.   At the time of his purchase, Plaintiff Krichevsky received from Volvo several warranties, including the remainder of the: (1) bumper-to-bumper limited

warranty lasting for four years or 50,000 miles, whichever occurred first; and (2) maintenance warranty lasting three years or 36,000 miles, whichever occurred first.

134.   At all times during his possession of the vehicle, Plaintiff Krichevsky has properly maintained and serviced his Class Vehicle according to Volvo's recommended maintenance guidelines.

135.   During the first year of ownership of his vehicle, Plaintiff Krichevsky changed the oil in his vehicle approximately every two to three months, based on prompts from the vehicle indicating the oil level was low. Late in 2017, he learned from an independent auto mechanic that his vehicle should not need such frequent oil changes. The mechanic recommended that Plaintiff Krichevsky contact Volvo.

136.   In 2018, Plaintiff Krichevsky contacted both Volvo corporate offices and West County Volvo. Volvo's corporate customer service line told him to bring his vehicle to an authorized dealership.  On or about January 24, 2018, when the vehicle had approximately 50,101 miles on the odometer, Plaintiff Krichevsky took his vehicle to West County Volvo for diagnosis and repair of the oil consumption issue, based on Volvo's direction. The dealership replaced the fuel pressure sensor and the spark plugs, but did not perform an oil consumption test or attempt a repair related to that symptom.

137.   The Piston Defect has continued to get worse in Plaintiff Krichevsky's vehicle since that time.  Specifically, on July 23, 2020, Plaintiff Krichevsky took his vehicle back to the dealership to complain about the oil consumption. The dealership provided him with an oil change and changed the breather box on the vehicle and indicated the vehicle "made new more," but provided no additional repairs.

34

138.   On or about March 3, 2021, Plaintiff Krichevsky contacted West County Volvo about a new oil consumption test Volvo had designed to diagnose the Defect. West County Volvo informed him that they "did not have experience with these recent oil consumption protocols" and that he would have to pay for the test on his own. Based on the dealership's remarks, Plaintiff Krichevsky has declined to take his vehicle to them again and is now putting oil into his vehicle every four weeks. His vehicle currently consumes about five quarts in twenty-five days.

139.   To date, Plaintiff Krichevsky's vehicle remains subject to the Piston Defect.

140.   As a result of the Piston Defect, Plaintiff Krichevsky has lost confidence in the ability of his Class Vehicle to provide safe and reliable transportation for ordinary and advertised purposes.  Further, Plaintiff Krichevsky will be unable to rely on Volvo's advertising or labeling in the future, and so will not purchase or lease another vehicle from Volvo in the future, though he would like to do so.

141.   At all times, Plaintiff Krichevsky, like other class members, has attempted to drive his vehicle in a manner that was both foreseeable and in which it was intended to be used. At all times, he has not abused his vehicle or used it for purposes unintended by Volvo such as drag racing, for example. The Piston Defect has rendered his vehicle unsafe and unfit to be used as Volvo intended.

**Plaintiffs Elise Saks and Steven Salhanick**

142.   Plaintiffs Elise Saks and Steven Salhanick ("Saks and Salhanick") are citizens of Massachusetts, domiciled in Andover, Massachusetts.

143.   On or about May 11, 2016, Plaintiffs Saks and Salhanick purchased a new 2015 Volvo S60 equipped with a 2.5L 5-cylinder engine with engine code B5254T12 from Volvo Village of Danvers, an authorized Volvo dealership located in Danvers, Massachusetts.

144.   Plaintiffs Saks and Salhanick purchased their vehicle primarily for personal, family, or household use.

145.   Passenger safety and reliability were important factors in Plaintiffs Saks and Salhanick' decision to purchase their vehicle.  Before purchasing the vehicle, Plaintiffs Saks and Salhanick reviewed the Monroney sticker (the "window sticker") which listed the 2.5L engine as a component, researched the vehicle on Consumer Reports and KBB, and spoke to the authorized salesperson at the dealership.  Plaintiffs Saks and Salhanick also took the vehicle for a test drive. Plaintiffs Saks and Salhanick selected and ultimately purchased their Class Vehicle because the vehicle was represented to be, and was marketed as, a high-quality vehicle capable of providing safe, reliable transportation.  The purchase was made in part on the advertised safety, reliability, and quality of the vehicle and its components, including its engine.

146.   None of the information provided to Plaintiffs Saks and Salhanick disclosed any defects in the vehicle or its engine.  Volvo's omissions were material to Plaintiffs Saks and Salhanick.

147.   Had Volvo disclosed its knowledge of the Piston Defect before they purchased their vehicle, Plaintiffs Saks and Salhanick would have seen and been aware of the disclosures.  Indeed, Volvo's misstatements and omissions were material to Plaintiffs Saks and Salhanick.  Like all members of the Class, Plaintiffs Saks and Salhanick would not have purchased their Class Vehicle, or would have paid less for the vehicle, had they known of the Piston Defect.

148.   In addition, at the time of Plaintiffs Saks and Salhanick' vehicle purchase, and in purchasing their vehicle, they relied upon Volvo and its authorized dealerships' representations, heard from the salesperson, and reviewed on the Monroney sticker, that the vehicle was fully functional, safe, durable, reliable, and that the engine operated correctly and effectively.  Plaintiffs Saks and Salhanick relied on those representations and the omission of, or failure to disclose, the Piston Defect, in purchasing the vehicle, and absent those representations and omissions, would not have purchased the vehicle, or would have paid less for it.

149.   At the time of their purchase, Plaintiffs Saks and Salhanick received from Volvo several warranties, including: (1) bumper-to-bumper limited warranty lasting for four years or 50,000 miles, whichever occurred first; and (2) maintenance warranty lasting three years or 36,000 miles, whichever occurred first.

150.   At all times during their possession of the vehicle, Plaintiffs Saks and Salhanick has properly maintained and serviced their Class Vehicle according to Volvo's recommended maintenance guidelines.

151.   On or around May 29, 2020, Plaintiff Salhanick took the vehicle for an oil change. The technician at Valvoline Instant Oil Change in North Reading,

Massachusetts warned him that the oil level seemed low and to keep an eye on it in the future. At the time, the vehicle had approximately 72,000 miles on the odometer. Several months after, the low oil level light illuminated on the vehicle's dashboard. Plaintiff Salhanick added oil to the engine.

152.   In or around August 2021, Plaintiff Salhanick was driving the vehicle on the highway when it made a grinding noise and stopped. He had the vehicle towed to Volvo Cars Exeter, an authorized Volvo dealership located in Exeter, New Hampshire. Plaintiff Salhanick informed the dealership's technician of the oil consumption issues. The technician diagnosed the vehicle needing the cylinder heads rebuilt. Plaintiffs paid approximately $3,500 for this repair. This did not remedy the Piston Defect.

153.   Over the next few months, the engine continued to consume oil, with Plaintiff Salhanick adding a quart every 300 miles. In or around November 2021, Plaintiff Salhanick took the vehicle to the dealership where it was purchased and asked for a diagnosis and repair. The dealership recommended an oil consumption test, which would not be completed until 2,000 miles were driven. Plaintiffs were worried that their vehicle would fail before the test was completed. Plaintiffs then took the vehicle to an independent mechanic, who examined the vehicle and recommended they sell the vehicle.

154.   After experiencing several misfires, on or about February 3, 2022, Plaintiffs took their vehicle back to the independent mechanic who completed a compression test and recommended Plaintiffs change the ignition coils and spark

plugs. This repair cost Plaintiffs $663.25. This repair failed to correct the Piston Defect and the mechanic advised that the vehicle needs a new engine.

155.   Plaintiffs called the dealership. The service manager agreed to "do [them] a favor" to evaluate the vehicle for oil consumption issues on February 23, 2022. Before Plaintiffs could bring their vehicle in for that appointment, the service manager at the dealership cancelled the appointment via email. Plaintiff Elise Saks called the dealership and the service manager told her that he was angry that she had complained about their encounter in November 2021. The service manager further stated that he had no obligation to service the vehicle or to disclose any defects, including at the time of sale.

156.   On or about February 25, 2022, Plaintiff Salhanick was attempting to drive the vehicle when it suddenly lost power and shook violently when at idle. After calling several Volvo dealerships in order to schedule diagnosis and repair without success, Plaintiff Saks called VCNA. VCNA provided a tow to a Jaffarian Volvo, an authorized dealership located in Haverhill, Massachusetts. Jaffarian Volvo rebuilt the cylinder heads, a repeat of the repair done by Exeter Volvo. This repair cost Plaintiffs $1,780.98, in addition to the cost of a rental vehicle from February 28, 2022 to March 11, 2022.

157.   On March 29, 2022, Plaintiffs brought their vehicle back to Jaffarian Volvo, complaining that the vehicle continued to idly roughly, had stalled several times, and that the check engine light periodically illuminated. At that time, a suction hose was replaced. This did not repair the Piston Defect, as the vehicle

39

continues to idly roughly and the check engine light comes on intermittently. Plaintiffs have also added 3 quarts of oil to the engine since March 11, 2022.

158.   To date, Plaintiffs Saks and Salhanick's vehicle remains subject to the Piston Defect.

159.   As a result of the Piston Defect, Plaintiffs Saks and Salhanick have lost confidence in the ability of their Class Vehicle to provide safe and reliable transportation for ordinary and advertised purposes.  Further, Plaintiffs Saks and Salhanick will be unable to rely on Volvo's advertising or labeling in the future, and so will not purchase or lease another vehicle from Volvo in the future, though they would like to do so.

160.   At all times, Plaintiff Saks and Salhanick, like other class members, have attempted to drive their vehicle in a manner that was both foreseeable and in which it was intended to be used. At all times, they have not abused their vehicle or used it for purposes unintended by Volvo such as drag racing, for example. The Piston Defect has rendered their vehicle unsafe and unfit to be used as Volvo intended.

**Plaintiff Mark Silber**

161.   Plaintiff Mark Silber is a citizen of Maine, domiciled in Summer, Maine.

162.   On or about February 22, 2018, Plaintiff Silber purchased a pre-owned 2016 Volvo XC70 equipped with a 2.5L 5-cylinder engine with engine code

B5254T12 with approximately 17,684 miles from New Country BMW, a dealership located in Hartford, Connecticut.

163.   Plaintiff Silber purchased his vehicle primarily for personal, family, or household use.

164.   Passenger safety and reliability were important factors in Plaintiff Silber's decision to purchase his vehicle.  Before purchasing the vehicle, Plaintiff Silber conducted general online research and to search for recalls, using search engines such as Google, KBB, and CarGurus, visited the dealership's websites, reviewed the Monroney sticker (the "window sticker") which listed the 2.5L engine as a component, reviewed the sales documentation, and spoke to the authorized salesperson at the dealership.  Plaintiff Silber also took the vehicle for a test drive.  Plaintiff Silber selected and ultimately purchased his Class Vehicle because the vehicle was represented to be, and was marketed as, a high-quality vehicle capable of providing safe, reliable transportation.  The purchase was made in part on the advertised safety, reliability, and quality of the vehicle and its components, including its engine.

165.   None of the information provided to Plaintiff Silber disclosed any defects in the vehicle or its engine.  Volvo's omissions were material to Plaintiff Silber.

166.   Had Volvo disclosed its knowledge of the Piston Defect before he purchased his vehicle, Plaintiff Silber would have seen and been aware of the disclosures. Indeed, Volvo's misstatements and omissions were material to Plaintiff Silber. Like all members of the Class, Plaintiff Silber would not have purchased his

Class Vehicle, or would have paid less for the vehicle, had he known of the Piston Defect.

167.   In addition, at the time of Plaintiff Silber's vehicle purchase, and in purchasing his vehicle, he relied upon Volvo, that the vehicle was fully functional, safe, durable, reliable, and that the engine operated correctly and effectively. Plaintiff Silber relied on those representations and the omission of, or failure to disclose, the Piston Defect, in purchasing the vehicle, and absent those representations and omissions, would not have purchased the vehicle, or would have paid less for it.

168.   At the time of his purchase, Plaintiff Silber received from Volvo several warranties, including the remainder of the: (1) bumper-to-bumper limited warranty lasting for four years or 50,000 miles, whichever occurred first; and (2) maintenance warranty lasting three years or 36,000 miles, whichever occurred first.

169.   At all times during his possession of the vehicle, Plaintiff Silber has properly maintained and serviced his Class Vehicle according to Volvo's recommended maintenance guidelines.

170.   At the vehicle's 50,000-mile servicing in January 2020, the technician observed that the oil seemed low. At the vehicle's 60,000-mile servicing on December 4, 2020, the technician at Expert Volvo, located in Lisbon, Maine, informed him that there was a significant amount of oil loss. His vehicle had consumed 4 quarts of oil between oil changes. The technician recommended a flush, that Plaintiff Silber change the oil in his vehicle every 5,000 miles rather than 10,000 miles and carry extra oil in the car at all times.

171.   Plaintiff Silber had to add a quart of oil every 2,500 miles in order to maintain proper oil levels. He began to research the problem and found a Volvo Technical Journal describing oil consumption issues in his vehicle. On July 28, 2021, Plaintiff Silber contacted Volvo's customer service directly via email, where he was directed to take his vehicle to Goodwin's Volvo for an oil consumption test. The dealership confirmed that the engine was consuming oil but informed Plaintiff Silber that the consumption was within specifications. At Plaintiff Silber's request, Goodwin's Volvo quoted between $4,000 and $5,000 to rebuild the engine to change the piston rings. Expert Volvo quoted over $7,000 for the repair. To date, Plaintiff Silber has paid for oil consumption tests, additional oil changes, and additional oil for his vehicle.

172.   To date, Plaintiff Silber's vehicle remains subject to the Piston Defect.

173.   As a result of the Piston Defect, Plaintiff Silber has lost confidence in the ability of his Class Vehicle to provide safe and reliable transportation for ordinary and advertised purposes.  Further, Plaintiff Silber will be unable to rely on Volvo's advertising or labeling in the future, and so will not purchase or lease another vehicle from Volvo in the future, though they would like to do so.

174.   At all times, Plaintiff Silber, like other class members, has attempted to drive his vehicle in a manner that was both foreseeable and in which it was intended to be used. At all times, he has not abused his vehicle or used it for purposes unintended by Volvo such as drag racing, for example. The Piston Defect has rendered his vehicle unsafe and unfit to be used as Volvo intended

**Plaintiffs Toni and Robert Tubbe**

175.   Plaintiffs Toni Tubbe and Robert Tubbe ("Tubbes") are citizens of Texas, domiciled in Trinity, Texas.

176.   On or about June 20, 2020, Plaintiffs Tubbes purchased a certified pre-owned 2015 Volvo XC60 equipped with a 2.0L 4-cylinder engine with engine code B4204T9 with approximately 60,000 miles on the odometer from DeMontrond Automotive Group, d/b/a DeMontrond Volvo Cars, an authorized Volvo dealership located in Houston, Texas.

177.   Plaintiffs Tubbes purchased their vehicle primarily for personal, family, or household use.

178.   Passenger safety and reliability were important factors in Plaintiffs Tubbes' decision to purchase their vehicle.  Before purchasing the vehicle, Plaintiffs Tubbes reviewed Volvo commercials, researched the vehicle generally on Youtube and Google, reviewed the Monroney sticker (the "window sticker") which listed the 2.0L engine as a component, visited the dealership's website, and spoke to the authorized salesperson at the dealership.  Plaintiffs Tubbes also took the vehicle for a test ride.  Plaintiffs Tubbes selected and ultimately purchased their Class Vehicle because the vehicle was represented to be, and was marketed as, a high-quality vehicle capable of providing safe, reliable transportation.  The purchase was made in part on the advertised safety, reliability, and quality of the vehicle and its components, including its engine.

179.   None of the information provided to Plaintiffs Tubbes disclosed any defects in the vehicle or its engine.  Volvo's omissions were material to Plaintiffs Tubbes.

180.   Had Volvo disclosed its knowledge of the Piston Defect before they purchased their vehicle, Plaintiffs Tubbes would have seen and been aware of the disclosures. Indeed, Volvo's misstatements and omissions were material to Plaintiffs Tubbes.  Like all members of the Class, Plaintiffs Tubbes would not have purchased their Class Vehicle, or would have paid less for the vehicle, had they known of the Piston Defect.

181.   In addition, at the time of Plaintiffs Tubbes' vehicle purchase, and in purchasing their vehicle, they relied upon Volvo and its authorized dealerships' representations, dealership website, commercials, heard from the salesperson, and reviewed on the Monroney sticker, that the vehicle was fully functional, safe, durable, reliable, and that the engine operated correctly and effectively.  Plaintiffs Tubbes relied on those representations and the omission of, or failure to disclose, the Piston Defect, in purchasing the vehicle, and absent those representations and omissions, would not have purchased the vehicle, or would have paid less for it.

182.   At the time of their purchase, Plaintiffs Tubbes received an unlimited warranty from the dealership, provided they complete all service at the selling dealership.

183.   At all times during their possession of the vehicle, Plaintiffs Tubbes has properly maintained and serviced their Class Vehicle according to Volvo's recommended maintenance guidelines.  In particular, Plaintiffs Tubbes brought their

vehicle to the selling dealership for all maintenance.  Further, the previous owners also had the vehicle exclusively serviced at authorized Volvo dealerships, including the selling dealership.

184.   Within a month of their purchase, Plaintiffs Tubbes noticed the low oil level light illuminated on the dashboard, prompting Plaintiff Robert Tubbe to add a quart of oil every two weeks thereafter. In or around August 2020, Plaintiff Tubbes returned the vehicle to the dealership, which initiated an oil consumption test, only for the Tubbes to be informed at the conclusion that the oil consumption rate was normal.

185.   Weeks later, the low oil level light illuminated again, and Plaintiff Robert Tubbe contacted VCNA regarding the oil consumption issue. Plaintiff Robert Tubbe was directed to take the vehicle back to the dealership, where a second oil consumption test was run. Plaintiffs Robert and Toni Tubbe were charged for this test, which the dealership told them did not show excessive oil consumption.

186.   Plaintiffs Robert and Toni Tubbe contacted VCNA once more, which directed them to return their car to the dealership for another test. On or about November 15, 2021, Plaintiffs Robert and Toni Tubbe were informed by the dealership that the engine was consuming oil and that cylinder #3 had scoring down the cylinder wall, necessitating a new engine. The repair order states that new engine was installed and that the dealership "reassembled old engine." To date, however, Plaintiffs Robert and Toni Tubbe cannot get confirmation via serial number that a new engine was installed in their vehicle from the dealership or VCNA.

187.   To date, Plaintiffs Tubbes' vehicle remains subject to the Piston Defect.

188.   As a result of the Piston Defect, Plaintiffs Tubbes have lost confidence in the ability of their Class Vehicle to provide safe and reliable transportation for ordinary and advertised purposes.  Further, Plaintiffs Tubbes will be unable to rely on Volvo's advertising or labeling in the future, and so will not purchase or lease another vehicle from Volvo in the future, though they would like to do so.

189.   At all times, Plaintiffs Tubbes, like other class members, have attempted to drive their vehicle in a manner that was both foreseeable and in which it was intended to be used. At all times, they have not abused their vehicle or used it for purposes unintended by Volvo such as drag racing, for example. The Piston Defect has rendered their vehicle unsafe and unfit to be used as Volvo intended.

**Plaintiff Donna Urben**

190.   Plaintiff Donna Urben is a citizen of Pennsylvania, domiciled in Butler, Pennsylvania.

191.   On or about September 18, 2015, Plaintiff Urben purchased a new 2015 Volvo V60 equipped with a 2.5L 5-cylinder engine with engine code B5254T12 from Bobby Rahal Volvo, an authorized Volvo dealership located in Wexford, Pennsylvania.

192.   Plaintiff Urben purchased her vehicle primarily for personal, family, or household use.

193.   Passenger safety and reliability were important factors in Plaintiff Urben's decision to purchase her vehicle.  Before purchasing the vehicle, Plaintiff Urben conducted general research, viewed dealer advertisements, reviewed the Monroney sticker (the "window sticker") which listed the 2.5L engine as a

component, reviewed the sales documentation, and spoke to the authorized salesperson at the dealership. Plaintiff Urben also took the vehicle for a test drive. Plaintiff Urben selected and ultimately purchased her Class Vehicle because the vehicle was represented to be, and was marketed as, a high-quality vehicle capable of providing safe, reliable transportation. The purchase was made in part on the advertised safety, reliability, and quality of the vehicle and its components, including its engine.

194.   None of the information provided to Plaintiff Urben disclosed any defects in the vehicle or its engine. Volvo's omissions were material to Plaintiff Urben.

195.   Had Volvo disclosed its knowledge of the Piston Defect before she purchased her vehicle, Plaintiff Urben would have seen and been aware of the disclosures. Indeed, Volvo's misstatements and omissions were material to Plaintiff Urben. Like all members of the Class, Plaintiff Urben would not have purchased her Class Vehicle, or would have paid less for the vehicle, had she known of the Piston Defect.

196.   In addition, at the time of Plaintiff Urben's vehicle purchase, and in purchasing her vehicle, she relied upon Volvo and its authorized dealerships' representations which she heard from the salesperson and in advertisements, that the vehicle was fully functional, safe, durable, reliable, and that the engine operated correctly and effectively. Plaintiff Urben relied on those representations and the omission of, or failure to disclose, the Piston Defect, in purchasing the vehicle, and

absent those representations and omissions, would not have purchased the vehicle, or would have paid less for it.

197.   At the time of her purchase, Plaintiff received from Volvo several warranties, including: (1) bumper-to-bumper basic warranty lasting for four years or 50,000 miles, whichever occurred first; and (2) maintenance warranty lasting three years or 36,000 miles, whichever occurred first.

198.   At all times during her possession of the vehicle, Plaintiff Urben has properly maintained and serviced her Class Vehicle according to Volvo's recommended maintenance guidelines.

199.   In the summer of 2020, the low oil level light illuminated frequently. On August 3, 2020, Plaintiff Urben called Bobby Rahal Volvo to discuss the oil consumption issue in her vehicle and brought her vehicle in for diagnosis and repair the next day. The dealership did not repair her vehicle and blamed any oil consumption issue on the high mileage of the vehicle, which was approximately 100,000 miles.

200.   On August 17, 2020, Plaintiff Urben called VCNA to complain about the issue in her vehicle and the dealership's response. VCNA arranged for the dealership to inspect and repair her vehicle. On August 27, 2020, Plaintiff Urben provided the complete service records of her vehicle to the dealership to prove she had properly maintained the vehicle.

201.   On September 11, 2020, the dealership replaced all the piston rings in her vehicle at VCNA's direction. In July 2021, while traveling in North Carolina, the low oil level light illuminated again, and her vehicle hesitated when she

attempted to accelerate. Plaintiff Urben ultimately called Bobby Rahal Volvo after she returned home, which recommended her vehicle be towed to the dealership for diagnosis and repair. The dealership performed an oil consumption test in August and September 2021 and informed Plaintiff Urben that her vehicle was functioning normally. VCNA also called Plaintiff Urben, because it had noticed she had taken her vehicle in again to Bobby Rahal Volvo for oil consumption issues. Since that time, Plaintiff Urben's vehicle continues to hesitate, the check engine light illuminates intermittently, and she fears that the oil consumption issue has not been adequately repaired.

202.   To date, Plaintiff Urben's vehicle remains subject to the Piston Defect.

203.   As a result of the Piston Defect, Plaintiff Urben has lost confidence in the ability of her Class Vehicle to provide safe and reliable transportation for ordinary and advertised purposes.  Further, Plaintiff Urben will be unable to rely on Volvo's advertising or labeling in the future, and so will not purchase or lease another vehicle from Volvo in the future, though she would like to do so.

204.   At all times, Plaintiff Urben, like other class members, has attempted to drive her vehicle in a manner that was both foreseeable and in which it was intended to be used. At all times, she has not abused her vehicle or used it for purposes unintended by Volvo such as drag racing, for example. The Piston Defect has rendered her vehicle unsafe and unfit to be used as Volvo intended.

**Plaintiffs Christopher and Melissa Johnson**

205.   Plaintiffs Christopher and Melissa Johnson ("Johnson") are citizens of Florida, domiciled in Land O' Lakes, Florida.

206.   In or around December 2015, Plaintiffs Johnson purchased a new (demo) 2015 Volvo S60 with approximately 6,000 miles on the odometer and equipped with a 2.0L 4-cylinder engine with engine code B4204T11 from Volvo of Tampa Bay, an authorized Volvo dealership located in Tampa Bay, Florida.

207.   Plaintiffs Johnson purchased their vehicle primarily for personal, family, or household use.

208.   Passenger safety and reliability were important factors in Plaintiffs Johnsons' decision to purchase their vehicle.   Before purchasing the vehicle, Plaintiffs Johnson researched the vehicle generally through Google; reviewed the Monroney sticker (the "window sticker") which listed the 2.0L engine as a component, visited Volvo's website and the dealership's website, spoke to the authorized salesperson at the dealership, and test-drove the vehicle.   Plaintiffs Johnson selected and ultimately purchased their Class Vehicle because the vehicle was represented to be, and was marketed as, a high-quality vehicle capable of providing safe, reliable transportation.   The purchase was made in part on the advertised safety, reliability, and quality of the vehicle and its components, including its engine.

209.   None of the information provided to Plaintiffs Johnson disclosed any defects in the vehicle or its engine.   Volvo's omissions were material to Plaintiffs Johnson.

210.   Had Volvo disclosed its knowledge of the Piston Defect before they purchased their vehicle, Plaintiffs Johnson would have seen and been aware of the disclosures. Indeed, Volvo's misstatements and omissions were material to Plaintiffs Johnson.   Like all members of the Class, Plaintiffs Johnson would not have purchased their Class Vehicle, or would have paid less for the vehicle, had they known of the Piston Defect.

211.   In addition, at the time of Plaintiffs Johnsons' vehicle purchase, and in purchasing their vehicle, they relied upon Volvo and its authorized dealerships' representations that the vehicle was fully functional, safe, durable, reliable, and that the engine operated correctly and effectively, which they heard or saw from Volvo's website, the dealership website, the dealership salesperson, and the Monroney sticker.. Plaintiffs Johnson relied on those representations and the omission of, or failure to disclose, the Piston Defect, in purchasing the vehicle, and absent those representations and omissions, would not have purchased the vehicle, or would have paid less for it.

212.   At the time of their purchase, Plaintiffs Johnson received from Volvo several warranties, including the remainder of the: (1) bumper-to-bumper limited warranty lasting for four years or 50,000 miles, whichever occurred first; and (2) maintenance warranty lasting three years or 36,000 miles, whichever occurred first.

213.   At all times during their possession of the vehicle, Plaintiffs Johnson have properly maintained and serviced their Class Vehicle according to Volvo's recommended maintenance guidelines.

214.   On or around December 13, 2021, Christopher Johnson took the vehicle to a local mechanic, Tire Choice, after noticing that the low oil light on the dashboard illuminated. At the time, the vehicle had approximately 76,000 miles on the odometer. The mechanic at Tire Choice determined that the Johnsons' Class Vehicle had many error codes, prompting Christopher Johnson to contact Volvo of Tampa Bay, the authorized Volvo dealership that sold the vehicle to the Johnsons. The dealership paid to have the Johnsons' Class Vehicle towed to the dealership, which diagnosed the vehicle with a piston ring issue. The dealership attempted to reseal the rings by flushing the system with "sea foam" and replaced spark plugs, charging the Johnsons $696.99 in out-of-pocket costs. The dealership informed Christopher Johnson that if this repair did not resolve the issue, the piston rings would likely need to be repaired at a cost of approximately $6,800 to $7,500.  On or around March 24, 2022, at approximately 78,500 miles on the odometer, the vehicle's low oil light illuminated again, and continued to intermittently turn on and off. On or around April 25, 2022, the low oil light illuminated and remained on, prompting Plaintiff Johnson to return the vehicle to Volvo of Tampa Bay to report the problems and request repairs. The dealership added two quarts of oil to the vehicle for which they charged $113.93, reconfirmed that the vehicle's piston rings were failing, and stated that fixing the piston rings would cost the Plaintiffs Johnson approximately $9,600.

215.   To date, Plaintiffs Johnson's vehicle remains subject to the Piston Defect.

216.   As a result of the Piston Defect, Plaintiffs Johnson have lost confidence in the ability of their Class Vehicle to provide safe and reliable transportation for

ordinary and advertised purposes.  Further, Plaintiffs Johnson will be unable to rely on Volvo's advertising or labeling in the future, and so will not purchase or lease another vehicle from Volvo in the future, though they would like to do so.

217.   At all times, Plaintiffs Johnson, like other class members, have attempted to drive their vehicle in a manner that was both foreseeable and in which it was intended to be used. At all times, they have not abused their vehicle or used it for purposes unintended by Volvo such as drag racing, for example. The Piston Defect has rendered their vehicle unsafe and unfit to be used as Volvo intended.

**Plaintiff Kimberly Madeja**

218.   Plaintiff Kimberly Madeja is a citizen of Maryland, domiciled in Eldersburg, Maryland.

219.   In or around September 2015, Plaintiff Kim Madeja ordered a new 2016 Volvo XC90 equipped with a 2.0L 4-cylinder engine with engine code B4204T27 from Volvo via Ourisman Volvo of Frederick, an authorized Volvo dealership located in Frederick, Maryland. She took delivery of this vehicle and completed the purchase in November 2015.

220.   Plaintiff Madeja purchased her vehicle primarily for personal, family, or household use.

221.   Passenger safety and reliability were important factors in Plaintiff Madeja's decision to purchase her vehicle.  Before purchasing the vehicle, Plaintiff Madeja conducted general research, researched the vehicle on Google, viewed dealer advertisements, viewed the vehicle information on Volvo's website, viewed internet

advertisements for the vehicle, reviewed the Monroney sticker (the "window sticker"), which listed the 2.5L engine as a component, and reviewed the sales documentation. Plaintiff Madeja visited two dealerships, Koons Volvo, located in White Marsh, Maryland, and Ourisman Volvo of Frederick, where she spoke to authorized salespersons and test drove the vehicle at each dealership.  Plaintiff Madeja selected and ultimately purchased her Class Vehicle because the vehicle was represented to be, and was marketed as, a high-quality vehicle capable of providing safe, reliable transportation.  The purchase was made in part on the advertised safety, reliability, and quality of the vehicle and its components, including its engine.

222.   None of the information provided to Plaintiff Madeja disclosed any defects in the vehicle or its engine.  Volvo's omissions were material to Plaintiff Madeja.

223.   Had Volvo disclosed its knowledge of the Piston Defect before she purchased her vehicle, Plaintiff Madeja would have seen and been aware of the disclosures. Indeed, Volvo's misstatements and omissions were material to Plaintiff Madeja. Like all members of the Class, Plaintiff Madeja would not have purchased her Class Vehicle, or would have paid less for the vehicle, had she known of the Piston Defect.

224.   In addition, at the time of Plaintiff Madeja's vehicle purchase, and in purchasing her vehicle, she relied upon Volvo and its authorized dealerships' representations, which she heard from the salesperson and in advertisements, that the vehicle was fully functional, safe, durable, reliable, and that the engine operated correctly and effectively.  Plaintiff Madeja relied on those representations and the

omission of, or failure to disclose, the Piston Defect, in purchasing the vehicle, and absent those representations and omissions, would not have purchased the vehicle, or would have paid less for it.

225.   At the time of her purchase, Plaintiff received from Volvo several warranties, including: (1) bumper-to-bumper basic warranty lasting for four years or 50,000 miles, whichever occurred first; and (2) maintenance warranty lasting three years or 36,000 miles, whichever occurred first.

226.   At all times during her possession of the vehicle, Plaintiff Madeja has properly maintained and serviced her Class Vehicle according to Volvo's recommended maintenance guidelines.

227.   Beginning in 2019, when the vehicle had approximately 50,000 miles on the odometer, the low oil level light would illuminate frequently, and Plaintiff Madeja was forced to add oil in between oil changes. She complained to the dealership about this issue, but the dealership and its service advisors consistently dismissed her concerns and did not provide a diagnosis or attempt a repair.

228.   In the summer of 2021, the dealership acknowledged that Plaintiff Madeja's vehicle was consuming excessive amounts of oil. Ourisman Volvo had possession of Plaintiff Madeja's vehicle from November 2021 to February 2022, during which time the engine was partially rebuilt per Volvo's explicit instructions, including a replacement of the piston heads.

229.   However, during that repair, Volvo did not authorize changing the spark plugs. As a result, in April 2022, the check engine light illuminated and her vehicle became sluggish. Plaintiff Madeja had the vehicle towed to the Ourisman

Volvo, which diagnosed the problem as a bad spark plug and explicitly informed her that Volvo had made the decision that the prior repair did not require new spark plugs.

230.   Plaintiff Madeja lost the use of her vehicle for over three months and has spent approximately $300 in out-of-pocket costs on the repair. Further, she has spent hundreds of dollars on oil during the two years the dealership refused to acknowledge the excessive oil consumption of her vehicle's engine.

231.   To date, Plaintiff Madeja's vehicle remains subject to the Piston Defect.

232.   As a result of the Piston Defect, Plaintiff Madeja has lost confidence in the ability of her Class Vehicle to provide safe and reliable transportation for ordinary and advertised purposes.  Further, Plaintiff Madeja will be unable to rely on Volvo's advertising or labeling in the future, and so will not purchase or lease another vehicle from Volvo in the future, though she would like to do so.

233.   At all times, Plaintiff Madeja, like other class members, has attempted to drive her vehicle in a manner that was both foreseeable and in which it was intended to be used. At all times, she has not abused her vehicle or used it for purposes unintended by Volvo such as drag racing, for example. The Piston Defect has rendered her vehicle unsafe and unfit to be used as Volvo intended.

**Defendants**

234.   Defendant VCUSA an entity incorporated in Delaware with its principal place of business and headquarters at 1800 Volvo Pl, Mahwah, NJ 07430.

At this facility, VCUSA coordinates many of the United States operations of the Volvo brand, as well the activities of its nearly 1,000 employees.

235.  Defendant VCUSA, through its various entities, manufactures, markets, and distributes Volvo-branded vehicles and parts for those automobiles, including the Class Vehicles, in multiple locations across the United States, including Connecticut, Illinois, Massachusetts, Missouri, New Jersey, New York, Pennsylvania, South Carolina, and Texas.

236.  In order to sell vehicles to the general public, VCUSA enters into agreements with authorized dealerships who engage in retail sales, lease, and subscription contracts with consumers such as Plaintiffs.  In return for the exclusive right to sell new and certified pre-owned Volvo-branded vehicles, authorized dealerships are also permitted to service and repair these vehicles under the warranties VCUSA's affiliated companies provide directly to consumers who purchased, lease, or subscribed to new vehicles from authorized dealerships.  All service and repair at an authorized dealership are completed according to VCUSA, VCNA, and Volvo AB's instructions, issued through service manuals, technical bulletins knowns as "Technical Journals" ("TJs"), and other documents.  Per the agreements between VCUSA and the authorized dealers, consumers such as Plaintiffs are able to receive services under the VCNA and Volvo AB-issued warranties at dealer locations that are convenient to them.  Similarly, the agreements between the authorized dealership and VCUSA explicitly name the dealerships as VCUSA's agents with regard to the subscription program.  These agreements provide VCUSA with a significant amount of control over the actions of the

authorized dealerships, of which there are approximately 291 in the United States. VCUSA has contractually retained the unilateral ability to terminate the dealership's agreements at any time.

237.   VCUSA is also listed as a manufacturer of Volvo-branded vehicles at NHTSA and is responsible for all communication with NHTSA as a result.  VCUSA thus files TJs with NHTSA, monitors NHTSA complaints, and is the Volvo-entity responsible for compliance with United States automobile regulations.  VCUSA also holds the United States copyrights for Volvo intellectual property, including brandings and logos.  VCUSA also develops and disseminated the advertisements and other promotional materials relating to the Class Vehicles, as well as the content of the Monroney stickers and other stickers affixed to the vehicles to advertise their features at authorized dealerships.

238.   VCNA is an entity incorporated in Delaware with its principal place of business and headquarters in Rockleigh, New Jersey.  At this facility, VCNA provides marketing, sales, parts, servicing, training to authorized dealerships in the United States, and also warrants the Class Vehicles.[1]  VCNA also oversees the Volvo-brand operations in Canada and Mexico.

239.   VCNA is also listed as a manufacturer of Volvo-branded vehicles at NHTSA along with VCUSA, one of the entities responsible for recalls.  VCNA, along with Volvo AB, is also the issuer of the warranty given to purchasers, lessees, and subscribers of Volvo-branded vehicles in the United States.    VCNA, in

---

[1] In vehicles which post-date the Class Vehicles, VCUSA is the named warranter.

conjunction with Volvo AB and VCUSA is also responsible for drafting and disseminating the TJs and other technical materials to Volvo dealerships in the United States.

240.   Defendant Volvo AB, also known as Volvo Car Corporation in the United States, is an entity incorporated in and registered to do business in Sweden with its principal place of business at Karossvagen 2 Goteborg, 418 78 Sweden. Goteborg, also written as Gothenburg, is also home to several of Volvo's AB facilities, as well as a new gigafactory for its fully-electric cars.  The engines in the Class Vehicles were manufactured by Volvo AB at facilities in Skovde, Sweden. Altogether, Volvo AB employs approximately 40,000 people.  Volvo AB designs, engineers, manufactures, tests, markets, supplies, markets, warrants, sells, and distributes Volvo-branded cars and parts for those cars worldwide, including in the United States.  Volvo AB produces and distributes over 650,000 vehicles a year.  Its gross revenues are about $27.7 billion per year from these activities.

241.   Volvo AB is the parent corporation of VCUSA and VCNA, which are each wholly owned subsidiaries.  For all its United States subsidiaries, including VCUSA and VCNA, Volvo AB provides all the technical information for the purpose of manufacturing, servicing, and repairing the Class Vehicles.  Volvo AB selected Delaware as place of incorporation for its subsidiaries and chose New Jersey as the location of the headquarters.

242.   Volvo is deliberately opaque with the roles and responsibilities of the various entities.  For example, both Volvo AB and VCNA are listed as warrantors in the warranties issued to Plaintiffs and Class Members.  Both Volvo AB and

VCUSA are listed as copyright holders on VolvoCars.com/us.  Both VCNA and VCUSA are listed as manufacturers and communicate with NHTSA regarding the safety of Volvo cars in the United States.   As such, it is extremely difficult for Plaintiffs and Class Members to further distinguish the roles of the three Volvo defendant entities.

## JURISDICTION

243.   This Court has original diversity jurisdiction pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2) ("CAFA").

244.   This is a class action.

245.   Plaintiffs and members of the proposed Class are citizens of states different from the home state of Defendants.

246.   The aggregate claims of individual Class Members exceed $5,000,000.00 in value, exclusive of interest and costs.

247.   Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1332(d).

## VENUE

248.   Defendants, through their business of distributing, selling, and leasing the Class Vehicles, have established sufficient contacts in this district such that personal jurisdiction is appropriate. As such, Defendants are deemed to reside in this district pursuant to 28 U.S.C. § 1391(c)-(d).

249.   In addition, a substantial part of the events or omissions giving rise to these claims took place in this District because VCUSA and VCNA both have their principal place of business in this District.  Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b).

## FACTUAL ALLEGATIONS

250.   For years, Volvo has designed, manufactured, distributed, sold, and leased the Class Vehicles. Volvo has sold, directly or indirectly, through dealers and other retail outlets, thousands of Class Vehicles in New Jersey and nationwide. Volvo warrants and services the Class Vehicles through its nationwide network of authorized dealers and service providers.

251.   The engines in Class Vehicles are either 4-cylinder or 5-cylinder engines.  The 5-cylinder engines are part of the Volvo Modular engine family and feature aluminum block, cylinder head, and pistons, as well as forged steel connecting rods.  The Volvo Modular engine is related to the Ford EcoBoost engine and shares some components with that engine.  In contrast, the 4-cylinder engines are part of the Volvo Engine Architecture ("VEA") family.  It also shares certain components with the Volvo Modular engine family, including having the same pistons and piston rings.

252.   As with most internal combustion engines, the pistons in these engines slide into the cylinder bore of an engine block, transferring the force from expanding gas in the cylinder to the crankshaft via the crankpin.  See Figure 1 below. Pistons, such as the ones in the Subject Engines, are cast aluminum alloy pieces which conduct and transfer heat.  Because aluminum expands when heated, both the piston and the cylinder bore must be manufactured precisely so that the piston can move freely without allowing the force of the combusting gas to escape.

**FIGURE 1**



Encyclopædia Britannica, Inc.

253.   The piston head is the top of the piston, closest to the cylinder head. Piston rings, which are settled into the piston grooves, seal the combustion chamber, transfer heat to the cylinder wall, and control oil consumption.  As with the piston itself, the piston rings must be manufactured to precise specifications, so that they can provide a radial fit between the cylinder wall and the piston.

254.   The Class Vehicles contain one or more design, manufacturing, and/or workmanship defects, including but not limited to defects to the piston rings and/or pistons/piston heads. Here, the piston rings cannot properly clear engine oil off the

side of the cylinder wall during the downstroke and instead push that oil up where it can coat the top of the piston head, enter the combustion chamber, and ignite.  Over time, this continual burning of oil damages the piston rings and piston heads, allowing more oil to ignite and causing the power created by the combustion to be lost in the Subject Engines. The Piston Defect is caused by a problem in which the oil control ring, the lowest piston ring, does not properly allow the oil from the cylinder wall to drain.

255.   Specifically, the lowest piston ring – the oil control ring – has small holes which allow the oil scraped from the cylinder wall to drain back down into the oil pan.  If that is ring is fit incorrectly, or if the small holes become clogged, it will leave a significant amount of oil on the cylinder wall, which the top piston ring – the compression ring, will push up the cylinder toward the piston head during the compression stroke and into the combustion chamber, where the oil ignites.  This will burn and thereby fragment the piston head. Figure 2[2] below is a picture of a piston from a 4-cylinder example of the Subject Engine which shows the burnt piston head.

---

[2] Figures 2 through 7 are screen-captures from "The Reason Some Volvo Engines Burn Oil Volvo Problem," by The Volvo Guy, available at https://www.youtube.com/watch?v=8yJoHgwiwio (last visited April 14, 2022).

**FIGURE 2**



256.    Figure 3 below is a set of pictures of a piston from a 5-cylinder example of the Subject Engines, again showing the burnt piston head.

**FIGURE 3**



257.    The Piston Defect is in significant part related to the small holes in the lowest piston ring that can easily become clogged with carbon deposits, as shown in Figure 4 below.  When combined with the relatively long oil change interval which Volvo recommends in Class Vehicles – that of 10,000 miles between oil changes –

65

this leads to significant carbon build-up which prevents oil from the cylinder wall from draining appropriately.

**FIGURE 4**



258.   Minute carbon deposits are expected in the operation of an internal combustion engine.   A properly designed and manufactured piston ring and piston head will take into account the accumulation of these carbon deposits in the circulating engine oil, which increases with the engine oil's age.   In a properly designated and manufactured piston set up, the lowest ring scraps the side of the cylinder wall, pushing the oil towards the holes.   The oil then drains through those holes to the back of the piston ring, as shown in Figure 5 below, and is directed to larger holes on the piston itself which allow the oil to drain into the oil pan.

**FIGURE 5**



259.   Halfway through 2016, Volvo changed the piston rings and pistons, but did not initiate a recall.  The new piston has a significantly wider bottom groove, to accommodate the new oil control ring that has more and much larger oil draining holes.  *See* Figure 6 (piston) and Figure 7 (redesigned oil control ring).  The old oil control ring was a slimmer, two-part piece consisting of a thin band and spring in the back, whereas the new oil control ring was a three-part piece, consisting of two rings with a shaped band in the middle providing significantly more and wider drainage points.

**FIGURE 6**



**FIGURE 7**



260.   One result of the Piston Defect is that the engine consumes excessive amounts of oil.  Furthermore, the damage to the piston causes immediate loss of compression within the engine cylinder.  Over time, the consistent burning can damage the piston and piston rings, allowing minutes pieces of these components to break off and circulate throughout the fuel system of the Class Vehicles, damaging other engine components.

261.   Volvo acquired its knowledge of the Piston Defect within the Subject Engines through sources not available to Plaintiffs or Class Members, including but not limited to pre-release testing data, the use of the same or materially similar components in earlier engines which developed the Piston Defect, early consumer complaints about the Piston Defect to Volvo and its dealers about the Class Vehicles as well as other earlier model year versions of such vehicles, testing conducted in response to those complaints, aggregate data from Volvo's dealers, aggregate sales

68

data of replacement piston rings, pistons, and engines, and from other internal sources.

262.   Presently, the Subject Engines in the Class Vehicles has caused Volvo to become aware of the Piston Defect through many customers' complaints of loss of compression within an engine cylinder, scoring along the cylinder wall, and/or other forms of engine failure. All of these failures or sequelae of failures ultimately cause the catastrophic failure of the engine, many of them before 75,000 miles. As such, many customers have had to completely replace their engines prematurely.

263.   Specifically, the Subject Engines' piston rings and pistons were defectively designed and/or manufactured failing to allow for proper and necessarily oil drainage from the cylinders, which in turn causes the piston rings and/or piston heads to crack, splinter, shatter, fracture, and/or break off into pieces within the engine cylinder when exposed to continually burning oil. In turn, this causes loss of compression in one or more cylinders, triggering a "check engine light" for cylinder misfire due to loss of engine performance. Additionally, the pistons' constant engagement to tremendous forces and heat during normal engine operation will cause the piston head and/or piston rings to become faulty or fail, leading to excessive oil consumption, engine knock and/or pre-ignition, which can lead to undesirable pressure within the engine resulting in poor performance and engine damage, and oftentimes catastrophic damage.

## I.    The Piston Defect Poses a Serious Safety Concern

264.   As discussed supra, when a piston or piston suddenly and unexpectedly fail, the Class Vehicles immediately lose partial or total engine power.  When a

vehicle loses partial engine power, it prevents the driver from accelerating or maintaining speed.  If a vehicle loses total engine power, it will stall, prevent the driver from being able to adequately control the steering wheel and/or engaging the brakes properly.  All of these situations drastically increase the risk of collisions, particularly at intersections and on highways, and puts other drivers, passengers and pedestrians in danger.

## II.    The Warranties Provided by Volvo for the Class Vehicles

265.   The "Volvo organization" provides warranties directly to Plaintiffs and consumers.  This New Vehicle Limited Warranty covers "defects in material and workmanship," and is limited to "four (4) years or 50,000 miles[], whichever occurs first."  This coverage includes the piston rings, pistons, and the engine and its other components.

266.   Volvo also provides a maintenance warranty, the Complimentary Factor Scheduled Maintenance Program, which provides that all new vehicles will have "the first three (3) regularly scheduled maintenance services at 10,000, 20,000 and 30,000 miles for the first three (3) years or up to 36,000 miles provided free of charge."

267.   These warranties, to the extent they have not expired, continue to customers who purchased previously owned Volvo vehicles.

268.   Volvo also provides a limited certified pre-owned warranty lasting seven years or 100,000 miles, whichever occurs first, for vehicles purchased certified pre-owned at an authorized Volvo dealership.

269.   The copyright to the warranty terms is held by Volvo Car Corporation, the American business name for Defendant Volvo AB.   In the United States, customers are directed to contact VCNA for customer support and assistance related to service and maintenance.   As such, the warranty booklets provided to Plaintiffs and consumers by VCNA are done so with the explicit permission of Volvo AB.

270.   The full warranty terms are not presented to consumers when considering a Volvo purchase.   Instead, the warranties are presented on a take-or-leave-it basis.

### III.   Volvo Had Superior and Exclusive Knowledge of the Piston Defect

271.   Since 2011, Volvo has designed, manufactured, distributed, sold, and leased the Class Vehicles. Because Volvo has been making the Volvo Modular engines since 1990, and has been designing the VEA engines since 2007, with initial production only beginning in 2013, Volvo was acutely aware of the engine's defective pistons and piston rings that caused oil consumption well before the Class Vehicles were offered for sale on the market.

272.   Volvo had superior and exclusive knowledge of the Piston Defect and knew or should have known that the defect was not known or reasonably discoverable by Plaintiffs and Class Members before they purchased or leased the Class Vehicles.

273.   Well before Plaintiffs' purchases of their vehicles, Volvo knew about the Piston Defect through sources not available to consumers, including pre-release testing data, early consumer complaints to Volvo and its dealers, testing conducted in response to those consumer complaints, high failure rates of the pistons within the

engines, the data demonstrating the inordinately high volume of replacement part sales, and other aggregate data from Volvo dealers about the problem.

274.   Volvo is experienced in the design and manufacture of consumer vehicles. As an experienced manufacturer, Volvo conducts tests, including pre-sale durability testing, on incoming components, including the pistons, to verify the parts are free from defect and align with Volvo's specifications.[3] Thus, Volvo knew or should have known the pistons within the engines were defective and prone to put drivers in a dangerous position due to the inherent risk of the Piston Defect.

275.   Specifically, Volvo has a robust pre-production testing process.  The process of mass-manufacturing a vehicle begins 40 months before the first vehicle to be sold rolls off the manufacturing plant line.  Pre-production testing takes place between 30 months and 12 months before.  Volvo builds the first full prototype 24 months before the start of production, a verification prototype is built at the plant where the vehicle is be manufactured 12 months before the start of production, and a pilot production vehicle is built at the same plant 3 months before the start of production.  This last prototype verifies that the vehicle is ready for production and the proper after sales support processes are in place.[4]

---

[3] Akweli Parker, *How Car Testing Works*, HOWSTUFFWORKS.COM, http://auto.howstuffworks.com/car-driving-safety/safety-regulatory-devices/car-testing.htm ("The idea behind car testing is that it allows manufactures to work out all the kinks and potential problems of a model before it goes into full production.") (last viewed June 5, 2019).

[4] *See* Volha Bordyk, "Analysis of software and hardware configuration management for pre-production vehicles – A case study at Volvo Car Corporation," at 2, Chalmer University of Technology (January 2012), https://publications.lib.chalmers.se/records/fulltext/156295.pdf (last visited March 21, 2022).

276.   Pre-production testing includes vigorous testing of the vehicle components, as well on-road testing of vehicles.  As such, this testing would have revealed that the piston heads and piston rings were not adequately preventing oil from entering the combustion chamber, and thus, Volvo would have become aware of the Piston Defect.

277.   Critically, Volvo also redesigned both the piston rings and the piston head for the engines in Class Vehicles.  These newly designed components were integrated into Volvo vehicles beginning in the middle of the 2016 model year, to prevent new vehicles from having the Piston Defect.  However, previously manufactured and sold vehicles were not recalled to have the new components installed.

278.   Instead, Volvo released numerous Technical Journals to its network of authorized dealership, describing the oil consumption symptom of the Piston Defect in affected vehicles and instructing dealerships to replace the piston rings and pistons.

279.   Specifically, in February 2016, Volvo issued TJ 31216, entitled "Drive-E: Low oil level message in Driver Information Module (DIM).  This TJ was updated repeatedly to add additional model years and models, with updates issued in June 2017, July 2017, November 2017, May 2019, June 2019, and January 2020.  The TJ addresses high oil consumption in 2014-2016 S60, 2016 S60L, 2014-2016 S80, 2015-2016 V40, 2014-2016 V60, 2014-2016 V70, 2014-2016 XC60, and 2016 XC90 vehicles with engine codes B4204T9, B4204T10, B4204T11, B4204T12, B4204T19, B4204T27, B4204T15, B4204T37, and B4204T38.  The TJ instructs

dealerships to replace the pistons and piston rings with new, differently designed components.  The TJ explicitly states: "Note! If there are scratches in the cylinder bore, which are confirmed by feeling with the nail, the engine must be replaced."

280.   Notably, TJ 31216 also warns dealerships that the pistons and piston rings are only to be replaced when other, less expensive fixes have been tried, including changing spark plugs.  The TJ references other TJs specifically to encourage dealerships to try the less expensive fixes which do not remedy the Piston Defect.

281.   In March 2019, Volvo also issued TJ 34588, entitled "High oil consumption. Engine 61." This TJ addressed high oil consumption and a low oil pressure light illuminated with no external leakage on the B5254T12 engine.  This engine was installed in 2013-2016 S60, 2016 S60 Cross County, 2016 S60L, 2013-2014 S80, 2014-2016 V60, 2015-2016 V60 Cross County, 2015-2016 XC60, and 2016 XC70 vehicles.  The TJ instructed dealerships to change the piston rings in the vehicles.  This TJ was also issued in April 2019, June 2019, and February 2020.

282.   Volvo also would have been made aware of problems with the piston rings and piston because the same issue with the same or similar oil control rings appeared in the Si6 engines starting with model year 2010.  Volvo began issuing TJs regarding oil consumption soon after, and eventually, had to redesign the piston rings to solve the problem.  The redesign period of those piston rings coincides with the use of the faulty oil control rings in the Subject Engines.

283.   Additionally, Defendants should have learned of this widespread defect from the sheer number of reports received from dealerships. Volvo's customer

74

relations department, which interacts with individual dealerships to identify potential common defects, has received numerous reports regarding the Piston Defect, even in other engines which use the same defective components. Volvo's customer relations department also collects and analyzes field data including, but not limited to, repair requests made at dealerships, technical reports prepared by engineers who have reviewed vehicles for which warranty coverage is being requested, parts sales reports, and warranty claims data.

284.   VCNA's warranty department similarly analyzes and collects data submitted by its dealerships to identify warranty trends in its vehicles. It is VCNA's policy that when a repair is made under warranty the dealership must provide VCNA with detailed documentation of the problem and a complete disclosure of the repairs employed to correct it. Dealerships have an incentive to provide detailed information to Defendants, because they will not be reimbursed for any repairs unless the justification for reimbursement is sufficiently detailed.  As a result of analyzing the requests for warranty repairs, Defendants would have learned about the ongoing nature of the Piston Defect.

285.   Federal law requires automakers like Volvo to be in close contact with NHTSA regarding potential auto defects, including imposing a legal requirement (backed by criminal penalties) compelling the confidential disclosure of defects and related data by automakers to NHTSA, including field reports, customer complaints, and warranty data. See TREAD Act, Pub. L. No. 106-414, 114 Stat.1800 (2000).

286.   Automakers have a legal obligation to identify and report emerging safety-related defects to NHTSA under the Early Warning Report requirements. *Id.*

Similarly, automakers monitor NHTSA databases for consumer complaints regarding their automobiles as part of their ongoing obligation to identify potential defects in their vehicles, including those which are safety-related. *Id*. Thus, Volvo knew or should have known of the many complaints about the Piston Defect logged by NHTSA ODI. The content, consistency, and disproportionate number of those complaints alerted, or should have alerted, Volvo to the Piston Defect in the Subject Engine as early as 2014.

287.  With respect solely to the Class Vehicles, Exhibit A, attached to this Complaint, contains a representative sampling of the many complaints concerning the Piston Defect which are available through NHTSA's website, www.NHTSA.gov. Many of the complaints reveal that Volvo, through its network of dealers and repair technicians, had been made aware of the Piston Defect. In addition, the complaints indicate that despite having knowledge of the Piston Defect and even armed with knowledge of the exact vehicles affected, Volvo often refused to diagnose the defect or otherwise attempt to repair it while Class Vehicles were still under warranty, instead changing spark plugs and coil packs, significantly less expensive repairs.

288.  In addition to Volvo's review of NHTSA complaints, discovery will show that Volvo's internal consumer relations department and/or online reputation management services routinely monitor the internet for complaints about its products, including complaints posted on consumer forums and other social media websites. The fact that so many customers made similar complaints put Volvo on notice of the Piston Defect. Exhibit B, attached to the Complaint, contains some

examples of complaints regarding the Pistons Defect on consumer boards (errors in original).

289.  A significant portion of Volvo's technical instructions to dealerships are only available on proprietary Volvo software and systems.  Dealership technicians are instructed by VCNA-given trainings how to use this software, which provides guided, step-by-step instructions on diagnosing, repairing, and communicating with consumers about problems with their vehicles.  Technicians at Volvo authorized dealerships are also routinely instructed to open technical cases with VCNA regarding certain repairs and to follow the instructions given by VCNA and/or VCUSA.  As a result, discovery will show that that Volvo has hundreds, if not thousands of cases in its records showing consumer and dealer complaints about piston ring and/or piston failure, and that Volvo has instructed dealerships to replace the piston rings, the pistons, and even the engine block itself as a result of those failures.

290.  The existence of the Piston Defect is a material fact that a reasonable consumer would consider when deciding whether to purchase or lease a Class Vehicle. Had Plaintiffs and other Class Members known of the Piston Defect, they would have paid less for the Class Vehicles or would not have purchased or leased them.

291.  Reasonable consumers, like Plaintiffs, expect that a vehicle's engine is safe, will function in a manner that will not pose a safety risk, and is free from defects. Plaintiffs and Class Members further reasonably expect that Volvo will not sell or lease vehicles with known safety defects, such as the Piston Defect, and will

disclose any such defects to its consumers when it learns of them. They did not expect Volvo to conceal and fail to disclose the Piston Defect to them, and fail to recall the defective piston rings and pistons once they were redesigned.

292.    Specifically, Volvo did not disclose its knowledge of the Piston Defect and its associated safety risk in commercials, brochures, or press release touting the Subject Engines or the Class Vehicles.  Volvo further did not disclose the Piston Defect on the Monroney Stickers affixed to Plaintiffs' and Class Members' vehicles, even though Volvo touted its "Accolades" including whether the vehicle was Insurance Institute for Highway Safety (IIHS) Top Safety Pick such as the window sticker for Plaintiffs Fergusons' vehicle.  Even those vehicles which were not IIHS Top Safety Picks had window stickers with enough room to invite consumer to "join the conversation" about Volvo or purchase Volvo accessories for their vehicles yet did not reveal the Piston Defect, such as the sticker for Plaintiff Urben's vehicle. *See* Figure 8, below.

**FIGURE 8**



293.    Instead, Volvo quietly redesigned the piston rings and pistons in the Subject Engines and failed to issue a recall.

## IV.    Volvo Has Actively Concealed the Piston Defect

294.    Despite its knowledge of the Piston Defect in the Class Vehicles, Volvo actively concealed the existence and nature of the defect from Plaintiffs and Class Members. Specifically, Volvo failed to disclose or actively concealed at and after the time of purchase, lease, or repair:

(a) any and all known material defects or material nonconformity of the Class Vehicles, including the defects pertaining to the pistons within the Subject Engines;

(b) that the Class Vehicles, including the pistons, were not in good in working order, were defective, and were not fit for their intended purposes; and

(c) that the Class Vehicles and the pistons were defective, despite the fact that Volvo learned of such defects as early as early 2012.

295.   When consumers present their Class Vehicles to an authorized Volvo dealer for piston related repairs, rather than repair the problem under warranty, Volvo dealers choose to inform consumers that their vehicles are functioning properly, conduct repairs that merely mask the Piston Defect, or fail to provide service stating that such damage is not covered under warranty.  In this manner, Volvo avoids paying for warranty repairs and unlawfully transfers the cost of the Piston Defect to Plaintiffs and other consumers.

296.   In particular, Volvo explicitly informs dealerships that oil consumption tests are necessary to prove excessive oil consumption even when consumers report that the low oil light illuminates frequently before oil change intervals.  Oil consumption tests involve changing the oil in a vehicle and having the consumer drive it for thousands of miles before being measured, a time-consuming task that potentially further damages engines.

297.   Volvo has further informed dealerships that warranty replacement of piston rings and pistons will not be authorized until other potential fixes for

excessive oil consumption are tried, even though Volvo is well-aware of the Piston Defect and its cause and knows such fixes are useless.  However, replacement of coil packs or spark plugs is significantly cheaper and Volvo hopes that the warranty duration will lapse before the consumer is aware that they did not receive a permanent fix.

298.   However, some technicians do acknowledge that the Piston Defect exists, as experienced by certain Plaintiffs.  They say it is a "known defect."  Despite this, Volvo has not issued any communications to Class Members acknowledging the Piston Defect, continuing to allow vehicles with a known safety risk to remain on the road, and to expend their own monies fixing a problem that was solved by Volvo no later than mid-2016.

299.   Volvo has caused Class Members to expend money at its dealerships to diagnose, repair or replace the Class Vehicles' pistons and/or related components, despite Volvo's knowledge of the Piston Defect.

**V.    The Agency Relationship between VCNA and its Network of Authorized Dealerships**

300.   In order to sell vehicles to the general public, VCNA and/or Volvo AB enters into agreements with its nationwide network of authorized dealerships to engage in retail sales with consumers such as Plaintiffs. Indeed, the warranties themselves refer to the dealerships as "retailers." In return for the exclusive right to sell new, Volvo-branded vehicles, the authorized dealerships are also permitted under these agreements with Volvo to service and repair these vehicles under the warranties Volvo provides directly to consumers who purchased new vehicles from

the authorized dealerships.  These agreements require a dealership to follow the rules and policies of Volvo in all aspects of the dealership's business, including in appearance of the dealership itself, advertising, customer services, delivering Volvo's warranties to consumers, and performing recalls and warranty repairs on Volvo's behalf.   Authorized Volvo dealerships are told they are Volvo's representatives to the consumer and are instructed to behave accordingly.  Failure of the dealership to behave according to rules and policies of Volvo will result in Volvo terminating the relationship, which is permitted to do unilaterally.

301.   As such, Volvo's authorized dealerships are Volvo's agents, and the consumers who purchase or lease Volvo vehicles are the third-party beneficiaries of these dealership agreements, which allow the consumers to purchase and service their Volvo vehicles locally. Because Plaintiffs and members of the Class there are third-party beneficiaries of the dealership agreements which create the implied warranty, they may avail themselves of the implied warranty. This is true because third-party beneficiaries to contracts between other parties that create an implied warranty of merchantability may avail themselves of the implied warranty. *See In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Practices, & Prod. Liab. Litig*., 754 F. Supp. 2d 1145, 1185 (C.D. Cal. 2010).

302.   Further, Plaintiffs and each of the members of the Class are the intended beneficiaries of Volvo's express and implied warranties. The dealers were not intended to be the ultimate consumers of the Class Vehicles, and they have no rights under the warranty agreements provided by Volvo. Volvo's warranties were designed for and intended to benefit the consumers only. The consumers are the true

intended beneficiaries of Volvo's express and implied warranties, and the consumers may therefore avail themselves of those warranties.

303.   Volvo issued the express warranty to the Plaintiffs and the Class members. Volvo also developed and disseminated the owner's manual and warranty booklets, advertisements, and other promotional materials relating to the Class Vehicles. Volvo also is responsible for the content of the Moroney Stickers on Volvo-branded vehicles. Because Volvo issues the express warranty directly to the consumers, the consumers are in direct privity with Volvo with respect to the warranties.

304.   In promoting, selling, and repairing its defective vehicles, Volvo acts through numerous authorized dealers who act, and represent themselves to the public, as exclusive Volvo representatives and agents. That the dealers act as Volvo's agents is demonstrated by the following facts:

> (a)   The authorized Volvo dealerships complete all service and repair according to Volvo's instructions, which Volvo issues to its authorized dealerships through service manuals, technical service bulletins ("TSBs"), and other documents, often only accessible via Volvo's proprietary computer systems referenced in many of the TSBs;

> (b)   Consumers are able to receive services under Volvo's issued New Vehicle Limited Warranty only at Volvo's authorized dealerships, and they are able to receive these services because of the agreements between Volvo and the authorized dealers.

83

These agreements provide Volvo with a significant amount of control over the actions of the authorized dealerships;

(c)     The warranties provided by Volvo for the defective vehicles direct consumers to take their vehicles to authorized dealerships for repairs or services;

(d)     Volvo dictates the nature and terms of the purchase contracts entered into between its authorized dealers and consumers;

(e)     Volvo controls the way in which its authorized dealers can respond to complaints and inquiries concerning defective vehicles, and the dealerships are able to perform repairs under warranty only with Volvo's authorization;

(f)     Volvo has entered into agreements and understandings with its authorized dealers pursuant to which it authorizes and exercises substantial control over the operations of its dealers and the dealers' interaction with the public;

(g)     Volvo implemented its express and implied warranties as they relate to the defects alleged herein by instructing authorized Volvo dealerships to address complaints of the Defect by prescribing and implementing the relevant TJs cited herein; and

(h)     Volvo's authorized dealerships are able to bind Volvo into the terms of the express warranties by selling vehicles to the public, by reviewing the quality of used Volvo vehicles and certifying

84

their worthiness to receive Volvo's Certified Pre-Owned Warranties.

(i)    Indeed, Volvo's warranty booklets make it abundantly clear that Volvo's authorized dealerships are Volvo's agents for vehicle sales, service, and to receive repairs from Volvo under the warranties it provides directly to consumers such as Plaintiffs. The booklets, which are plainly written for the consumers, not the dealerships, tell the consumers repeatedly to seek repairs and assistance at its "your retailer." For example, the booklets state, "[s]hould you have any questions concerning service of your Volvo's performance, your retailer will be happy to answer them for you."

(j)    Further, warranty repairs "will be performed by an authorized Volvo retailer" and "[t]o obtain repairs under warranty, contact an authorized Volvo retailer and explain the condition."

305.   The booklets direct Plaintiffs and class members, should they believe a situation has not been addressed to their satisfaction, to first "[d]iscuss the matter with the appropriate department manager at the retail facility" before "discuss[ing] the matter with the General Manager."  Next, Plaintiffs and class members are directed to contact Volvo directly through Volvo's Customer Care Center.

306.   Accordingly, as the above paragraphs demonstrate, the authorized dealerships are agents of Volvo. Plaintiffs and each of the members of the Class have had sufficient direct dealings with either Volvo or its agent dealerships to establish

privity of contract between Volvo, on one hand, and Plaintiffs and each of the members of the Class, on the other hand. This establishes privity with respect to the express and implied warranty between Plaintiffs and Volvo.

## VI.   **Volvo Has Unjustly Retained A Substantial Benefit**

307.   Volvo unlawfully failed to disclose the Piston Defect to induce Plaintiff sand other Class Members to purchase or lease the Class Vehicles.

308.   Volvo thus engaged in deceptive acts or practices pertaining to all transactions involving the Class Vehicles, including Plaintiffs'.

309.   Volvo unlawfully induced Plaintiffs and class members to purchase their respective Class Vehicles by concealing a material fact (the defective pistons/piston rings within the Subject Engines). Had Plaintiffs and class members known of the subject defect, they would have paid less for the Class Vehicles or would or not have purchased them at all.

310.   Accordingly, Volvo's ill-gotten gains, benefits accrued in the form of increased sales and profits resulting from the material omissions that did - and likely will continue to - deceive consumers, should be disgorged.

## TOLLING OF THE STATUTE OF LIMITATIONS

311.   Any applicable statute(s) of limitations have been tolled by Volvo's knowing and active concealment and denial of the facts alleged herein. Plaintiff and members of the Class could not have reasonably discover the true, latent nature of the Piston Defect until shortly before this action was commenced.

312.   In addition, even after Class Members contacted Defendant VCNA and/or its authorized agent dealerships for vehicle repairs within the statute of

86

limitations for repairs concerning the Piston Defect and its symptoms, they were routinely told that the Class Vehicles were not defective, that oil consumption was normal, and/or given illusory repairs.

313. Defendants were and remain under a continuing duty to disclose Plaintiff and Class Members the true character, quality, and nature of the Class Vehicles because they had superior knowledge of the Piston Defect and its associated safety risk, provided partial disclosures about the functionality and ability of the Class Vehicles to provide safe, reliable transportation, and the facts about the Piston Defect were not reasonably discoverable by Plaintiff and the Class.

## CLASS ACTION ALLEGATIONS

314. Plaintiffs bring this lawsuit as a class action on behalf of themselves and all others similarly situated as members of the proposed Class pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3). This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of those provisions.

315. The Class and Sub-Class are defined as:

**Class**:  All individuals in the United States who purchased or leased any 2013-2016 Volvo vehicle equipped with the Subject Engines ("Class Vehicles.")

**Connecticut Sub-Class:**  All members of the Class who purchased a Class Vehicle in the State of Connecticut.

**Florida Sub-Class:** All members of the Class who purchased a Class Vehicle in the State of Florida.

**Illinois Sub-Class:** All members of the Class who purchased a Class Vehicle in the State of Illinois.

87

**Maryland Sub-Class:** All members of the Class who purchased a Class Vehicle in the State of Maryland.

**Massachusetts Sub-Class:** All members of the Class who purchased a Class Vehicle in the Commonwealth of Massachusetts.

**Missouri Sub-Class:** All members of the Class who purchased a Class Vehicle in the State of Missouri.

**New York Sub-Class:** All members of the Class who purchased a Class Vehicle in the State of New York.

**Pennsylvania Sub-Class:** All members of the Class who purchased a Class Vehicle in the Commonwealth of Pennsylvania.

**South Carolina Sub-Class:** All members of the Class who purchased a Class Vehicle in the State of South Carolina.

**Texas Sub-Class:** All members of the Class who purchased a Class Vehicle in the State of Texas.

316.   Excluded from the Class and Sub-Classes are:  (1) Defendants, any entity or division in which Defendants have a controlling interest, and their legal representatives, officers, directors, assigns, and successors; (2) the Judge to whom this case is assigned and the Judge's staff; (3) any Judge sitting in the presiding state and/or federal court system who may hear an appeal of any judgment entered; and (4) those persons who have suffered personal injuries as a result of the facts alleged herein. Plaintiffs reserve the right to amend the Class and Sub-Class definitions if discovery and further investigation reveal that the Class and Sub-Class should be expanded or otherwise modified.

317.   **Numerosity:**   Although the exact number of Class Members is uncertain, and can only be ascertained through appropriate discovery, the number is easily in the multiple thousands and thus significant enough such that joinder is impracticable. The disposition of the claims of these Class Members in a single

action will provide substantial benefits to all parties and to the Court. The Class Members are readily identifiable from information and records in Defendants' possession, custody, or control, as well as from records kept by the Department of Motor Vehicles.

318. **Typicality:**  Plaintiffs' claims are typical of the claims of the Class in that Plaintiffs, like all Class Members, purchased or leased a Class Vehicle designed, manufactured, and distributed by Volvo. The representative Plaintiffs, like all Class Members, have been damaged by Defendants' misconduct in that they have incurred or will incur the cost of repairing or replacing the defective piston rings and/or pistons, as well as other engine components damaged by the defective parts. Repairs for the Piston Defect average between $4,000 and $14,000.  Furthermore, the factual bases of Volvo's misconduct are common to all Class Members and represent a common thread resulting in injury to the Class.

319. **Commonality**:  There are numerous questions of law and fact common to Plaintiffs and the Class that predominate over any question affecting Class Members individually. These common legal and factual issues include the following:

    (a)    Whether Class Vehicles suffer from defects relating to the pistons within the Subject Engines;

    (b)    Whether the defects relating to the pistons in the Subject Engines constitute an unreasonable safety risk;

(c)     Whether Defendants knew about the defects pertaining to the pistons and/or piston rings in the Subject Engines and, if so, how long Defendants have known of the defect;

(d)     Whether the defective nature of the pistons constitutes a material fact;

(e)     Whether Defendants have had an ongoing duty to disclose the defective nature of the pistons in the Subject Engines to Plaintiff and Class Members;

(f)     Whether Plaintiffs and the other Class Members are entitled to equitable relief, including a preliminary and/or a permanent injunction;

(g)     Whether Defendants knew or reasonably should have known of the defects pertaining to the pistons within the Subject Engines before it sold and leased Class Vehicles to Class Members;

(h)     Whether Defendants should be declared financially responsible for notifying the Class Members of problems with the Class Vehicles and for the costs and expenses of repairing and replacing the defective pistons within the Subject Engines and/or its components;

(i)     Whether Defendants are obligated to inform Class Members of their right to seek reimbursement for having paid to diagnose, repair, or replace their defective pistons and/or its components;

(j)    Whether VCNA and/or Volvo AB breached their express warranties under UCC section 2301;

(k)    Whether VCNA and/or Volvo AB breached its express warranty under the laws of Connecticut, Florida, Illinois, Maryland, Massachusetts, Missouri, New York, Pennsylvania, South Carolina, and Texas;

(l)    Whether Defendants breached their implied warranties under the laws of Connecticut, Florida, Illinois, Maryland, Massachusetts, Missouri, New York, Pennsylvania, South Carolina, and Texas; and

(m)    Whether Defendants breached the consumer protection laws of Connecticut, Florida, Illinois, Maryland, Massachusetts, Missouri, New York, Pennsylvania, South Carolina, and Texas.

320.  **Adequate Representation:**  Plaintiffs will fairly and adequately protect the interests of the Class Members. Plaintiffs have retained attorneys experienced in the prosecution of class actions, including consumer and product defect class actions, and Plaintiffs intend to vigorously prosecute this action.

321.  **Predominance and Superiority:**  Plaintiffs and Class Members have all suffered, and will continue to suffer, harm and damages as a result of Defendants' unlawful and wrongful conduct. A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Absent a class action, most Class Members would likely find the cost of litigating their claims prohibitively high and would therefore have no effective remedy. Because of the relatively small size

of the individual Class Members' claims, it is likely that only a few Class Members could afford to seek legal redress for Defendants' misconduct. Absent a class action, Class Members will continue to incur damages, and Defendants' misconduct will continue unabated without remedy or relief. Class treatment of common questions of law and fact would also be a superior method to multiple individual actions or piecemeal litigation in that it will conserve the resources of the courts and the litigants and promote consistency and efficiency of adjudication.

**COUNT I**
**Violation of the Magnuson-Moss Warranty Act**
**(15 U.S.C. § 2301, *et seq.*)**
**(On Behalf of the Class, or Alternatively, all Sub-Classes against All Defendants)**

322.   Plaintiffs repeat and re-allege each and every allegation contained above in paragraphs 1 through 314 above as if fully set forth herein.

323.   Plaintiffs brings this count on behalf of themselves and the Class, or alternatively, on behalf of all Sub-Classes, or on behalf of Plaintiffs individually against all Defendants.

324.   Plaintiffs are "consumers" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3).

325.   Volvo is a "supplier" and "warrantor" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(4)-(5).

326.   The Class Vehicles are "consumer products" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(1).

92

327.   15 U.S.C. § 2310(d)(1) provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with a written or implied warranty.

328.   Defendants' implied warranty is an "implied warranty" within the meaning of 15 U.S.C. § 2301(7).

329.   Defendants' express warranty is a "written warranty" within the meaning of 15 U.S.C. §2301(6).

330.   Defendants breached the implied warranty and the express warranty by virtue of the above-described acts.

331.   Plaintiffs and the other Class Members notified Defendants of the breach within a reasonable time and/or were not required to do so. Volvo was also on notice of the Defect from, among other sources, the complaints and service requests it received from Class Members and its dealers.

332.   Defendants' breach of the implied warranty and express warranty deprived Plaintiff and Class Members of the benefits of their bargains.

333.   Privity is not required here because Plaintiffs and each of the other Class Members are intended third-party beneficiaries of contracts between Volvo and its dealers, and specifically, of Volvo's implied warranties. The dealers were not intended to be the ultimate consumers of the Class Vehicles and have no rights under

93

the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumer only.

334.   Volvo breached these warranties, as described in more detail above. Without limitation, the Class Vehicles contain a Defect that puts vehicle occupants' safety in jeopardy. The Class Vehicles share a common defect in that they are manufactured with defective materials and/or with poor workmanship. Contrary to Volvo's representations about its vehicles, the Class Vehicles are defective in manufacture, materials and/or workmanship and are unsafe. The Class Vehicles share a common defect.

335.   Affording Volvo a reasonable opportunity to cure its breach of written warranties would be unnecessary and futile here. Indeed, Volvo has long been on notice of the claims of Plaintiffs and Class members and has refused to provide a remedy, instead placing the blame on customers or refusing to acknowledge the existence of the defect.

336.   At the time of sale or lease of each Class Vehicle, Volvo knew, should have known, or was reckless in not knowing of its misrepresentations and omissions concerning the Class Vehicles' Defect and inability to perform as warranted, but nonetheless failed to rectify the situation and/or disclose the Defect. Under the circumstances, the remedies available under any informal settlement procedure would be inadequate and any requirement that Plaintiffs resort to an informal dispute

resolution procedure and/or afford Volvo a reasonable opportunity to cure its breach of warranties is excused and thereby deemed satisfied.

337.   Plaintiffs and the other Class members would suffer economic hardship if they returned their Class Vehicles but did not receive the return of all payments made by them. Because Volvo is refusing to acknowledge any revocation of acceptance and return immediately any payments made, Plaintiffs and the other Class members have not re-accepted their Class Vehicles by retaining them.

338.   Plaintiffs provided notice to Volvo of their intent to pursue class claims under the MMWA via letters dated February 10, 2022; February 16, 2022; February 18, 2022; February 25, 2022; March 2, 2022; and March 9, 2022.

339.   The amount in controversy of Plaintiffs' individual claims meets or exceeds the sum of $25. The amount in controversy of this action exceeds the sum of $50,000, exclusive of interest and costs, computed on the basis of all claims to be determined in this lawsuit.

340.   Plaintiffs, individually and on behalf of all members of the Class, seek all damages permitted by law, in an amount to be proven at trial.

## COUNT II
### Fraudulent Omission
### (On Behalf of the Class, or Alternatively, all Sub-Classes against All Defendants)

341.   Plaintiffs repeat and re-allege each and every allegation contained above in paragraphs 1 through 314 above as if fully set forth herein.

95

342.   Plaintiffs brings this count on behalf of themselves and the Class, or alternatively, on behalf of all Sub-Classes, or on behalf of Plaintiffs individually against all Defendants.

343.   Volvo knew that the Class Vehicles suffered from an inherent Defect, were defectively designed and/or manufactured and were not suitable for their intended use.

344.   Defendants concealed from and failed to disclose to Plaintiffs and Class Members the defective nature of the Class Vehicles.

345.   Defendants were under a duty to Plaintiffs and Class Members to disclose the defective nature of the Class Vehicles because:

      a.   Defendants were in a superior position to know the true state of facts about the safety defect contained in the Class Vehicles;

      b.   The omitted facts were material because they directly impact the safety of the Class Vehicles;

      c.   Defendants knew the omitted facts regarding the Defect were not known to or reasonably discoverable by Plaintiffs and Class Members;

      d.   Defendants made partial disclosures about the quality of the Class Vehicles without revealing their true defective nature; and,

      e.   Defendants actively concealed the defective nature of the Class

Vehicles from Plaintiffs and Class Members.

346.   The facts concealed or not disclosed by Defendants to Plaintiffs and the other Class Members are material in that a reasonable person would have considered them to be important in deciding whether to purchase or lease Defendants' Class Vehicles or pay a lesser price for them. Whether a vehicle's engine is defective, which can cause excessive oil consumption causing sudden shut off, premature engine wear, damage, and failure, is a material safety concern. Had Plaintiffs and Class Members known about the defective nature of the Class Vehicles, they would not have purchased or leased the Class Vehicles or would have paid less for them.

347.   Defendants concealed or failed to disclose the true nature of the design and/or manufacturing defects contained in the Class Vehicles to induce Plaintiffs and Class Members to act thereon. Plaintiffs and the other Class Members justifiably relied on Defendants' omissions to their detriment. This detriment is evident from Plaintiffs' and Class Members' purchase or lease of Defendants' defective Class Vehicles.

348.   Defendants continued to conceal the defective nature of the Class Vehicles even after Class Members began to report the problems. Indeed, Defendants continues to cover up and conceal the true nature of the problem today.

349.   As a direct and proximate result of Defendants' misconduct, Plaintiffs and Class Members have suffered and will continue to suffer actual damages.

97

Plaintiffs and the Class reserve their right to elect either to (a) rescind their purchase or lease of the Defective Vehicles and obtain restitution or (b) affirm their purchase or lease of the Defective Vehicles and recover damages.

350.   Defendants' acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the Class's rights and well-being to enrich Defendants. Defendants' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

**Claims on Behalf of the Connecticut Sub-Class**

<u>**COUNT III**</u>
**Breach of Express Warranty**
**Conn. Gen. Stat. Ann. §§ 42a-2-313 and 42a-2A-503**
**(On Behalf of the Connecticut Sub-Class against**
**Defendants VCNA and Volvo AB)**

351.   Plaintiffs repeat and re-allege each and every allegation contained above in paragraphs 1 through 314 above as if fully set forth herein.

352.   Plaintiff Mark Silber ("Connecticut Plaintiff") brings this count individually and on behalf the Connecticut Sub-Class against Defendants VCNA and Volvo AB.

353.   Defendants VCNA and Volvo AB are and were at all relevant times "merchants" with respect to motor vehicles under Conn. Gen. Stat. Ann. §42a-2-

104(1) and "merchant lessees" under Conn. Gen. Stat. Ann. § 42a-2A-102(a)(27), and "sellers" of motor vehicles under Conn. Gen. Stat. Ann. § 42a-2-103(1)(c).

354.   With respect to leases, Defendants VCNA and Volvo AB are and were at all relevant times "lessors" of motor vehicles under Conn. Gen. Stat. Ann. § 42a-2A-102(a)(23).

355.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Conn. Gen. Stat. Ann. § 42a-2-105(1) and Conn. Gen. Stat. Ann. § 42a-2A-102(a)(15).

356.   The engines were manufactured and/or installed in the Class Vehicles by Volvo and are covered by the express warranty.

357.   Defendants VCNA and Volvo AB provided all purchasers and lessees of the Class Vehicles with an express warranty described herein, which became a material part of the bargain. Accordingly, Defendants VCNA and Volvo AB's express warranty is an express warranty under Connecticut state law.

358.   In a section entitled "Warranty Repairs," Defendants VCNA and Volvo AB's express warranty (or New Vehicle Limited Warranty ("NVLW")) provides in relevant part that "[w]arranty repairs which are required as a result of defects in material or workmanship, and are brought to the attention of an authorized Volvo retailer by an owner, will be performed by an authorized Volvo retailer only at no charge during the warranty period."

359.  According to Volvo, the NVLW coverage is for "4 years/50,000 miles[.]"

360.  Defendants VCNA and Volvo AB also provide a maintenance warranty, the Complimentary Factor Scheduled Maintenance Program ("Factory Maintenance Program"), which provides that all new vehicles will have "the first three (3) regularly scheduled maintenance services at 10,000, 20,000 and 30,000 miles for the first three (3) years or up to 36,000 miles provided free of charge."

361.  Defendants VCNA and Volvo AB's NVLW, Factory Maintenance Program, and other warranties regarding the Class Vehicles formed a basis of the bargain that was breached when Connecticut Plaintiff and members of the Connecticut Sub-Class purchased or leased the Class Vehicles with the defective engine and/or related components.

362.  Connecticut Plaintiff and members of the Connecticut Sub-Class experienced defects within the warranty period. Despite the existence of the NVLW, Defendants VCNA and Volvo AB failed to inform Connecticut Plaintiff and members of the Connecticut Sub-Class that the Class Vehicles were equipped with defective engines and related components.  When providing repairs under the express warranty, these repairs were ineffective and incomplete and did not provide a permanent repair for the Defect.

363.   Defendants VCNA and Volvo AB breached the express warranty through the acts and omissions described above, including by promising to repair or adjust defects in materials or workmanship of any part supplied by Volvo and then failing to do so. Defendants VCNA and Volvo AB have not repaired or adjusted, and have been unable to repair or adjust, the Class Vehicles materials and workmanship defects.

364.   Connecticut Plaintiff and members of the Connecticut Sub-Class have had sufficient direct dealings with either Defendants VCNA and Volvo AB or their agents (*i.e.*, dealerships and technical support) to establish privity of contract between Defendants VCNA and Volvo AB, on one hand, and Connecticut Plaintiff and each member of the Connecticut Sub-Class on the other hand.  Nonetheless, privity is not required here because Connecticut Plaintiff and members of the Connecticut Sub-Class are intended third-party beneficiaries of contracts between Defendants VCNA and Volvo AB and their distributors and dealers, and specifically, of Defendants VCNA and Volvo AB's express warranties, including the NVLW, the Powertrain Warranties, and any warranties provided with certified pre-owned vehicles.  The dealers were not intended to be the ultimate consumers of the Class Vehicles and have rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumer only.

365.   Any attempt by Defendants VCNA and Volvo AB to disclaim or limit recovery to the terms of the express warranty is unconscionable and unenforceable here.   Specifically, the warranty limitation is unenforceable because Volvo knowingly sold or leased defective products without informing consumers about the Defect.   The time limits are unconscionable and inadequate to protect Connecticut Plaintiff and the members of the Connecticut Sub-Class.   Among other things, Connecticut Plaintiff and members of the Connecticut Sub-Class did not determine these time limitations and/or did not know of other limitations not appearing in the text of the warranties, the terms of which were drafted by Defendants VCNA and Volvo AB and unreasonable favored Defendants VCNA and Volvo AB. A gross disparity in bargaining power and knowledge of the extent, severity, and safety risk of the Defect existed between Defendants VCNA and Volvo AB and members of the Connecticut Sub-Class.

366.   Further, the limited warranty promising to repair and/or correct a manufacturing or workmanship defect fails of its essential purpose because the contractual remedy is insufficient to make Connecticut Plaintiff and the members of the Connecticut Sub-Class whole, because Defendants VCNA and Volvo AB have failed and/or have refused to adequately provide the promised remedies, *i.e.*, a permanent repair, within a reasonable time.

367.   Connecticut Plaintiff was not required to notify Defendants VCNA and Volvo AB of the breach because affording Defendants VCNA and Volvo AB a reasonable opportunity to cure their breach of written warranty would have been futile. Defendants VCNA and Volvo AB were also on notice of the Defect from the complaints and service requests it received from Class Members, including those formal complaints submitted to NHTSA, and through other internal sources.

368.   Nonetheless, Connecticut Plaintiff and members of the Connecticut Sub-Class provided notice to Defendants VCNA and Volvo AB of the breach of express warranties when they took their vehicles to Volvo-authorized providers of warranty repairs.  Connecticut Plaintiff also provided notice to Defendants VCNA and Volvo AB of their breach of express warranty by letter dated February 16, 2022.

369.   As a result of Defendants VCNA and Volvo AB's breach of the applicable express warranties, owners and/or lessees of the Class Vehicles suffered, and continue to suffer, an ascertainable loss of money, property, and/or value of their Class Vehicles.

370.   As a direct and proximate result of Defendants VCNA and Volvo AB's breach of express warranties, Connecticut Plaintiff and members of the Connecticut Sub-Class have been damaged in an amount to be determined at trial.

371.   As a result of Defendants VCNA and Volvo AB's breach of the express warranty, Connecticut Plaintiff and Connecticut Sub-Class Members are entitled to

legal and equitable relief against Volvo, including actual damages, specific performance, attorney's fees, costs of suit, and other relief as appropriate.

## COUNT IV
### Breach of the Implied Warranty of Merchantability
### Conn. Gen. Stat. Ann. §§ 42a-2-314 and 42a-2A-504
### (On Behalf of the Connecticut Sub-Class against all Defendants)

372. Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 314 as if fully set forth herein.

373. Connecticut Plaintiff brings this count individually and on behalf of the Connecticut Sub-Class against all Defendants.

374. Volvo is and was at all relevant times a "merchant" with respect to motor vehicles under Conn. Gen. Stat. Ann. §42a-2-104(1) and a "merchant lessee" under Conn. Gen. Stat. Ann. § 42a-2A-102(a)(27), and a "seller" of motor vehicles under Conn. Gen. Stat. Ann. § 42a-2-103(1)(c).

375. With respect to leases, Volvo is and was at all relevant times a "lessor" of motor vehicles under Conn. Gen. Stat. Ann. § 42a-2A-102(a)(23).

376. The Class Vehicles are and were at all relevant times "goods" within the meaning of Conn. Gen. Stat. Ann. § 42a-2-105(1) and Conn. Gen. Stat. Ann. § 42a-2A-102(a)(15).

377. A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law under Conn. Gen. Stat. Ann. § 42a-2-314 and Conn. Gen. Stat. Ann. § 42a-2A-504.

378. Volvo knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased. Volvo directly sold and marketed Class

Vehicles to customers through authorized dealers, like those from whom Connecticut Plaintiff and members of the Connecticut Sub-Class bought or leased their vehicles, for the intended purpose of consumers purchasing the vehicles. Volvo knew that the Class Vehicles would and did pass unchanged from the authorized dealers to Connecticut Plaintiff and members of the Connecticut Sub-Class, with no modification to the defective Class Vehicles.

379.   Volvo provided Connecticut Plaintiff and members of the Connecticut Sub-Class with an implied warranty that the Class Vehicles and their components and parts are merchantable and fit for the ordinary purposes for which they were sold.  However, the Class Vehicles are not fit for their ordinary purpose of providing reasonably reliable and safe transportation because, *inter alia*, the Class Vehicles and their engine suffered from an inherent defect at the time of sale and thereafter and are not fit for their particular purpose of providing safe and reliable transportation.

380.   This implied warranty included, among other things: (i) a warranty that the Class Vehicles that were manufactured, supplied, distributed, and/or sold by Volvo were safe and reliable for providing transportation; and (ii) a warranty that the Class Vehicles would be fit for their intended use while the Class Vehicles were being operated.

381.   Contrary to the applicable implied warranties, the Class Vehicles at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiffs and Class Members with reliable, durable, and safe transportation. Instead, the Class Vehicles were and are defective at the time of sale

or lease and thereafter as more fully described above. Volvo knew of this defect at the time these sale or lease transactions occurred.

382.   As a result of Volvo's breach of the applicable implied warranties, Connecticut Plaintiff and members of the Connecticut Sub-Class suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Defect, Connecticut Plaintiff and members of the Connecticut Sub-Class were harmed and suffered actual damages in that the Class Vehicles are substantially certain to fail before their expected useful life has run.

383.   Volvo's actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use in violation of the Uniform Commercial Code and relevant state law.

384.   Connecticut Plaintiff and members of the Connecticut Sub-Class have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of Volvo's conduct described herein.

385.   Connecticut Plaintiff and members of the Connecticut Sub-Class have had sufficient direct dealings with either Volvo or its agents (*i.e.*, dealerships and technical support) to establish privity of contract between Volvo, on one hand, and Connecticut Plaintiff and members of the Connecticut Sub-Class on the other hand. Nonetheless, privity is not required here because Connecticut Plaintiff and members of the Connecticut Sub-Class are intended third-party beneficiaries of contracts between Volvo and its distributors and dealers, and specifically, of Volvo's express warranties, including the NVLW, the Powertrain Warranties, and any warranties

provided with certified pre-owned vehicles.  The dealers were not intended to be the ultimate consumers of the Class Vehicles and have rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumer only.

386.   Connecticut Plaintiff and members of the Connecticut Sub-Class were not required to notify Volvo of the breach because affording Volvo a reasonable opportunity to cure its breach of warranty would have been futile. Volvo was also on notice of the Defect from the complaints and service requests it received from Connecticut Plaintiff and the Class Members and through other internal sources.

387.   Nonetheless, Connecticut Plaintiff and members of the Connecticut Sub-Class provided notice to Volvo of the breach of express warranties when they took their vehicles to Volvo-authorized provider of warranty repairs.  Connecticut Plaintiff also provided notice to Volvo of its breach of express warranty by letter dated February 16, 2022.

388.   As a direct and proximate cause of Volvo's breach, Connecticut Plaintiff and members of the Connecticut Sub-Class suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, Connecticut Plaintiff and members of the Connecticut Sub-Class have incurred or will incur economic damages at the point of repair in the form of the cost of repair as well as additional losses.

389.   As a direct and proximate result of Volvo's breach of the implied warranty of merchantability, Connecticut Plaintiff and members of the Connecticut Sub-Class have been damaged.

**COUNT V**
**Violations of the Connecticut Unlawful Trade Practices Act**
**Conn. Gen. Stat. § 42-110A, *et seq.***
**(On Behalf of the Connecticut Sub-Class against all Defendants)**

390.   Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 314 above as if fully set forth herein.

391.   Connecticut Plaintiff brings this cause of action individually and on behalf of the members of the Connecticut Sub-Class against all Defendants.

392.   Volvo, Connecticut Plaintiff, and Connecticut Sub-Class members are "persons" within the meaning of Conn. Gen. Stat. § 42-110a(3) of the Connecticut Unfair Trade Practices Act ("Connecticut UTPA").

393.   Volvo engaged in "trade" or "commerce" within the meaning of Conn. Gen. Stat. § 42-110a(4).

394.   The Connecticut UTPA provides: "No person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Conn. Gen. Stat. § 42-110b(a). Volvo engaged in unlawful trade practices, and unfair or deceptive acts or practices that violated the Connecticut UTPA.

395.   Volvo participated in unfair or deceptive trade practices that violated the Connecticut UTPA.  As described below and alleged throughout the Complaint, by failing to disclose the Defect, by concealing the Defect, by marketing its vehicles

108

as safe, reliable, well-engineered, and of high quality, and by presenting itself as a reputable manufacturer that valued safety, performance and reliability, and stood behind its vehicles after they were sold, Volvo knowingly and intentionally misrepresented and omitted material facts in connection with the sale or lease of the Class Vehicles. Volvo systematically misrepresented, concealed, suppressed, or omitted material facts relating to the Class Vehicles and the Defect in the course of its business.

396.   Volvo also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles.

397.   Volvo's unfair and deceptive acts or practices occurred repeatedly in Volvo's trade or business, were capable of deceiving a substantial portion of the purchasing public, and imposed a serious safety risk on the public.

398.   Volvo knew that the Class Vehicles suffered from an inherent defect, were defectively designed and/or manufactured, and were not suitable for their intended use.

399.   Volvo knew or should have known that its conduct violated the Connecticut UTPA.

400.   Volvo was under a duty to Connecticut Plaintiff and the Connecticut Sub-Class Members to disclose the defective nature of the Class Vehicles because:

(a)    Volvo was in a superior position to know the true state of facts about the safety defect in the Class Vehicles;

(b)    Volvo made partial disclosures about the quality of the Class Vehicles without revealing the defective nature of the Class Vehicles; and

(c)    Volvo actively concealed the defective nature of the Class Vehicles from Connecticut Plaintiff and the Connecticut Sub-Class Members at the time of sale and thereafter.

401.   By failing to disclose the Defect, Volvo knowingly and intentionally concealed material facts and breached its duty not to do so.

402.   The facts concealed or not disclosed by Volvo to Connecticut Plaintiff and the Connecticut Sub-Class Members are material because a reasonable person would have considered them to be important in deciding whether or not to purchase or lease Volvo's Class Vehicles, or to pay less for them. Whether an engine installed in a vehicle will exhibit excessive oil consumption causing sudden shut off, premature engine wear, damage, and failure, is a material safety concern. Had Connecticut Plaintiff and the Connecticut Sub-Class Members known that the Class Vehicles suffered from the Defect described herein, they would not have purchased or leased the Class Vehicles or would have paid less for them.

403.   Connecticut Plaintiff and the Connecticut Sub-Class Members are reasonable consumers who do not expect that their vehicles will suffer from the Defect. That is the reasonable and objective consumer expectation for vehicles.

404.   As a result of Volvo's misconduct, Connecticut Plaintiff and the Connecticut Sub-Class Members have been harmed and have suffered actual damages in that the Class Vehicles are defective and require repairs or replacement.

405.   As a direct and proximate result of Volvo's unfair or deceptive acts or practices, Connecticut Plaintiff and the Connecticut Sub-Class Members have suffered and will continue to suffer actual damages.

406.   Volvo's violations present a continuing risk to Connecticut Plaintiff and the Connecticut Sub-Class Members as well as to the general public.  Volvo's unlawful acts and practices complained of herein affect the public interest.

407.   Connecticut Plaintiff provided notice of his claims by letter dated February 16, 2022.

408.   Pursuant to Conn. Gen. Stat. § 42-110g, Connecticut Plaintiff and the Connecticut Sub-Class seek an order enjoining Volvo's unfair and/or deceptive acts or practices, and awarding damages, punitive damages, attorneys' fees and costs, and any other just and proper relief available under the Connecticut UTPA.

**Claims on Behalf of the Florida Sub-Class**

<u>**COUNT VI**</u>
**Breach of Express Warranty**
**F.S.A. §§ 672.313 AND 680.21**
**(On Behalf of the Florida Sub-Class against**
**Defendants VCNA and Volvo AB)**

409.   Plaintiffs repeat and re-allege each and every allegation contained above in paragraphs 1 through 314 above as if fully set forth herein.

111

410.   Plaintiffs Christopher and Melissa Johnson ("Florida Plaintiffs") brings this count on behalf of themselves and the Florida Sub-Class against Defendants VCNA and Volvo AB.

411.   Defendants VCNA and Volvo AB are and were at all relevant times "merchants" with respect to motor vehicles under F.S.A. §§ 672.104(1) and 680.1031(3)(k), and a "seller" of motor vehicles under § 672.103(1)(d).

412.   With respect to leases, Defendants VCNA and Volvo AB are and were at all relevant times "lessors" of motor vehicles under F.S.A. § 680.1031(1)(p).

413.   The Class Vehicles are and were at all relevant times "goods" within the meaning of F.S.A. §§ 672.105(1) and 680.1031(1)(h).

414.   The engines were manufactured and/or installed in the Class Vehicles by Volvo and are covered by the express warranty.

415.   Defendants VCNA and Volvo AB provided all purchasers and lessees of the Class Vehicles with an express warranty described herein, which became a material part of the bargain. Accordingly, Defendants VCNA and Volvo AB's express warranty is an express warranty under Connecticut state law.

416.   In a section entitled "Warranty Repairs," Defendants VCNA and Volvo AB's express warranty (or New Vehicle Limited Warranty ("NVLW")) provides in relevant part that "[w]arranty repairs which are required as a result of defects in material or workmanship, and are brought to the attention of an authorized Volvo

retailer by an owner, will be performed by an authorized Volvo retailer only at no charge during the warranty period."

417. According to Volvo, the NVLW coverage is for "4 years/50,000 miles[.]"

418. Defendants VCNA and Volvo AB also provide a maintenance warranty, the Complimentary Factor Scheduled Maintenance Program ("Factory Maintenance Program"), which provides that all new vehicles will have "the first three (3) regularly scheduled maintenance services at 10,000, 20,000 and 30,000 miles for the first three (3) years or up to 36,000 miles provided free of charge."

419. Defendants VCNA and Volvo AB's NVLW, Factory Maintenance Program, and other warranties regarding the Class Vehicles formed a basis of the bargain that was breached when Florida Plaintiffs and members of the Florida Sub-Class purchased or leased the Class Vehicles with the defective engine and/or related components.

420. Florida Plaintiffs and members of the Florida Sub-Class experienced defects within the warranty period. Despite the existence of the NVLW, Defendants VCNA and Volvo AB failed to inform Florida Plaintiffs and members of the Florida Sub-Class that the Class Vehicles were equipped with defective engines and related components. When providing repairs under the express warranty, these repairs were ineffective and incomplete and did not provide a permanent repair for the Defect.

421.   Defendants VCNA and Volvo AB breached the express warranty through the acts and omissions described above, including by promising to repair or adjust defects in materials or workmanship of any part supplied by Volvo and then failing to do so. Defendants VCNA and Volvo AB have not repaired or adjusted, and have been unable to repair or adjust, the Class Vehicles materials and workmanship defects.

422.   Florida Plaintiffs and members of the Florida Sub-Class have had sufficient direct dealings with either Defendants VCNA and Volvo AB or their agents (*i.e.*, dealerships and technical support) to establish privity of contract between Defendants VCNA and Volvo AB, on one hand, and Florida Plaintiffs and each member of the Florida Sub-Class on the other hand.  Nonetheless, privity is not required here because Florida Plaintiffs and members of the Florida Sub-Class are intended third-party beneficiaries of contracts between Defendants VCNA and Volvo AB and their distributors and dealers, and specifically, of Defendants VCNA and Volvo AB's express warranties, including the NVLWs, the Powertrain Warranties, and any warranties provided with certified pre-owned vehicles.  The dealers were not intended to be the ultimate consumers of the Class Vehicles and have rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumer only.

423.   Any attempt by Defendants VCNA and Volvo AB to disclaim or limit recovery to the terms of the express warranty is unconscionable and unenforceable here.   Specifically, the warranty limitation is unenforceable because Volvo knowingly sold or leased defective products without informing consumers about the Defect.   The time limits are unconscionable and inadequate to protect Florida Plaintiffs and the members of the Florida Sub-Class.   Among other things, Florida Plaintiffs and members of the Florida Sub-Class did not determine these time limitations and/or did not know of other limitations not appearing in the text of the warranties, the terms of which were drafted by Defendants VCNA and Volvo AB and unreasonably favored Defendants VCNA and Volvo AB. A gross disparity in bargaining power and knowledge of the extent, severity, and safety risk of the Defect existed between Defendants VCNA and Volvo AB and members of the Florida Sub-Class.

424.   Further, the limited warranty promising to repair and/or correct a manufacturing or workmanship defect fails of its essential purpose because the contractual remedy is insufficient to make Florida Plaintiffs and the members of the Florida Sub-Class whole, because Defendants VCNA and Volvo AB have failed and/or have refused to adequately provide the promised remedies, *i.e.*, a permanent repair, within a reasonable time.

115

425.   Florida Plaintiffs were not required to notify Defendants VCNA and Volvo AB of the breach because affording Defendants VCNA and Volvo AB a reasonable opportunity to cure their breach of written warranty would have been futile. Defendants VCNA and Volvo AB were also on notice of the Defect from the complaints and service requests it received from Class Members, including those formal complaints submitted to NHTSA, and through other internal sources.

426.   Nonetheless, Florida Plaintiffs and members of the Florida Sub-Class provided notice to Defendants VCNA and Volvo AB of the breach of express warranties when they took their vehicles to Volvo-authorized providers of warranty repairs.

427.   As a result of Defendants VCNA and Volvo AB's breach of the applicable express warranties, owners and/or lessees of the Class Vehicles suffered, and continue to suffer, an ascertainable loss of money, property, and/or value of their Class Vehicles.

428.   As a direct and proximate result of Defendants VCNA and Volvo AB's breach of express warranties, Florida Plaintiffs and members of the Florida Sub-Class have been damaged in an amount to be determined at trial.

429.   As a result of Defendants VCNA and Volvo AB's breach of the express warranty, Florida Plaintiffs and Florida Sub-Class Members are entitled to legal and

equitable relief against Volvo, including actual damages, specific performance, attorney's fees, costs of suit, and other relief as appropriate.

## COUNT VII
### Breach of the Implied Warranty of Merchantability
### F.S.A. §§ 672.314 AND 680.212
### (On Behalf of the Florida Sub-Class against all Defendants)

430.   Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 314 as if fully set forth herein.

431.   Florida Plaintiffs brings this count on behalf of themselves and the Florida Sub-Class against all Defendants.

432.   Volvo is and was at all relevant times a "merchant" with respect to motor vehicles under F.S.A. §§ 672.104(1) and 680.1031(3)(k), and a "seller" of motor vehicles under § 672.103(1)(d).

433.   With respect to leases, Volvo is and was at all relevant times a "lessor" of motor vehicles under F.S.A. § 680.1031(1)(p).

434.   The Class Vehicles are and were at all relevant times "goods" within the meaning of F.S.A. §§ 672.105(1) and 680.1031(1)(h).

435.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law under F.S.A. §§ 672.314 and 680.212.

436.   Volvo knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased. Volvo directly sold and marketed Class Vehicles to customers through authorized dealers, like those from whom Florida Plaintiffs and members of the Florida Sub-Class bought or leased their vehicles, for

the intended purpose of consumers purchasing the vehicles. Volvo knew that the Class Vehicles would and did pass unchanged from the authorized dealers to Florida Plaintiffs and members of the Florida Sub-Class, with no modification to the defective Class Vehicles.

437.   Volvo provided Florida Plaintiffs and members of the Florida Sub-Class with an implied warranty that the Class Vehicles and their components and parts are merchantable and fit for the ordinary purposes for which they were sold. However, the Class Vehicles are not fit for their ordinary purpose of providing reasonably reliable and safe transportation because, *inter alia*, the Class Vehicles and their engine suffered from an inherent defect at the time of sale and thereafter and are not fit for their particular purpose of providing safe and reliable transportation.

438.   This implied warranty included, among other things: (i) a warranty that the Class Vehicles that were manufactured, supplied, distributed, and/or sold by Volvo were safe and reliable for providing transportation; and (ii) a warranty that the Class Vehicles would be fit for their intended use while the Class Vehicles were being operated.

439.   Contrary to the applicable implied warranties, the Class Vehicles at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiffs and Class Members with reliable, durable, and safe transportation. Instead, the Class Vehicles were and are defective at the time of sale or lease and thereafter as more fully described above. Volvo knew of this defect at the time these sale or lease transactions occurred.

440.   As a result of Volvo's breach of the applicable implied warranties, Connecticut Plaintiff and members of the Connecticut Sub-Class suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Defect, Florida Plaintiffs and members of the Florida Sub-Class were harmed and suffered actual damages in that the Class Vehicles are substantially certain to fail before their expected useful life has run.

441.   Volvo's actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use in violation of the Uniform Commercial Code and relevant state law.

442.   Florida Plaintiffs and members of the Florida Sub-Class have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of Volvo's conduct described herein.

443.   Florida Plaintiffs and members of the Florida Sub-Class have had sufficient direct dealings with either Volvo or its agents (*i.e.*, dealerships and technical support) to establish privity of contract between Volvo, on one hand, and Florida Plaintiffs and members of the Florida Sub-Class on the other hand. Nonetheless, privity is not required here because Florida Plaintiffs and members of the Florida Sub-Class are intended third-party beneficiaries of contracts between Volvo and its distributors and dealers, and specifically, of Volvo's express warranties, including the NVLW, the Powertrain Warranties, and any warranties provided with certified pre-owned vehicles.  The dealers were not intended to be the ultimate consumers of the Class Vehicles and have rights under the warranty

agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumer only.

444. Florida Plaintiffs and members of the Florida Sub-Class were not required to notify Volvo of the breach because affording Volvo a reasonable opportunity to cure its breach of warranty would have been futile. Volvo was also on notice of the Defect from the complaints and service requests it received from Florida Plaintiffs and the Class Members and through other internal sources.

445. Nonetheless, Florida Plaintiffs and members of the Florida Sub-Class provided notice to Volvo of the breach of express warranties when they took their vehicles to Volvo-authorized provider of warranty repairs.

446. As a direct and proximate cause of Volvo's breach, Florida Plaintiffs and members of the Florida Sub-Class suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, Florida Plaintiffs and members of the Florida Sub-Class have incurred or will incur economic damages at the point of repair in the form of the cost of repair as well as additional losses.

447. As a direct and proximate result of Volvo's breach of the implied warranty of merchantability, Florida Plaintiffs and members of the Florida Sub-Class have been damaged.

## COUNT VIII
### Violations of the Florida Unlawful Trade Practices Act
### F.S.A. §§ 501.201-.213
### (On Behalf of the Florida Sub-Class against all Defendants)

448.   Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 314 above as if fully set forth herein.

449.   Florida Plaintiffs brings this cause of action on behalf of themselves and on behalf of the members of the Florida Sub-Class against all Defendants.

450.   Volvo's business acts and practices alleged herein constitute unfair, unconscionable and/or deceptive methods, acts or practices under the Florida Deceptive and Unfair Trade Practices Act, § 501.201, *et seq*., ("FDUTPA").

451.   At all relevant times, Florida Plaintiffs and members of the Florida Sub-Class were "consumers" within the meaning of the FDUTPA. F.S.A. § 501.203(7).

452.   GM's conduct, as set forth herein, occurred in the conduct of "trade or commerce" within the meaning of the FDUTPA. F.S.A. § 501.203(8).

453.   FDUPTA prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce" at set forth in the statute. Fla. Stat. § 501.204(1).  Breach of express and implied warranties constitutes an unfair or deceptive act or practice under FDUTPA.  Volvo engaged in unlawful trade practices, and unfair or deceptive acts or practices that violated the FDUTPA

454.   Volvo participated in unfair or deceptive trade practices that violated the FDUTPA.  As described below and alleged throughout the Complaint, by failing

121

to disclose the Defect, by concealing the Defect, by marketing its vehicles as safe, reliable, well-engineered, and of high quality, and by presenting itself as a reputable manufacturer that valued safety, performance and reliability, and stood behind its vehicles after they were sold, Volvo knowingly and intentionally misrepresented and omitted material facts in connection with the sale or lease of the Class Vehicles. Volvo systematically misrepresented, concealed, suppressed, or omitted material facts relating to the Class Vehicles and the Defect in the course of its business.

455.   Volvo also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles.

456.   Volvo's unfair and deceptive acts or practices occurred repeatedly in Volvo's trade or business, were capable of deceiving a substantial portion of the purchasing public, and imposed a serious safety risk on the public.

457.   Volvo knew that the Class Vehicles suffered from an inherent defect, were defectively designed and/or manufactured, and were not suitable for their intended use.

458.   Volvo knew or should have known that its conduct violated the FDUTPA.

122

459. Volvo was under a duty to Florida Plaintiffs and the Florida Sub-Class Members to disclose the defective nature of the Class Vehicles because:

(a) Volvo was in a superior position to know the true state of facts about the safety defect in the Class Vehicles;

(b) Volvo made partial disclosures about the quality of the Class Vehicles without revealing the defective nature of the Class Vehicles; and

(c) Volvo actively concealed the defective nature of the Class Vehicles from Connecticut Plaintiff and the Connecticut Sub-Class Members at the time of sale and thereafter.

460. By failing to disclose the Defect, Volvo knowingly and intentionally concealed material facts and breached its duty not to do so.

461. The facts concealed or not disclosed by Volvo to Florida Plaintiffs and the Florida Sub-Class Members are material because a reasonable person would have considered them to be important in deciding whether or not to purchase or lease Volvo's Class Vehicles, or to pay less for them. Whether an engine installed in a vehicle will exhibit excessive oil consumption causing sudden shut off, premature engine wear, damage, and failure, is a material safety concern. Had Florida Plaintiffs and the Florida Sub-Class Members known that the Class Vehicles suffered from the

Defect described herein, they would not have purchased or leased the Class Vehicles or would have paid less for them.

462.   Florida Plaintiffs and the Florida Sub-Class Members are reasonable consumers who do not expect that their vehicles will suffer from the Defect. That is the reasonable and objective consumer expectation for vehicles.

463.   As a result of Volvo's misconduct, Florida Plaintiffs and the Florida Sub-Class Members have been harmed and have suffered actual damages in that the Class Vehicles are defective and require repairs or replacement.

464.   As a direct and proximate result of Volvo's unfair or deceptive acts or practices, Florida Plaintiffs and the Florida Sub-Class Members have suffered and will continue to suffer actual damages.

465.   Volvo's violations present a continuing risk to Florida Plaintiffs and the Florida Sub-Class Members as well as to the general public.  Volvo's unlawful acts and practices complained of herein affect the public interest.

466.   Florida Plaintiffs and the Florida Sub-Class seek an order enjoining Volvo's unfair and/or deceptive acts or practices, and awarding damages, punitive damages, attorneys' fees and costs, and any other just and proper relief available under the FDUTPA.

**Claims on Behalf of the Illinois Sub-Class**

<u>COUNT IX</u>
**Breach of Express Warranty**
**810 ILL. COMP. STAT. §§ 5/2-313 AND 5/2A-210**
**(On Behalf of the Illinois Sub-Class against Defendants VCNA and Volvo AB)**

467.   Plaintiffs repeat and re-allege each and every allegation contained above in paragraphs 1 through 314 above as if fully set forth herein.

468.   Plaintiff Philippe Geyskens ("Illinois Plaintiff") brings this count on behalf of himself and the Illinois Sub-Class against Defendants VCNA and Volvo AB.

469.   Defendants VCNA and Volvo AB are and were at all relevant times "merchants" with respect to motor vehicles under 810 Ill. Comp. Stat. §§ 5/2-104(1) and 5/2A-103(3), and "sellers" of motor vehicles under § 5/2-103(1)(d).

470.   With respect to leases, Defendants VCNA and Volvo AB are and were at all relevant times "lessors" of motor vehicles under 810 Ill. Comp. Stat. § 5/2A-103(1)(p).

471.   The Class Vehicles are and were at all relevant times "goods" within the meaning of 810 Ill. Comp. Stat. §§ 5/2-105(1) and 5/2A-103(1)(h).

472.   The engines were manufactured and/or installed in the Class Vehicles by Volvo and are covered by the express warranty.

473.   Defendants VCNA and Volvo AB provided all purchasers and lessees of the Class Vehicles with an express warranty described herein, which became a

material part of the bargain. Accordingly, Defendants VCNA and Volvo AB's express warranty is an express warranty under Illinois state law.

474.   In a section entitled "Warranty Repairs," Defendants VCNA and Volvo AB's express warranty (or New Vehicle Limited Warranty ("NVLW")) provides in relevant part that "[w]arranty repairs which are required as a result of defects in material or workmanship, and are brought to the attention of an authorized Volvo retailer by an owner, will be performed by an authorized Volvo retailer only at no charge during the warranty period."

475.   According to Volvo, the NVLW coverage is for "4 years/50,000 miles[.]"

476.   Defendants VCNA and Volvo AB also provide a maintenance warranty, the Complimentary Factor Scheduled Maintenance Program ("Factory Maintenance Program"), which provides that all new vehicles will have "the first three (3) regularly scheduled maintenance services at 10,000, 20,000 and 30,000 miles for the first three (3) years or up to 36,000 miles provided free of charge."

477.   Defendants VCNA and Volvo AB's NVLW, Factory Maintenance Program, and other warranties regarding the Class Vehicles formed a basis of the bargain that was breached when Illinois Plaintiff and members of the Illinois Sub-Class purchased or leased the Class Vehicles with the defective engine and/or related components.

126

478.   Illinois Plaintiff and members of the Illinois Sub-Class experienced defects within the warranty period. Despite the existence of the NVLW, Defendants VCNA and Volvo AB failed to inform Illinois Plaintiff and members of the Illinois Sub-Class that the Class Vehicles were equipped with defective engines and related components.  When providing repairs under the express warranty, these repairs were ineffective and incomplete and did not provide a permanent repair for the Defect.

479.   Defendants VCNA and Volvo AB breached the express warranty through the acts and omissions described above, including by promising to repair or adjust defects in materials or workmanship of any part supplied by Volvo and then failing to do so. Defendants VCNA and Volvo AB have not repaired or adjusted, and have been unable to repair or adjust, the Class Vehicles materials and workmanship defects.

480.   Illinois Plaintiff and members of the Illinois Sub-Class have had sufficient direct dealings with either Defendants VCNA and Volvo AB or their agents (*i.e.*, dealerships and technical support) to establish privity of contract between Defendants VCNA and Volvo AB, on one hand, and Illinois Plaintiff and each member of the Illinois Sub-Class on the other hand.  Nonetheless, privity is not required here because Illinois Plaintiff and members of the Illinois Sub-Class are intended third-party beneficiaries of contracts between Defendants VCNA and Volvo AB and their distributors and dealers, and specifically, of Defendants VCNA

and Volvo AB's express warranties, including the NVLW, the Powertrain Warranties, and any warranties provided with certified pre-owned vehicles. The dealers were not intended to be the ultimate consumers of the Class Vehicles and have rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumer only.

481.   Any attempt by Defendants VCNA and Volvo AB to disclaim or limit recovery to the terms of the express warranty is unconscionable and unenforceable here.   Specifically, the warranty limitation is unenforceable because Volvo knowingly sold or leased defective products without informing consumers about the Defect.   The time limits are unconscionable and inadequate to protect Illinois Plaintiff and the members of the Illinois Sub-Class.   Among other things, Illinois Plaintiff and members of the Illinois Sub-Class did not determine these time limitations and/or did not know of other limitations not appearing in the text of the warranties, the terms of which were drafted by Defendants VCNA and Volvo AB and unreasonable favored Defendants VCNA and Volvo AB. A gross disparity in bargaining power and knowledge of the extent, severity, and safety risk of the Defect existed between Defendants VCNA and Volvo AB and members of the Illinois Sub-Class.

482.   Further, the limited warranty promising to repair and/or correct a manufacturing or workmanship defect fails of its essential purpose because the

contractual remedy is insufficient to make Illinois Plaintiff and the members of the Illinois Sub-Class whole, because Defendants VCNA and Volvo AB have failed and/or have refused to adequately provide the promised remedies, *i.e.*, a permanent repair, within a reasonable time.

483.   Illinois Plaintiff was not required to notify Defendants VCNA and Volvo AB of the breach because affording Defendants VCNA and Volvo AB a reasonable opportunity to cure their breach of written warranty would have been futile. Defendants VCNA and Volvo AB were also on notice of the Defect from the complaints and service requests it received from Class Members, including those formal complaints submitted to NHTSA, and through other internal sources.

484.   Nonetheless, Illinois Plaintiff and members of the Illinois Sub-Class provided notice to Defendants VCNA and Volvo AB of the breach of express warranties when they took their vehicles to Volvo-authorized providers of warranty repairs.  Illinois Plaintiff also provided notice to Defendants VCNA and Volvo AB of their breach of express warranty by letter dated February 18, 2022.

485.   As a result of Defendants VCNA and Volvo AB's breach of the applicable express warranties, owners and/or lessees of the Class Vehicles suffered, and continue to suffer, an ascertainable loss of money, property, and/or value of their Class Vehicles.

486.   As a direct and proximate result of Defendants VCNA and Volvo AB's breach of express warranties, Illinois Plaintiff and members of the Illinois Sub-Class have been damaged in an amount to be determined at trial.

487.   As a result of Defendants VCNA and Volvo AB's breach of the express warranty, Illinois Plaintiff and Illinois Sub-Class Members are entitled to legal and equitable relief against Volvo, including actual damages, specific performance, attorney's fees, costs of suit, and other relief as appropriate.

**COUNT X**
**Breach of the Implied Warranty of Merchantability**
**810 ILL. COMP. STAT. §§ 5/2-314 AND 5/2A-212**
**(On Behalf of the Illinois Sub-Class against all Defendants)**

488.   Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 314 as if fully set forth herein.

489.   Illinois Plaintiff brings this count on behalf of himself and the Illinois Sub-Class against all Defendants.

490.   Volvo is and was at all relevant times a "merchant" with respect to motor vehicles under 810 Ill. Comp. Stat. §§ 5/2-104(1) and 5/2A-103(3), and a "seller" of motor vehicles under § 5/2-103(1)(d).

491.   With respect to leases, Volvo is and was at all relevant times a "lessor" of motor vehicles under 810 Ill. Comp. Stat. § 5/2A-103(1)(p).

130

492.   The Class Vehicles are and were at all relevant times "goods" within the meaning of 810 Ill. Comp. Stat. §§ 5/2-105(1) and 5/2A-103(1)(h).

493.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law under 810 Ill. Comp. Stat. §§ 5/2-314 and 5/2A-212.

494.   Volvo knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased. Volvo directly sold and marketed Class Vehicles to customers through authorized dealers, like those from whom Illinois Plaintiff and members of the Illinois Sub-Class bought or leased their vehicles, for the intended purpose of consumers purchasing the vehicles. Volvo knew that the Class Vehicles would and did pass unchanged from the authorized dealers to Illinois Plaintiff and members of the Illinois Sub-Class, with no modification to the defective Class Vehicles.

495.   Volvo provided Illinois Plaintiff and members of the Illinois Sub-Class with an implied warranty that the Class Vehicles and their components and parts are merchantable and fit for the ordinary purposes for which they were sold.  However, the Class Vehicles are not fit for their ordinary purpose of providing reasonably reliable and safe transportation because, *inter alia*, the Class Vehicles and their engine suffered from an inherent defect at the time of sale and thereafter and are not fit for their particular purpose of providing safe and reliable transportation.

496.   This implied warranty included, among other things: (i) a warranty that the Class Vehicles that were manufactured, supplied, distributed, and/or sold by Volvo were safe and reliable for providing transportation; and (ii) a warranty that the Class Vehicles would be fit for their intended use while the Class Vehicles were being operated.

497.   Contrary to the applicable implied warranties, the Class Vehicles at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiffs and Class Members with reliable, durable, and safe transportation. Instead, the Class Vehicles were and are defective at the time of sale or lease and thereafter as more fully described above. Volvo knew of this defect at the time these sale or lease transactions occurred.

498.   As a result of Volvo's breach of the applicable implied warranties, Illinois Plaintiff and members of the Illinois Sub-Class suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Defect, Illinois Plaintiff and members of the Illinois Sub-Class were harmed and suffered actual damages in that the Class Vehicles are substantially certain to fail before their expected useful life has run.

499.   Volvo's actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use in violation of the Uniform Commercial Code and relevant state law.

500.   Illinois Plaintiff and members of the Illinois Sub-Class have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of Volvo's conduct described herein.

501.   Illinois Plaintiff and members of the Illinois Sub-Class have had sufficient direct dealings with either Volvo or its agents (*i.e.*, dealerships and technical support) to establish privity of contract between Volvo, on one hand, and Illinois Plaintiff and members of the Illinois Sub-Class on the other hand. Nonetheless, privity is not required here because Illinois Plaintiff and members of the Illinois Sub-Class are intended third-party beneficiaries of contracts between Volvo and its distributors and dealers, and specifically, of Volvo's express warranties, including the NVLW, the Powertrain Warranties, and any warranties provided with certified pre-owned vehicles.  The dealers were not intended to be the ultimate consumers of the Class Vehicles and have rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumer only.

502.   Illinois Plaintiff and members of the Illinois Sub-Class were not required to notify Volvo of the breach because affording Volvo a reasonable opportunity to cure its breach of warranty would have been futile. Volvo was also on notice of the Defect from the complaints and service requests it received from Illinois Plaintiff and the Class Members and through other internal sources.

503.   Nonetheless, Illinois Plaintiff and members of the Illinois Sub-Class provided notice to Volvo of the breach of express warranties when they took their vehicles to Volvo-authorized provider of warranty repairs.  Illinois Plaintiff also provided notice to Volvo of its breach of express warranty by letter dated February 18, 2022.

504.   As a direct and proximate cause of Volvo's breach, Illinois Plaintiff and members of the Illinois Sub-Class suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, Illinois Plaintiff and members of the Illinois Sub-Class have incurred or will incur economic damages at the point of repair in the form of the cost of repair as well as additional losses.

505.   As a direct and proximate result of Volvo's breach of the implied warranty of merchantability, Illinois Plaintiff and members of the Illinois Sub-Class have been damaged in an amount to be proven at trial.

## COUNT XI
### Violations of the Illinois Consumer Fraud and Deceptive Business Practices Act
### 815 ILCS 505/1, *et seq.*
### (On Behalf of the Illinois Sub-Class against all Defendants)

506.   Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 314 above as if fully set forth herein.

507.   Illinois Plaintiff brings this cause of action on behalf of himself and on behalf of the members of the Illinois Sub-Class against all Defendants.

508.   Volvo is a "person" as that term is defined in 815 ILCS 505/1(c).

509.   Illinois Plaintiff and the Illinois Sub-Class members are "consumers" as that term is defined in 815 ILCS 505/1(e).

510.   The Illinois Consumer Fraud and Deceptive Business Practices Act ("Illinois CFA") prohibits "unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression, or omission of any material fact, with intent that others rely upon the concealment, suppression, or omission of such material fact … in the conduct of trade or commerce … whether any person has in fact been misled, deceived or damaged thereby." 815 ILCS 505/2. Volvo engaged in unlawful trade practices, and unfair or deceptive acts or practices that violated the Illinois CFA.

511.   Volvo participated in unfair or deceptive trade practices that violated the Illinois CFA.  As described below and alleged throughout the Complaint, by failing to disclose the Defect, by concealing the Defect, by marketing its vehicles as safe, reliable, well-engineered, and of high quality, and by presenting itself as a reputable manufacturer that valued safety, performance and reliability, and stood behind its vehicles after they were sold, Volvo knowingly and intentionally misrepresented and omitted material facts in connection with the sale or lease of the Class Vehicles. Volvo systematically misrepresented, concealed, suppressed, or

omitted material facts relating to the Class Vehicles and the Defect in the course of its business.

512. Volvo also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale of the Class Vehicles.

513. Volvo's unfair and deceptive acts or practices occurred repeatedly in Volvo's trade or business, were capable of deceiving a substantial portion of the purchasing public and imposed a serious safety risk on the public.

514. Volvo knew that the Class Vehicles suffered from an inherent defect, were defectively designed and/or manufactured, and were not suitable for their intended use.

515. Volvo knew or should have known that its conduct violated the Illinois CFA.

516. Volvo was under a duty to Illinois Plaintiff and the Illinois Sub-Class Members to disclose the defective nature of the Class Vehicles because:

> (a)    Volvo was in a superior position to know the true state of facts about the safety defect in the Class Vehicles;
>
> (b)    Volvo made partial disclosures about the quality of the Class Vehicles without revealing the defective nature of the Class Vehicles; and

(c)    Volvo actively concealed the defective nature of the Class Vehicles from Illinois Plaintiff and the Illinois Sub-Class Members at the time of sale and thereafter.

517.   By failing to disclose the Defect, Volvo knowingly and intentionally concealed material facts and breached its duty not to do so.

518.   The facts concealed or not disclosed by Volvo to Illinois Plaintiff and the Illinois Sub-Class Members are material because a reasonable person would have considered them to be important in deciding whether or not to purchase or lease Volvo's Class Vehicles, or to pay less for them. Whether an engine installed in a vehicle will exhibit excessive oil consumption causing sudden shut off, premature engine wear, damage, and failure, is a material safety concern. Had Illinois Plaintiff and the Illinois Sub-Class Members known that the Class Vehicles suffered from the Defect described herein, they would not have purchased or leased the Class Vehicles or would have paid less for them.

519.   Illinois Plaintiff and the Illinois Sub-Class Members are reasonable consumers who do not expect that their vehicles will suffer from the Defect. That is the reasonable and objective consumer expectation for vehicles.

520.   As a result of Volvo's misconduct, Illinois Plaintiff and the Illinois Sub-Class Members have been harmed and have suffered actual damages in that the Class Vehicles are defective and require repairs or replacement.

521.   As a direct and proximate result of Volvo's unfair or deceptive acts or practices, Illinois Plaintiff and the Illinois Sub-Class Members have suffered and will continue to suffer actual damages.

522.   Volvo's violations present a continuing risk to Illinois Plaintiff and the Illinois Sub-Class Members as well as to the general public.  Volvo's unlawful acts and practices complained of herein affect the public interest.

523.   Illinois Plaintiff provided notice of his claims, by letter dated February 18, 2022.

524.   Pursuant to 815 ILCS 505/10a(a), Illinois Plaintiff and the Illinois Sub-Class Members seek monetary relief against Volvo in the amount of actual damages, as well as punitive damages because Volvo acted with fraud and/or malice and/or was grossly negligent.

525.   Illinois Plaintiff and the Illinois Sub-Class Members also seeks attorneys' fees, and any other just and proper relief available under 815 Ill. Comp. Stat. § 505/1, *et seq*.

**Claims on Behalf of the Maryland Sub-Class**

<u>**COUNT XII**</u>
**Breach of Express Warranty**
**Md. Com. Law §§ 2-313 and 2A-210**
**(On Behalf of the Maryland Sub-Class against Defendants VCNA and Volvo AB)**

526.   Plaintiffs repeat and re-allege each and every allegation contained above in paragraphs 1 through 314 above as if fully set forth herein.

527.   Plaintiff Kimberly Madeja ("Maryland Plaintiff") brings this count on behalf of herself and the Maryland Sub-Class against Defendants VCNA and Volvo AB.

528.   Defendants VCNA and Volvo AB are and were at all relevant times "merchants" with respect to motor vehicles under Md. Com. Law §§ 2-104(1) and 2A-103(3), and a "seller" of motor vehicles under § 2-103(1)(d).

529.   With respect to leases, Defendants VCNA and Volvo AB are and were at all relevant times "lessors" of motor vehicles under Md. Com. Law § 2A-103(1)(p).

530.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Md. Com. Law §§ 2-105(1) and 2A-103(1)(h).

531.   The engines were manufactured and/or installed in the Class Vehicles by Volvo and are covered by the express warranty.

532.   Defendants VCNA and Volvo AB provided all purchasers and lessees of the Class Vehicles with an express warranty described herein, which became a material part of the bargain. Accordingly, Defendants VCNA and Volvo AB's express warranty is an express warranty under Maryland state law.

533.   In a section entitled "Warranty Repairs," Defendants VCNA and Volvo AB's express warranty (or New Vehicle Limited Warranty ("NVLW")) provides in relevant part that "[w]arranty repairs which are required as a result of defects in material or workmanship, and are brought to the attention of an authorized Volvo retailer by an owner, will be performed by an authorized Volvo retailer only at no charge during the warranty period."

534. According to Volvo, the NVLW coverage is for "4 years/50,000 miles[.]"

535. Defendants VCNA and Volvo AB also provide a maintenance warranty, the Complimentary Factor Scheduled Maintenance Program ("Factory Maintenance Program"), which provides that all new vehicles will have "the first three (3) regularly scheduled maintenance services at 10,000, 20,000 and 30,000 miles for the first three (3) years or up to 36,000 miles provided free of charge."

536. Defendants VCNA and Volvo AB's NVLW, Factory Maintenance Program, and other warranties regarding the Class Vehicles formed a basis of the bargain that was breached when Maryland Plaintiff and members of the Maryland Sub-Class purchased or leased the Class Vehicles with the defective engine and/or related components.

537. Maryland Plaintiff and members of the Maryland Sub-Class experienced defects within the warranty period. Despite the existence of the NVLW, Defendants VCNA and Volvo AB failed to inform Maryland Plaintiff and members of the Maryland Sub-Class that the Class Vehicles were equipped with defective engines and related components.  When providing repairs under the express warranty, these repairs were ineffective and incomplete and did not provide a permanent repair for the Defect.

538. Defendants VCNA and Volvo AB breached the express warranty through the acts and omissions described above, including by promising to repair or adjust defects in materials or workmanship of any part supplied by Volvo and then failing to do so. Defendants VCNA and Volvo AB have not repaired or adjusted, and have been unable to repair or adjust, the Class Vehicles materials and workmanship defects.

539. Maryland Plaintiff and members of the Maryland Sub-Class have had sufficient direct dealings with either Defendants VCNA and Volvo AB or their agents (*i.e.*, dealerships and technical support) to establish privity of contract between Defendants VCNA and Volvo AB, on one hand, and Maryland Plaintiff and each member of the Maryland Sub-Class on the other hand.  Nonetheless, privity is not required here because Maryland Plaintiff and members of the Maryland Sub-Class are intended third-party beneficiaries of contracts between Defendants VCNA and Volvo AB and their distributors and dealers, and specifically, of Defendants VCNA and Volvo AB's express warranties, including the NVLW, the Powertrain Warranties, and any warranties provided with certified pre-owned vehicles.  The dealers were not intended to be the ultimate consumers of the Class Vehicles and have rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumer only.

540.   Any attempt by Defendants VCNA and Volvo AB to disclaim or limit recovery to the terms of the express warranty is unconscionable and unenforceable here.   Specifically, the warranty limitation is unenforceable because Volvo knowingly sold or leased defective products without informing consumers about the Defect.  The time limits are unconscionable and inadequate to protect Maryland Plaintiff and the members of the Maryland Sub-Class.   Among other things, Maryland Plaintiff and members of the Maryland Sub-Class did not determine these time limitations and/or did not know of other limitations not appearing in the text of the warranties, the terms of which were drafted by Defendants VCNA and Volvo AB and unreasonable favored Defendants VCNA and Volvo AB. A gross disparity in bargaining power and knowledge of the extent, severity, and safety risk of the Defect existed between Defendants VCNA and Volvo AB and members of the Maryland Sub-Class.

541.  Further, the limited warranty promising to repair and/or correct a manufacturing or workmanship defect fails of its essential purpose because the contractual remedy is insufficient to make Maryland Plaintiff and the members of the Maryland Sub-Class whole, because Defendants VCNA and Volvo AB have failed and/or have refused to adequately provide the promised remedies, *i.e.*, a permanent repair, within a reasonable time.

542.   Maryland Plaintiff was not required to notify Defendants VCNA and Volvo AB of the breach because affording Defendants VCNA and Volvo AB a reasonable opportunity to cure their breach of written warranty would have been futile. Defendants VCNA and Volvo AB were also on notice of the Defect from the complaints and service requests it received from Class Members, including those formal complaints submitted to NHTSA, and through other internal sources.

543.   Nonetheless, Maryland Plaintiff and members of the Maryland Sub-Class provided notice to Defendants VCNA and Volvo AB of the breach of express warranties when they took their vehicles to Volvo-authorized providers of warranty repairs.  Illinois Plaintiff also provided notice to Defendants VCNA and Volvo AB of their breach of express warranty by letter dated May 20, 2022.

544.   As a result of Defendants VCNA and Volvo AB's breach of the applicable express warranties, owners and/or lessees of the Class Vehicles suffered, and continue to suffer, an ascertainable loss of money, property, and/or value of their Class Vehicles.

545.   As a direct and proximate result of Defendants VCNA and Volvo AB's breach of express warranties, Maryland Plaintiff and members of the Maryland Sub-Class have been damaged in an amount to be determined at trial.

546.   As a result of Defendants VCNA and Volvo AB's breach of the express warranty, Maryland Plaintiff and Maryland Sub-Class Members are entitled to legal

and equitable relief against Volvo, including actual damages, specific performance,

attorney's fees, costs of suit, and other relief as appropriate.

## COUNT XIII
### Breach of the Implied Warranty of Merchantability
### Md. Com. Law §§ 2-314 and 2A-212
### (On Behalf of the Maryland Sub-Class against all Defendants)

547.   Plaintiffs repeat and re-allege each and every allegation contained in

paragraphs 1 through 314 as if fully set forth herein.

548.   Maryland Plaintiff brings this count on behalf of herself and the

Maryland Sub-Class against all Defendants.

549.   Volvo is and was at all relevant times a "merchant" with respect to

motor vehicles under Md. Com. Law §§ 2-104(1) and 2A-103(3), and a "seller" of

motor vehicles under § 2-103(1)(d).

550.   With respect to leases, Volvo is and was at all relevant times a "lessor"

of motor vehicles under Md. Com. Law § 2A-103(1)(p).

551.   The Class Vehicles are and were at all relevant times "goods" within

the meaning of Md. Com. Law §§ 2-105(1) and 2A-103(1)(h).

552.   A warranty that the Class Vehicles were in merchantable condition and

fit for the ordinary purpose for which vehicles are used is implied by law under Md.

Com. Law §§ 2-314 and 2A-212.

553.   Volvo knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased. Volvo directly sold and marketed Class Vehicles to customers through authorized dealers, like those from whom Maryland Plaintiff and members of the Maryland Sub-Class bought or leased their vehicles, for the intended purpose of consumers purchasing the vehicles. Volvo knew that the Class Vehicles would and did pass unchanged from the authorized dealers to Maryland Plaintiff and members of the Maryland Sub-Class, with no modification to the defective Class Vehicles.

554.   Volvo provided Maryland Plaintiff and members of the Maryland Sub-Class with an implied warranty that the Class Vehicles and their components and parts are merchantable and fit for the ordinary purposes for which they were sold. However, the Class Vehicles are not fit for their ordinary purpose of providing reasonably reliable and safe transportation because, *inter alia*, the Class Vehicles and their engine suffered from an inherent defect at the time of sale and thereafter and are not fit for their particular purpose of providing safe and reliable transportation.

555.   This implied warranty included, among other things: (i) a warranty that the Class Vehicles that were manufactured, supplied, distributed, and/or sold by Volvo were safe and reliable for providing transportation; and (ii) a warranty that

the Class Vehicles would be fit for their intended use while the Class Vehicles were being operated.

556.   Contrary to the applicable implied warranties, the Class Vehicles at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiffs and Class Members with reliable, durable, and safe transportation. Instead, the Class Vehicles were and are defective at the time of sale or lease and thereafter as more fully described above. Volvo knew of this defect at the time these sale or lease transactions occurred.

557.   As a result of Volvo's breach of the applicable implied warranties, Maryland Plaintiff and members of the Maryland Sub-Class suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Defect, Maryland Plaintiff and members of the Maryland Sub-Class were harmed and suffered actual damages in that the Class Vehicles are substantially certain to fail before their expected useful life has run.

558.   Volvo's actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use in violation of the Uniform Commercial Code and relevant state law.

559.   Maryland Plaintiff and members of the Maryland Sub-Class have complied with all obligations under the warranty, or otherwise have been excused

146

from performance of said obligations as a result of Volvo's conduct described herein.

560.   Maryland Plaintiff and members of the Maryland Sub-Class have had sufficient direct dealings with either Volvo or its agents (*i.e.*, dealerships and technical support) to establish privity of contract between Volvo, on one hand, and Maryland Plaintiff and members of the Maryland Sub-Class on the other hand. Nonetheless, privity is not required here because Maryland Plaintiff and members of the Maryland Sub-Class are intended third-party beneficiaries of contracts between Volvo and its distributors and dealers, and specifically, of Volvo's express warranties, including the NVLW, the Powertrain Warranties, and any warranties provided with certified pre-owned vehicles.  The dealers were not intended to be the ultimate consumers of the Class Vehicles and have rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumer only.

561.   Maryland Plaintiff and members of the Maryland Sub-Class were not required to notify Volvo of the breach because affording Volvo a reasonable opportunity to cure its breach of warranty would have been futile. Volvo was also on notice of the Defect from the complaints and service requests it received from Maryland Plaintiff and the Class Members and through other internal sources.

562.   Nonetheless, Maryland Plaintiff and members of the Maryland Sub-Class provided notice to Volvo of the breach of express warranties when they took their vehicles to Volvo-authorized provider of warranty repairs.  Maryland Plaintiff also provided notice to Volvo of its breach of express warranty by letter dated May 20, 2022.

563.   As a direct and proximate cause of Volvo's breach, Maryland Plaintiff and members of the Maryland Sub-Class suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, Maryland Plaintiff and members of the Maryland Sub-Class have incurred or will incur economic damages at the point of repair in the form of the cost of repair as well as additional losses.

564.   As a direct and proximate result of Volvo's breach of the implied warranty of merchantability, Maryland Plaintiff and members of the Maryland Sub-Class have been damaged in an amount to be proven at trial.

**COUNT XIV**
**Violations of the Maryland Consumer Protection Act,**
**Md. Code Ann., Com. Law § 13-101, *et seq.***
**(On Behalf of the Maryland Sub-Class against all Defendants)**

565.   Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 314 above as if fully set forth herein.

566.   Maryland Plaintiff brings this cause of action on behalf of herself and on behalf of the members of the Maryland Sub-Class against all Defendants.

567.   Volvo, Maryland Plaintiff, and the Maryland Sub-Class Members are "persons" within the meaning of Md. Code Ann., Com. Law § 13-101(h).

568.   The Maryland Consumer Protection Act ("Maryland CPA") provides that a person may not engage in any unfair and deceptive trade practice in the sale or lease of any consumer good, including representing that goods are of a particular standard, quality, or grade if they are not, advertising goods without intent to sell or lease them as advertised, selling goods knowing that a service, replacement or repair was needed, "failure to state a material fact if the failure deceives or tends to deceive," and "[d]eception, fraud, false pretense, false premise, misrepresentation, or knowing concealment, suppression, or omission of any material fact with the intent that a consumer rely on the same," Md. Code Ann., Com. Law § 13-301, regardless of whether the consumer is actually deceived or damaged, Md. Code Ann., Com. Law § 13-302.  Volvo engaged in unlawful trade practices, and unfair or deceptive acts or practices that violated the Maryland CPA.

569.   Volvo participated in unfair or deceptive trade practices that violated the Maryland CPA.  As described below and alleged throughout the Complaint, by failing to disclose the Defect, by concealing the Defect, by marketing its vehicles as safe, reliable, well-engineered, and of high quality, and by presenting itself as a reputable manufacturer that valued safety, performance and reliability, and stood behind its vehicles after they were sold, Volvo knowingly and intentionally

149

misrepresented and omitted material facts in connection with the sale or lease of the Class Vehicles. Volvo systematically misrepresented, concealed, suppressed, or omitted material facts relating to the Class Vehicles and the Defect in the course of its business.

570.    Volvo also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale of the Class Vehicles.

571.    Volvo's unfair and deceptive acts or practices occurred repeatedly in Volvo's trade or business, were capable of deceiving a substantial portion of the purchasing public and imposed a serious safety risk on the public.

572.    Volvo knew that the Class Vehicles suffered from an inherent defect, were defectively designed and/or manufactured, and were not suitable for their intended use.

573.    Volvo knew or should have known that its conduct violated the Maryland CPA.

574.    Volvo was under a duty to Maryland Plaintiff and the Maryland Sub-Class Members to disclose the defective nature of the Class Vehicles because:

(a)     Volvo was in a superior position to know the true state of facts about the safety defect in the Class Vehicles;

      (b)    Volvo made partial disclosures about the quality of the Class Vehicles without revealing the defective nature of the Class Vehicles; and

      (c)    Volvo actively concealed the defective nature of the Class Vehicles from Illinois Plaintiff and the Illinois Sub-Class Members at the time of sale and thereafter.

575.  By failing to disclose the Defect, Volvo knowingly and intentionally concealed material facts and breached its duty not to do so.

576.  The facts concealed or not disclosed by Volvo to Maryland Plaintiff and the Maryland Sub-Class Members are material because a reasonable person would have considered them to be important in deciding whether or not to purchase or lease Volvo's Class Vehicles, or to pay less for them. Whether an engine installed in a vehicle will exhibit excessive oil consumption causing sudden shut off, premature engine wear, damage, and failure, is a material safety concern. Had Maryland Plaintiff and the Maryland Sub-Class Members known that the Class Vehicles suffered from the Defect described herein, they would not have purchased or leased the Class Vehicles or would have paid less for them.

577.  Maryland Plaintiff and the Maryland Sub-Class Members are reasonable consumers who do not expect that their vehicles will suffer from the Defect. That is the reasonable and objective consumer expectation for vehicles.

578.  As a result of Volvo's misconduct, Maryland Plaintiff and the Maryland Sub-Class Members have been harmed and have suffered actual damages in that the Class Vehicles are defective and require repairs or replacement.

579.   As a direct and proximate result of Volvo's unfair or deceptive acts or practices, Maryland Plaintiff and the Maryland Sub-Class Members have suffered and will continue to suffer actual damages.

580.   Volvo's violations present a continuing risk to Maryland Plaintiff and the Maryland Sub-Class Members as well as to the general public.  Volvo's unlawful acts and practices complained of herein affect the public interest.

581.   Maryland Plaintiff provided notice of her claims, by letter dated May 20, 2022.

582.   Pursuant to Md. Code Ann., Com. Law § 13-408, Maryland Plaintiff and members of the Maryland Sub-Class seek monetary relief against Ford in the amount of actual damages, attorneys' fees, and any other just and proper relief available under the Maryland CPA.

**Claims on Behalf of the Massachusetts Sub-Class**

<u>**COUNT XV**</u>
**Breach of Express Warranty**
**Mass. Gen. Laws ch. 106 §§ 2-313 and 2A-210**
**(On Behalf of the Massachusetts Sub-Class against Defendants VCNA and Volvo AB)**

583.   Plaintiffs repeat and re-allege each and every allegation contained above in paragraphs 1 through 314 above as if fully set forth herein.

584.   Plaintiffs Kevin Flynn, Elsie Saks, and Steven Salhanick ("Massachusetts Plaintiffs") bring this count on behalf of themselves and the Massachusetts Sub-Class against Defendants VCNA and Volvo AB.

585.   Defendants VCNA and Volvo AB are and were at all relevant times "merchants" with respect to motor vehicles under Mass. Gen. Laws ch. 106 §§ 2-104(1) and 2A-103(3), and "sellers" of motor vehicles under § 2-103(1)(d).

586.   With respect to leases, Defendants VCNA and Volvo AB are and were at all relevant times "lessors" of motor vehicles under Mass. Gen. Laws ch. 106 § 2A-103(1)(p).

587.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Mass. Gen. Laws ch. 106 §§ 2-105(1) and 2A-103(1)(h).

588.   The engines were manufactured and/or installed in the Class Vehicles by Volvo and are covered by the express warranty.

589.   Defendants VCNA and Volvo AB provided all purchasers and lessees of the Class Vehicles with an express warranty described herein, which became a material part of the bargain. Accordingly, Defendants VCNA and Volvo AB's express warranty is an express warranty under Massachusetts state law.

590.   In a section entitled "Warranty Repairs," Defendants VCNA and Volvo AB's express warranty (or New Vehicle Limited Warranty ("NVLW")) provides in relevant part that "[w]arranty repairs which are required as a result of defects in material or workmanship, and are brought to the attention of an authorized Volvo retailer by an owner, will be performed by an authorized Volvo retailer only at no charge during the warranty period."

591. According to Volvo, the NVLW coverage is for "4 years/50,000 miles[.]"

592. Defendants VCNA and Volvo AB also provide a maintenance warranty, the Complimentary Factor Scheduled Maintenance Program ("Factory Maintenance Program"), which provides that all new vehicles will have "the first three (3) regularly scheduled maintenance services at 10,000, 20,000 and 30,000 miles for the first three (3) years or up to 36,000 miles provided free of charge."

593. Defendants VCNA and Volvo AB's NVLW, Factory Maintenance Program, and other warranties regarding the Class Vehicles formed a basis of the bargain that was breached when Massachusetts Plaintiffs and members of the Massachusetts Sub-Class purchased or leased the Class Vehicles with the defective engine and/or related components.

594. Massachusetts Plaintiffs and members of the Massachusetts Sub-Class experienced defects within the warranty period. Despite the existence of the NVLW, Defendants VCNA and Volvo AB failed to inform Massachusetts Plaintiffs and members of the Massachusetts Sub-Class that the Class Vehicles were equipped with defective engines and related components. When providing repairs under the express warranty, these repairs were ineffective and incomplete and did not provide a permanent repair for the Defect.

595.   Defendants VCNA and Volvo AB breached the express warranty through the acts and omissions described above, including by promising to repair or adjust defects in materials or workmanship of any part supplied by Volvo and then failing to do so. Defendants VCNA and Volvo AB have not repaired or adjusted, and have been unable to repair or adjust, the Class Vehicles materials and workmanship defects.

596.   Massachusetts Plaintiffs and members of the Massachusetts Sub-Class have had sufficient direct dealings with either Defendants VCNA and Volvo AB or their agents (*i.e.*, dealerships and technical support) to establish privity of contract between Defendants VCNA and Volvo AB, on one hand, and Massachusetts Plaintiffs and each member of the Massachusetts Sub-Class on the other hand. Nonetheless, privity is not required here because Massachusetts Plaintiffs and members of the Massachusetts Sub-Class are intended third-party beneficiaries of contracts between Defendants VCNA and Volvo AB and their distributors and dealers, and specifically, of Defendants VCNA and Volvo AB's express warranties, including the NVLW, the Powertrain Warranties, and any warranties provided with certified pre-owned vehicles.  The dealers were not intended to be the ultimate consumers of the Class Vehicles and have rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumer only.

597. Any attempt by Defendants VCNA and Volvo AB to disclaim or limit recovery to the terms of the express warranty is unconscionable and unenforceable here. Specifically, the warranty limitation is unenforceable because Volvo knowingly sold or leased defective products without informing consumers about the Defect. The time limits are unconscionable and inadequate to protect Massachusetts Plaintiffs and the members of the Massachusetts Sub-Class. Among other things, Massachusetts Plaintiffs and members of the Massachusetts Sub-Class did not determine these time limitations and/or did not know of other limitations not appearing in the text of the warranties, the terms of which were drafted by Defendants VCNA and Volvo AB and unreasonable favored Defendants VCNA and Volvo AB. A gross disparity in bargaining power and knowledge of the extent, severity, and safety risk of the Defect existed between Defendants VCNA and Volvo AB and members of the Massachusetts Sub-Class.

598. Further, the limited warranty promising to repair and/or correct a manufacturing or workmanship defect fails of its essential purpose because the contractual remedy is insufficient to make Massachusetts Plaintiffs and the members of the Massachusetts Sub-Class whole, because Defendants VCNA and Volvo AB have failed and/or have refused to adequately provide the promised remedies, *i.e.*, a permanent repair, within a reasonable time.

599.   Massachusetts Plaintiffs was not required to notify Defendants VCNA and Volvo AB of the breach because affording Defendants VCNA and Volvo AB a reasonable opportunity to cure their breach of written warranty would have been futile. Defendants VCNA and Volvo AB were also on notice of the Defect from the complaints and service requests it received from Class Members, including those formal complaints submitted to NHTSA, and through other internal sources.

600.   Nonetheless, Massachusetts Plaintiffs and members of the Massachusetts Sub-Class provided notice to Defendants VCNA and Volvo AB of the breach of express warranties when they took their vehicles to Volvo-authorized providers of warranty repairs.  Massachusetts Plaintiffs also provided notice to Defendants VCNA and Volvo AB of their breach of express warranty by letters dated February 10, 2022 and February 25, 2022.

601.   As a result of Defendants VCNA and Volvo AB's breach of the applicable express warranties, owners and/or lessees of the Class Vehicles suffered, and continue to suffer, an ascertainable loss of money, property, and/or value of their Class Vehicles.

602.   As a direct and proximate result of Defendants VCNA and Volvo AB's breach of express warranties, Massachusetts Plaintiffs and members of the Massachusetts Sub-Class have been damaged in an amount to be determined at trial.

157

603.   As a result of Defendants VCNA and Volvo AB's breach of the express warranty, Massachusetts Plaintiffs and Massachusetts Sub-Class Members are entitled to legal and equitable relief against Volvo, including actual damages, specific performance, attorney's fees, costs of suit, and other relief as appropriate.

## COUNT XVI
### Breach of the Implied Warranty of Merchantability
### Mass. Gen. Laws ch. 106 §§ 2-314 and 2A-212
### (On Behalf of the Massachusetts Sub-Class against all Defendants)

604.   Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 314 as if fully set forth herein.

605.   Massachusetts Plaintiffs brings this count on behalf of himself and the Massachusetts Sub-Class against all Defendants.

606.   Volvo is and was at all relevant times a "merchant" with respect to motor vehicles under Mass. Gen. Laws ch. 106 §§ 2-104(1) and 2A-103(3), and a "seller" of motor vehicles under § 2-103(1)(d).

607.   With respect to leases, Volvo is and was at all relevant times a "lessor" of motor vehicles under Mass. Gen. Laws ch. 106 § 2A-103(1)(p).

608.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Mass. Gen. Laws ch. 106 §§ 2-105(1) and 2A-103(1)(h).

609.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law under Mass. Gen. Laws ch. 106 §§ 2-314 and 2A-212.

610.   Volvo knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased. Volvo directly sold and marketed Class Vehicles to customers through authorized dealers, like those from whom Massachusetts Plaintiffs and members of the Massachusetts Sub-Class bought or leased their vehicles, for the intended purpose of consumers purchasing the vehicles. Volvo knew that the Class Vehicles would and did pass unchanged from the authorized dealers to Massachusetts Plaintiffs and members of the Massachusetts Sub-Class, with no modification to the defective Class Vehicles.

611. Volvo provided Massachusetts Plaintiffs and members of the Massachusetts Sub-Class with an implied warranty that the Class Vehicles and their components and parts are merchantable and fit for the ordinary purposes for which they were sold.  However, the Class Vehicles are not fit for their ordinary purpose of providing reasonably reliable and safe transportation because, *inter alia*, the Class Vehicles and their engine suffered from an inherent defect at the time of sale and thereafter and are not fit for their particular purpose of providing safe and reliable transportation.

612.   This implied warranty included, among other things: (i) a warranty that the Class Vehicles that were manufactured, supplied, distributed, and/or sold by Volvo were safe and reliable for providing transportation; and (ii) a warranty that the Class Vehicles would be fit for their intended use while the Class Vehicles were being operated.

613.   Contrary to the applicable implied warranties, the Class Vehicles at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiffs and Class Members with reliable, durable, and safe transportation. Instead, the Class Vehicles were and are defective at the time of sale or lease and thereafter as more fully described above. Volvo knew of this defect at the time these sale or lease transactions occurred.

614.   As a result of Volvo's breach of the applicable implied warranties, Massachusetts Plaintiffs and members of the Massachusetts Sub-Class suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Defect, Massachusetts Plaintiffs and members of the Massachusetts Sub-Class were harmed and suffered actual damages in that the Class Vehicles are substantially certain to fail before their expected useful life has run.

615.   Volvo's actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use in violation of the Uniform Commercial Code and relevant state law.

160

616.   Massachusetts Plaintiffs and members of the Massachusetts Sub-Class have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of Volvo's conduct described herein.

617.   Massachusetts Plaintiffs and members of the Massachusetts Sub-Class have had sufficient direct dealings with either Volvo or its agents (*i.e.*, dealerships and technical support) to establish privity of contract between Volvo, on one hand, and Massachusetts Plaintiffs and members of the Massachusetts Sub-Class on the other hand.   Nonetheless, privity is not required here because Massachusetts Plaintiffs and members of the Massachusetts Sub-Class are intended third-party beneficiaries of contracts between Volvo and its distributors and dealers, and specifically, of Volvo's express warranties, including the NVLW, the Powertrain Warranties, and any warranties provided with certified pre-owned vehicles.   The dealers were not intended to be the ultimate consumers of the Class Vehicles and have rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumer only.

618.   Massachusetts Plaintiffs and members of the Massachusetts Sub-Class were not required to notify Volvo of the breach because affording Volvo a reasonable opportunity to cure its breach of warranty would have been futile. Volvo was also on notice of the Defect from the complaints and service requests it received

from Massachusetts Plaintiffs and the Class Members and through other internal sources.

619.   Nonetheless, Massachusetts Plaintiffs and members of the Massachusetts Sub-Class provided notice to Volvo of the breach of express warranties when they took their vehicles to Volvo-authorized provider of warranty repairs.  Massachusetts Plaintiffs also provided notice to Volvo of its breach of express warranty by letters dated February 10, 2022 and February 25, 2022.

620.   As a direct and proximate cause of Volvo's breach, Massachusetts Plaintiffs and members of the Massachusetts Sub-Class suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, Massachusetts Plaintiffs and members of the Massachusetts Sub-Class have incurred or will incur economic damages at the point of repair in the form of the cost of repair as well as additional losses.

621.   As a direct and proximate result of Volvo's breach of the implied warranty of merchantability, Massachusetts Plaintiffs and members of the Massachusetts Sub-Class have been damaged in an amount to be proven at trial.

## COUNT XVII
### Violations of the Massachusetts Consumer Protection Act
### Mass. Gen. Laws 93A, § 1, *et seq.*
### (On Behalf of the Massachusetts Sub-Class against all Defendants)

622.   Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 314 above as if fully set forth herein.

623.   Massachusetts Plaintiffs brings this cause of action on behalf of himself and on behalf of the members of the Massachusetts Sub-Class against all Defendants.

624.   Volvo, Massachusetts Plaintiffs, and the Massachusetts Sub-Class Members are "persons" within the meaning of "persons" within the meaning of Mass. Gen. Laws 93A, § 1(a).

625.   The Massachusetts Consumer Protection Act ("MCPA") prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce." Mass. Gen. Laws 93A, § 2(a).  Volvo engaged in unlawful trade practices, and unfair or deceptive acts or practices that violated the MCPA

626.   Volvo participated in unfair or deceptive trade practices that violated the MCPA.  As described below and alleged throughout the Complaint, by failing to disclose the Defect, by concealing the Defect, by marketing its vehicles as safe, reliable, well-engineered, and of high quality, and by presenting itself as a reputable manufacturer that valued safety, performance and reliability, and stood behind its

vehicles after they were sold, Volvo knowingly and intentionally misrepresented and omitted material facts in connection with the sale or lease of the Class Vehicles. Volvo systematically misrepresented, concealed, suppressed, or omitted material facts relating to the Class Vehicles and the Defect in the course of its business.

627.   Volvo also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale of the Class Vehicles.

628.   Volvo's unfair and deceptive acts or practices occurred repeatedly in Volvo's trade or business, were capable of deceiving a substantial portion of the purchasing public and imposed a serious safety risk on the public.

629.   Volvo knew that the Class Vehicles suffered from an inherent defect, were defectively designed and/or manufactured, and were not suitable for their intended use.

630.   Volvo knew or should have known that its conduct violated the MCPA.

631.   Volvo was under a duty to Massachusetts Plaintiffs and the Massachusetts Sub-Class Members to disclose the defective nature of the Class Vehicles because:

(a)   Volvo was in a superior position to know the true state of facts about the safety defect in the Class Vehicles;

(b)   Volvo made partial disclosures about the quality of the Class Vehicles without revealing the defective nature of the Class Vehicles; and

(c)   Volvo actively concealed the defective nature of the Class Vehicles from Massachusetts Plaintiffs and the Massachusetts Sub-Class Members at the time of sale and thereafter.

632.   By failing to disclose the Defect, Volvo knowingly and intentionally concealed material facts and breached its duty not to do so.

633.   The facts concealed or not disclosed by Volvo to Massachusetts Plaintiffs and the Massachusetts Sub-Class Members are material because a reasonable person would have considered them to be important in deciding whether or not to purchase or lease Volvo's Class Vehicles, or to pay less for them. Whether an engine installed in a vehicle will exhibit excessive oil consumption causing sudden shut off, premature engine wear, damage, and failure, is a material safety concern. Had Massachusetts Plaintiffs and the Massachusetts Sub-Class Members known that the Class Vehicles suffered from the Defect described herein, they would not have purchased or leased the Class Vehicles or would have paid less for them.

634.   Massachusetts Plaintiffs and the Massachusetts Sub-Class Members are reasonable consumers who do not expect that their vehicles will suffer from the Defect. That is the reasonable and objective consumer expectation for vehicles.

635.   As a result of Volvo's misconduct, Massachusetts Plaintiffs and the Massachusetts Sub-Class Members have been harmed and have suffered actual damages in that the Class Vehicles are defective and require repairs or replacement.

636.   As a direct and proximate result of Volvo's unfair or deceptive acts or practices, Massachusetts Plaintiffs and the Massachusetts Sub-Class Members have suffered and will continue to suffer actual damages.

637.   Volvo's violations present a continuing risk to Massachusetts Plaintiffs and the Massachusetts Sub-Class Members as well as to the general public.  Volvo's unlawful acts and practices complained of herein affect the public interest.

638.   Massachusetts Plaintiffs provided notice of their claims, by letters dated February 10, 2022 and February 25, 2022.

639.   Pursuant to Mass. Gen. Laws 93A, § 9, Massachusetts Plaintiffs and members of the Massachusetts Sub-Class seek monetary relief against Defendants measures as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $25 for each Massachusetts Plaintiffs and each member of the Massachusetts Sub-Class. Because Defendants' conduct was committed willfully and knowingly, Massachusetts Plaintiffs and members of

the Massachusetts Sub-Class are entitled to recover, for Massachusetts Plaintiffs and each member of the Massachusetts Sub-Class, up to three times actual damages, but no less than two times actual damages.

**Claims on Behalf of the Missouri Sub-Class**

<u>COUNT XVIII</u>
**Breach of Express Warranty**
**Mo. Rev. Stat. § 400.2-313 and § 400.2A-210**
**(On Behalf of the Missouri Sub-Class against Defendants VCNA and Volvo AB)**

640.   Plaintiffs repeat and re-allege each and every allegation contained above in paragraphs 1 through 314 above as if fully set forth herein.

641.   Plaintiff Arthur Yakov Krichevsky ("Missouri Plaintiff") bring this count on behalf of themselves and the Missouri Sub-Class against Defendants VCNA and Volvo AB.

642.   Defendants VCNA and Volvo AB are and were at all relevant times "merchants" with respect to motor vehicles under Mo. Rev. Stat. § 400.2-104(1) and "sellers" of motor vehicles under § 400.2-314.

643.   With respect to leases, Defendants VCNA and Volvo AB are and were at all relevant times "lessors" of motor vehicles under Mo. Rev. Stat. § 400.2A-103(1)(p) and § 400.2A-212.

644.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Mo. Rev. Stat. § 400.2-105(1) and Mo. Stat. § 400.2A-103(1)(h).

645.   The engines were manufactured and/or installed in the Class Vehicles by Volvo and are covered by the express warranty.

646.   Defendants VCNA and Volvo AB provided all purchasers and lessees of the Class Vehicles with an express warranty described herein, which became a material part of the bargain. Accordingly, Defendants VCNA and Volvo AB's express warranty is an express warranty under Missouri state law.

647.   In a section entitled "Warranty Repairs," Defendants VCNA and Volvo AB's express warranty (or New Vehicle Limited Warranty ("NVLW")) provides in relevant part that "[w]arranty repairs which are required as a result of defects in material or workmanship, and are brought to the attention of an authorized Volvo retailer by an owner, will be performed by an authorized Volvo retailer only at no charge during the warranty period."

648.   According to Volvo, the NVLW coverage is for "4 years/50,000 miles[.]"

649.   Defendants VCNA and Volvo AB also provide a maintenance warranty, the Complimentary Factor Scheduled Maintenance Program ("Factory Maintenance Program"), which provides that all new vehicles will have "the first three (3) regularly scheduled maintenance services at 10,000, 20,000 and 30,000 miles for the first three (3) years or up to 36,000 miles provided free of charge."

650.   Defendants VCNA and Volvo AB's NVLW, Factory Maintenance Program, and other warranties regarding the Class Vehicles formed a basis of the bargain that was breached when Missouri Plaintiff and members of the Missouri Sub-Class purchased or leased the Class Vehicles with the defective engine and/or related components.

651.   Missouri Plaintiff and members of the Missouri Sub-Class experienced defects within the warranty period. Despite the existence of the NVLW, Defendants VCNA and Volvo AB failed to inform Missouri Plaintiff and members of the Missouri Sub-Class that the Class Vehicles were equipped with defective engines and related components.  When providing repairs under the express warranty, these repairs were ineffective and incomplete and did not provide a permanent repair for the Defect.

652.   Defendants VCNA and Volvo AB breached the express warranty through the acts and omissions described above, including by promising to repair or adjust defects in materials or workmanship of any part supplied by Volvo and then failing to do so. Defendants VCNA and Volvo AB have not repaired or adjusted, and have been unable to repair or adjust, the Class Vehicles materials and workmanship defects.

653.   Missouri Plaintiff and members of the Missouri Sub-Class have had sufficient direct dealings with either Defendants VCNA and Volvo AB or their

agents (*i.e.*, dealerships and technical support) to establish privity of contract between Defendants VCNA and Volvo AB, on one hand, and Missouri Plaintiff and each member of the Missouri Sub-Class on the other hand. Nonetheless, privity is not required here because Missouri Plaintiff and members of the Missouri Sub-Class are intended third-party beneficiaries of contracts between Defendants VCNA and Volvo AB and their distributors and dealers, and specifically, of Defendants VCNA and Volvo AB's express warranties, including the NVLW, the Powertrain Warranties, and any warranties provided with certified pre-owned vehicles. The dealers were not intended to be the ultimate consumers of the Class Vehicles and have rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumer only.

654. Any attempt by Defendants VCNA and Volvo AB to disclaim or limit recovery to the terms of the express warranty is unconscionable and unenforceable here. Specifically, the warranty limitation is unenforceable because Volvo knowingly sold or leased defective products without informing consumers about the Defect. The time limits are unconscionable and inadequate to protect Missouri Plaintiff and the members of the Missouri Sub-Class. Among other things, Missouri Plaintiff and members of the Missouri Sub-Class did not determine these time limitations and/or did not know of other limitations not appearing in the text of the warranties, the terms of which were drafted by Defendants VCNA and Volvo AB

170

and unreasonable favored Defendants VCNA and Volvo AB. A gross disparity in bargaining power and knowledge of the extent, severity, and safety risk of the Defect existed between Defendants VCNA and Volvo AB and members of the Missouri Sub-Class.

655.   Further, the limited warranty promising to repair and/or correct a manufacturing or workmanship defect fails of its essential purpose because the contractual remedy is insufficient to make Missouri Plaintiff and the members of the Missouri Sub-Class whole, because Defendants VCNA and Volvo AB have failed and/or have refused to adequately provide the promised remedies, *i.e.*, a permanent repair, within a reasonable time.

656.   Missouri Plaintiff was not required to notify Defendants VCNA and Volvo AB of the breach because affording Defendants VCNA and Volvo AB a reasonable opportunity to cure their breach of written warranty would have been futile. Defendants VCNA and Volvo AB were also on notice of the Defect from the complaints and service requests it received from Class Members, including those formal complaints submitted to NHTSA, and through other internal sources.

657.   Nonetheless, Missouri Plaintiff and members of the Missouri Sub-Class provided notice to Defendants VCNA and Volvo AB of the breach of express warranties when they took their vehicles to Volvo-authorized providers of warranty

repairs.  Missouri Plaintiff also provided notice to Defendants VCNA and Volvo AB of their breach of express warranty by letter dated February 10, 2022.

658.   As a result of Defendants VCNA and Volvo AB's breach of the applicable express warranties, owners and/or lessees of the Class Vehicles suffered, and continue to suffer, an ascertainable loss of money, property, and/or value of their Class Vehicles.

659.   As a direct and proximate result of Defendants VCNA and Volvo AB's breach of express warranties, Missouri Plaintiff and members of the Missouri Sub-Class have been damaged in an amount to be determined at trial.

660.   As a result of Defendants VCNA and Volvo AB's breach of the express warranty, Missouri Plaintiff and Missouri Sub-Class Members are entitled to legal and equitable relief against Volvo, including actual damages, specific performance, attorney's fees, costs of suit, and other relief as appropriate.

## COUNT XIX
**Breach of the Implied Warranty of Merchantability**
**Mo. Rev. Stat. § 400.2-314 and § 400.2A-212**
**(On Behalf of the Missouri Sub-Class against all Defendants)**

661.   Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 314 as if fully set forth herein.

662.   Missouri Plaintiff brings this count on behalf of himself and the Missouri Sub-Class against all Defendants.

663.   Volvo is and was at all relevant times a "merchant" with respect to motor vehicles under Mo. Rev. Stat. § 400.2-104(1) and a "seller" of motor vehicles under § 400.2-314.

664.   With respect to leases, Volvo is and was at all relevant times a "lessor" of motor vehicles under Mo. Rev. Stat. § 400.2A-103(1)(p) and § 400.2A-212.

665.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Mo. Rev. Stat. § 400.2-105(1) and Mo. Stat. § 400.2A-103(1)(h).

666.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law under Mo. Rev. Stat. § 400.2-314 and § 400.2A-212.

667.   Volvo knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased. Volvo directly sold and marketed Class Vehicles to customers through authorized dealers, like those from whom Missouri Plaintiff and members of the Missouri Sub-Class bought or leased their vehicles, for the intended purpose of consumers purchasing the vehicles. Volvo knew that the Class Vehicles would and did pass unchanged from the authorized dealers to Missouri Plaintiff and members of the Missouri Sub-Class, with no modification to the defective Class Vehicles.

668.   Volvo provided Missouri Plaintiff and members of the Missouri Sub-Class with an implied warranty that the Class Vehicles and their components and

parts are merchantable and fit for the ordinary purposes for which they were sold. However, the Class Vehicles are not fit for their ordinary purpose of providing reasonably reliable and safe transportation because, *inter alia*, the Class Vehicles and their engine suffered from an inherent defect at the time of sale and thereafter and are not fit for their particular purpose of providing safe and reliable transportation.

669.   This implied warranty included, among other things: (i) a warranty that the Class Vehicles that were manufactured, supplied, distributed, and/or sold by Volvo were safe and reliable for providing transportation; and (ii) a warranty that the Class Vehicles would be fit for their intended use while the Class Vehicles were being operated.

670.   Contrary to the applicable implied warranties, the Class Vehicles at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiffs and Class Members with reliable, durable, and safe transportation. Instead, the Class Vehicles were and are defective at the time of sale or lease and thereafter as more fully described above. Volvo knew of this defect at the time these sale or lease transactions occurred.

671.   As a result of Volvo's breach of the applicable implied warranties, Missouri Plaintiff and members of the Missouri Sub-Class suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a

result of the Defect, Missouri Plaintiff and members of the Missouri Sub-Class were harmed and suffered actual damages in that the Class Vehicles are substantially certain to fail before their expected useful life has run.

672. Volvo's actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use in violation of the Uniform Commercial Code and relevant state law.

673. Missouri Plaintiff and members of the Missouri Sub-Class have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of Volvo's conduct described herein.

674. Missouri Plaintiff and members of the Missouri Sub-Class have had sufficient direct dealings with either Volvo or its agents (*i.e.*, dealerships and technical support) to establish privity of contract between Volvo, on one hand, and Missouri Plaintiff and members of the Missouri Sub-Class on the other hand. Nonetheless, privity is not required here because Missouri Plaintiff and members of the Missouri Sub-Class are intended third-party beneficiaries of contracts between Volvo and its distributors and dealers, and specifically, of Volvo's express warranties, including the NVLW, the Powertrain Warranties, and any warranties provided with certified pre-owned vehicles. The dealers were not intended to be the ultimate consumers of the Class Vehicles and have rights under the warranty

agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumer only.

675.   Missouri Plaintiff and members of the Missouri Sub-Class were not required to notify Volvo of the breach because affording Volvo a reasonable opportunity to cure its breach of warranty would have been futile. Volvo was also on notice of the Defect from the complaints and service requests it received from Missouri Plaintiff and the Class Members and through other internal sources.

676.   Nonetheless, Missouri Plaintiff and members of the Missouri Sub-Class provided notice to Volvo of the breach of express warranties when they took their vehicles to Volvo-authorized provider of warranty repairs.  Missouri Plaintiff also provided notice to Volvo of its breach of express warranty by letter dated February 10, 2022.

677.   As a direct and proximate cause of Volvo's breach, Missouri Plaintiff and members of the Missouri Sub-Class suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, Missouri Plaintiff and members of the Missouri Sub-Class have incurred or will incur economic damages at the point of repair in the form of the cost of repair as well as additional losses.

678.   As a direct and proximate result of Volvo's breach of the implied warranty of merchantability, Missouri Plaintiff and members of the Missouri Sub-Class have been damaged in an amount to be proven at trial.

## COUNT XX
**Violations of the Missouri Merchandising Practices Act**
**Mo. Rev. Stat. § 407.010, *et seq.***
**(On Behalf of the Missouri Sub-Class against all Defendants)**

679.   Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 314 above as if fully set forth herein.

680.   Missouri Plaintiff brings this cause of action on behalf of himself and on behalf of the members of the Missouri Sub-Class against all Defendants.

681.   Volvo, Missouri Plaintiff, and members of the Missouri Sub-Class are "persons" within the meaning of the Missouri Merchandising Practices Act ("Missouri MPA"), Mo. Rev. Stat. § 407.010(5).

682.   Volvo engaged in "trade" or "commerce" in the State of Missouri within the meaning of Mo. Rev. Stat. § 407.010(7).

683.   The Missouri MPA makes unlawful the "act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise." Mo. Rev. Stat. §

407.020.  Volvo engaged in unlawful trade practices, and unfair or deceptive acts or practices that violated the Missouri MPA.

684.   Volvo participated in unfair or deceptive trade practices that violated the Missouri MPA.  As described below and alleged throughout the Complaint, by failing to disclose the Defect, by concealing the Defect, by marketing its vehicles as safe, reliable, well-engineered, and of high quality, and by presenting itself as a reputable manufacturer that valued safety, performance and reliability, and stood behind its vehicles after they were sold, Volvo knowingly and intentionally misrepresented and omitted material facts in connection with the sale or lease of the Class Vehicles. Volvo systematically misrepresented, concealed, suppressed, or omitted material facts relating to the Class Vehicles and the Defect in the course of its business.

685.   Volvo also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale of the Class Vehicles.

686.   Volvo's unfair and deceptive acts or practices occurred repeatedly in Volvo's trade or business, were capable of deceiving a substantial portion of the purchasing public and imposed a serious safety risk on the public.

178

687.   Volvo knew that the Class Vehicles suffered from an inherent defect, were defectively designed and/or manufactured, and were not suitable for their intended use.

688.   Volvo knew or should have known that its conduct violated the Missouri MPA.

689.   Volvo was under a duty to Missouri Plaintiff and the Missouri Sub-Class Members to disclose the defective nature of the Class Vehicles because:

    (a)   Volvo was in a superior position to know the true state of facts about the safety defect in the Class Vehicles;

    (b)   Volvo made partial disclosures about the quality of the Class Vehicles without revealing the defective nature of the Class Vehicles; and

    (c)   Volvo actively concealed the defective nature of the Class Vehicles from Missouri Plaintiff and the Missouri Sub-Class Members at the time of sale and thereafter.

690.   By failing to disclose the Defect, Volvo knowingly and intentionally concealed material facts and breached its duty not to do so.

691.   The facts concealed or not disclosed by Volvo to Missouri Plaintiff and the Missouri Sub-Class Members are material because a reasonable person would have considered them to be important in deciding whether or not to purchase or lease Volvo's Class Vehicles, or to pay less for them. Whether an engine installed in a

vehicle will exhibit excessive oil consumption causing sudden shut off, premature engine wear, damage, and failure, is a material safety concern. Had Missouri Plaintiff and the Missouri Sub-Class Members known that the Class Vehicles suffered from the Defect described herein, they would not have purchased or leased the Class Vehicles or would have paid less for them.

692.    Missouri Plaintiff and the Missouri Sub-Class Members are reasonable consumers who do not expect that their vehicles will suffer from the Defect. That is the reasonable and objective consumer expectation for vehicles.

693.    As a result of Volvo's misconduct, Missouri Plaintiff and the Missouri Sub-Class Members have been harmed and have suffered actual damages in that the Class Vehicles are defective and require repairs or replacement.

694.    As a direct and proximate result of Volvo's unfair or deceptive acts or practices, Missouri Plaintiff and the Missouri Sub-Class Members have suffered and will continue to suffer actual damages.

695.    Volvo's violations present a continuing risk to Missouri Plaintiff and the Missouri Sub-Class Members as well as to the general public.  Volvo's unlawful acts and practices complained of herein affect the public interest.

696.    Missouri Plaintiff provided notice of their claims, by letter dated February 10, 2022.

697.   Volvo is liable to Missouri Plaintiff and Missouri Sub-Class Members for damages in amounts to be proven at trial, including actual damages, attorneys' fees, costs, and punitive damages, as well as injunctive relief enjoining Volvo's unfair and deceptive practices, and any other just and proper relief available under Mo. Rev. Stat. § 407.025.

**Claims on Behalf of the New York Sub-Class**

<u>COUNT XXI</u>
**Breach of Express Warranty**
**N.Y. U.C.C. §§ 2-314 AND 2A-210**
**(On Behalf of the New York Sub-Class against Defendants VCNA and Volvo AB)**

698.   Plaintiffs repeat and re-allege each and every allegation contained above in paragraphs 1 through 314 above as if fully set forth herein.

699.   Plaintiff Rollie Buchanan ("New York Plaintiff") brings this count on behalf of himself and the New York Sub-Class against Defendants VCNA and Volvo AB.

700.   Defendants VCNA and Volvo AB are and were at all relevant times "merchants" with respect to motor vehicles under N.Y. UCC Law §§ 11-2-104(1), and "sellers" of motor vehicles under § 2-103(1)(d).

701.   With respect to leases, Defendants VCNA and Volvo AB are and were at all relevant times "lessors" of motor vehicles under N.Y. UCC Law § 2A-103(1)(p).

702.   The Class Vehicles are and were at all relevant times "goods" within the meaning of N.Y. UCC Law §§ 2-105(1) and 2A-103(1)(h).

703.   The engines were manufactured and/or installed in the Class Vehicles by Volvo and are covered by the express warranty.

704.   Defendants VCNA and Volvo AB provided all purchasers and lessees of the Class Vehicles with an express warranty described herein, which became a material part of the bargain. Accordingly, Defendants VCNA and Volvo AB's express warranty is an express warranty under New York state law.

705.   In a section entitled "Warranty Repairs," Defendants VCNA and Volvo AB's express warranty (or New Vehicle Limited Warranty ("NVLW")) provides in relevant part that "[w]arranty repairs which are required as a result of defects in material or workmanship, and are brought to the attention of an authorized Volvo retailer by an owner, will be performed by an authorized Volvo retailer only at no charge during the warranty period."

706.   According to Volvo, the NVLW coverage is for "4 years/50,000 miles[.]"

707.   Defendants VCNA and Volvo AB also provide a maintenance warranty, the Complimentary Factor Scheduled Maintenance Program ("Factory Maintenance Program"), which provides that all new vehicles will have "the first three (3) regularly scheduled maintenance services at 10,000, 20,000 and 30,000 miles for the first three (3) years or up to 36,000 miles provided free of charge."

708.   Defendants VCNA and Volvo AB's NVLW, Factory Maintenance Program, and other warranties regarding the Class Vehicles formed a basis of the bargain that was breached when New York Plaintiff and members of the New York Sub-Class purchased or leased the Class Vehicles with the defective engine and/or related components.

709.   New York Plaintiff and members of the New York Sub-Class experienced defects within the warranty period. Despite the existence of the NVLW, Defendants VCNA and Volvo AB failed to inform New York Plaintiff and members of the New York Sub-Class that the Class Vehicles were equipped with defective engines and related components.   When providing repairs under the express warranty, these repairs were ineffective and incomplete and did not provide a permanent repair for the Defect.

710.   Defendants VCNA and Volvo AB breached the express warranty through the acts and omissions described above, including by promising to repair or adjust defects in materials or workmanship of any part supplied by Volvo and then failing to do so. Defendants VCNA and Volvo AB have not repaired or adjusted, and have been unable to repair or adjust, the Class Vehicles materials and workmanship defects.

711.   New York Plaintiff and members of the New York Sub-Class have had sufficient direct dealings with either Defendants VCNA and Volvo AB or their

agents (*i.e.*, dealerships and technical support) to establish privity of contract between Defendants VCNA and Volvo AB, on one hand, and New York Plaintiff and each member of the New York Sub-Class on the other hand. Nonetheless, privity is not required here because New York Plaintiff and members of the New York Sub-Class are intended third-party beneficiaries of contracts between Defendants VCNA and Volvo AB and their distributors and dealers, and specifically, of Defendants VCNA and Volvo AB's express warranties, including the NVLW, the Powertrain Warranties, and any warranties provided with certified pre-owned vehicles. The dealers were not intended to be the ultimate consumers of the Class Vehicles and have rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumer only.

712. Any attempt by Defendants VCNA and Volvo AB to disclaim or limit recovery to the terms of the express warranty is unconscionable and unenforceable here. Specifically, the warranty limitation is unenforceable because Volvo knowingly sold or leased defective products without informing consumers about the Defect. The time limits are unconscionable and inadequate to protect New York Plaintiff and the members of the New York Sub-Class. Among other things, New York Plaintiff and members of the New York Sub-Class did not determine these time limitations and/or did not know of other limitations not appearing in the text of the

warranties, the terms of which were drafted by Defendants VCNA and Volvo AB and unreasonable favored Defendants VCNA and Volvo AB. A gross disparity in bargaining power and knowledge of the extent, severity, and safety risk of the Defect existed between Defendants VCNA and Volvo AB and members of the New York Sub-Class.

713.   Further, the limited warranty promising to repair and/or correct a manufacturing or workmanship defect fails of its essential purpose because the contractual remedy is insufficient to make New York Plaintiff and the members of the New York Sub-Class whole, because Defendants VCNA and Volvo AB have failed and/or have refused to adequately provide the promised remedies, *i.e.*, a permanent repair, within a reasonable time.

714.   New York Plaintiff was not required to notify Defendants VCNA and Volvo AB of the breach because affording Defendants VCNA and Volvo AB a reasonable opportunity to cure their breach of written warranty would have been futile. Defendants VCNA and Volvo AB were also on notice of the Defect from the complaints and service requests it received from Class Members, including those formal complaints submitted to NHTSA, and through other internal sources.

715.   Nonetheless, New York Plaintiff and members of the New York Sub-Class provided notice to Defendants VCNA and Volvo AB of the breach of express

warranties when they took their vehicles to Volvo-authorized providers of warranty repairs.

716.   As a result of Defendants VCNA and Volvo AB's breach of the applicable express warranties, owners and/or lessees of the Class Vehicles suffered, and continue to suffer, an ascertainable loss of money, property, and/or value of their Class Vehicles.

717.   As a direct and proximate result of Defendants VCNA and Volvo AB's breach of express warranties, New York Plaintiff and members of the New York Sub-Class have been damaged in an amount to be determined at trial.

718.   As a result of Defendants VCNA and Volvo AB's breach of the express warranty, New York Plaintiff and New York Sub-Class Members are entitled to legal and equitable relief against Volvo, including actual damages, specific performance, attorney's fees, costs of suit, and other relief as appropriate.

## COUNT XXII
### Breach of the Implied Warranty of Merchantability
### N.Y. U.C.C. §§ 2-314 AND 2A-212
### (On Behalf of the New York Sub-Class against all Defendants)

719.   Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 314 as if fully set forth herein.

720.   New York Plaintiff brings this count on behalf of himself and the New York Sub-Class against all Defendants.

721.   Volvo is and was at all relevant times a "merchant" with respect to motor vehicles under N.Y. UCC Law §§ 11-2-104(1), and a "seller" of motor vehicles under § 2-103(1)(d).

722.   With respect to leases, Volvo is and was at all relevant times a "lessor" of motor vehicles under N.Y. UCC Law § 2A-103(1)(p).

723.   The Class Vehicles are and were at all relevant times "goods" within the meaning of N.Y. UCC Law §§ 2-105(1) and 2A-103(1)(h).

724.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law under N.Y. UCC Law §§ 2-314 and 2A-212.

725.   Volvo knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased. Volvo directly sold and marketed Class Vehicles to customers through authorized dealers, like those from whom New York Plaintiff and members of the New York Sub-Class bought or leased their vehicles, for the intended purpose of consumers purchasing the vehicles. Volvo knew that the Class Vehicles would and did pass unchanged from the authorized dealers to New York Plaintiff and members of the New York Sub-Class, with no modification to the defective Class Vehicles.

726.   Volvo provided New York Plaintiff and members of the New York Sub-Class with an implied warranty that the Class Vehicles and their components and parts are merchantable and fit for the ordinary purposes for which they were sold.  However, the Class Vehicles are not fit for their ordinary purpose of providing reasonably reliable and safe transportation because, inter alia, the Class Vehicles and

their engine suffered from an inherent defect at the time of sale and thereafter and are not fit for their particular purpose of providing safe and reliable transportation.

727.   This implied warranty included, among other things: (i) a warranty that the Class Vehicles that were manufactured, supplied, distributed, and/or sold by Volvo were safe and reliable for providing transportation; and (ii) a warranty that the Class Vehicles would be fit for their intended use while the Class Vehicles were being operated.

728.   Contrary to the applicable implied warranties, the Class Vehicles at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiff and Class Members with reliable, durable, and safe transportation. Instead, the Class Vehicles were and are defective at the time of sale or lease and thereafter as more fully described above. Volvo knew of this defect at the time these sale or lease transactions occurred.

729.   As a result of Volvo's breach of the applicable implied warranties, New York Plaintiff and members of the New York Sub-Class suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Defect, New York Plaintiff and members of the New York Sub-Class were harmed and suffered actual damages in that the Class Vehicles are substantially certain to fail before their expected useful life has run.

730.   Volvo's actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use in violation of the Uniform Commercial Code and relevant state law.

731.   New York Plaintiff and members of the New York Sub-Class have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of Volvo's conduct described herein.

732.   New York Plaintiff and members of the New York Sub-Class have had sufficient direct dealings with either Volvo or its agents (*i.e.*, dealerships and technical support) to establish privity of contract between Volvo, on one hand, and New York Plaintiff and members of the New York Sub-Class on the other hand. Nonetheless, privity is not required here because New York Plaintiff and members of the New York Sub-Class are intended third-party beneficiaries of contracts between Volvo and its distributors and dealers, and specifically, of Volvo's express warranties, including the NVLW, the Powertrain Warranties, and any warranties provided with certified pre-owned vehicles.  The dealers were not intended to be the ultimate consumers of the Class Vehicles and have rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumer only.

733.   New York Plaintiff and members of the New York Sub-Class were not required to notify Volvo of the breach because affording Volvo a reasonable opportunity to cure its breach of warranty would have been futile. Volvo was also on notice of the Defect from the complaints and service requests it received from New York Plaintiff and the Class Members and through other internal sources.

734.   Nonetheless, New York Plaintiff and members of the New York Sub-Class provided notice to Volvo of the breach of express warranties when they took their vehicles to Volvo -authorized provider of warranty repairs.

735.   As a direct and proximate cause of Volvo's breach, New York Plaintiff and members of the New York Sub-Class suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, New York Plaintiff and members of the New York Sub-Class have incurred or will incur economic damages at the point of repair in the form of the cost of repair as well as additional losses.

736.   As a direct and proximate result of Volvo's breach of the implied warranty of merchantability, New York Plaintiff and members of the New York Sub-Class have been damaged in an amount to be proven at trial.

## COUNT XXIII
### Violations of the New York General Business Law § 349
### N.Y. GEN. BUS. LAW § 349
### (On Behalf of the New York Sub-Class against all Defendants)

737.   Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 314 above as if fully set forth herein.

738.   New York Plaintiff brings this cause of action on behalf of himself and on behalf of the members of the New York Sub-Class against all Defendants.

739.   New York Plaintiff and members of the New York Sub-Class are "persons" as defined by the New York General Business Law ("New York GBL"). N.Y. Gen. Bus. Law § 349(h).

740.   Volvo is a "person," "firm," "corporation," or "association" within the meaning of N.Y. Gen. Bus. Law § 349.New York's General Business Law § 349 makes unlawful "[d]eceptive acts or practices in the conduct of any business, trade or commerce." N.Y. Gen. Bus. Law § 349. Volvo engaged in unlawful trade practices, and unfair or deceptive acts or practices that violated the New York GBL.

741.   Volvo participated in unfair or deceptive trade practices that violated the New York GBL.  As described below and alleged throughout the Complaint, by failing to disclose the Defect, by concealing the Defect, by marketing its vehicles as safe, reliable, well-engineered, and of high quality, and by presenting itself as a reputable manufacturer that valued safety, performance and reliability, and stood behind its vehicles after they were sold, Volvo knowingly and intentionally misrepresented and omitted material facts in connection with the sale or lease of the Class Vehicles. Volvo systematically misrepresented, concealed, suppressed, or omitted material facts relating to the Class Vehicles and the Defect in the course of its business.

742.   Volvo also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale of the Class Vehicles.

743.   Volvo's unfair and deceptive acts or practices occurred repeatedly in Volvo's trade or business, were capable of deceiving a substantial portion of the purchasing public and imposed a serious safety risk on the public.

744. Volvo knew that the Class Vehicles suffered from an inherent defect, were defectively designed and/or manufactured, and were not suitable for their intended use.

745. Volvo knew or should have known that its conduct violated the New York GBL.

746. Volvo was under a duty to New York Plaintiff and the New York Sub-Class Members to disclose the defective nature of the Class Vehicles because:

   a.   Volvo was in a superior position to know the true state of facts about the safety defect in the Class Vehicles;

   b.   Volvo made partial disclosures about the quality of the Class Vehicles without revealing the defective nature of the Class Vehicles; and

   c.   Volvo actively concealed the defective nature of the Class Vehicles from New York Plaintiff and the New York Sub-Class Members at the time of sale and thereafter.

747. By failing to disclose the Defect, Volvo knowingly and intentionally concealed material facts and breached its duty not to do so.

748. The facts concealed or not disclosed by Volvo to New York Plaintiff and the New York Sub-Class Members are material because a reasonable person would have considered them to be important in deciding whether or not to purchase or lease Volvo's Class Vehicles, or to pay less for them. Whether an engine installed in a vehicle will exhibit excessive oil consumption causing sudden shut off, premature engine wear, damage, and failure, is a material safety concern. Had New

York Plaintiff and the New York Sub-Class Members known that the Class Vehicles suffered from the Defect described herein, they would not have purchased or leased the Class Vehicles or would have paid less for them.

749.   New York Plaintiff and the New York Sub-Class Members are reasonable consumers who do not expect that their vehicles will suffer from the Defect. That is the reasonable and objective consumer expectation for vehicles.

750.   As a result of Volvo's misconduct, New York Plaintiff and the New York Sub-Class Members have been harmed and have suffered actual damages in that the Class Vehicles are defective and require repairs or replacement.

751.   As a direct and proximate result of Volvo's unfair or deceptive acts or practices, New York Plaintiff and the New York Sub-Class Members have suffered and will continue to suffer actual damages.

752.   Volvo's violations present a continuing risk to New York Plaintiff and the New York Sub-Class Members as well as to the general public.   Volvo's unlawful acts and practices complained of herein affect the public interest.

753.   Pursuant to N.Y. Gen. Bus. Law § 349(h), New York Plaintiff and each New York Sub-Class Member seek actual damages or $50, whichever is greater, in addition to discretionary three times actual damages up to $1,000 for Volvo's willful and knowing violation of N.Y. Gen. Bus. Law § 349. Plaintiffs and New York Class members also seek attorneys' fees, an order enjoining Volvo's deceptive conduct, and any other just and proper relief available under the New York GBL.

## COUNT XXIV
### Violations of the New York General Business Law § 350
### N.Y. GEN. BUS. LAW § 350
### (On Behalf of the New York Sub-Class against all Defendants)

754. Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 314 above as if fully set forth herein.

755. New York Plaintiff brings this cause of action on behalf of himself and on behalf of the members of the New York Sub-Class against all Defendants.

756. New York's General Business Law § 350, the New York False Advertising Act ("NY FAA"), makes unlawful "[f]alse advertising in the conduct of any business, trade or commerce[.]" False advertising includes "advertising, including labeling, of a commodity . . . if such advertising is misleading in a material respect," taking into account "the extent to which the advertising fails to reveal facts material in the light of . . . representations [made] with respect to the commodity." N.Y. Gen. Bus. Law § 350-a.

757. Volvo caused to be made or disseminated throughout New York, through advertising, marketing, and other publications, representations that were untrue or misleading, and which were known, or which by the exercise of reasonable care should have been known to Volvo, to be untrue and misleading to consumers, including New York Plaintiff and the New York Sub-Class Members.

758. Volvo violated the NY FAA because of the misrepresentations and omissions alleged herein, including, but not limited to, Volvo's failure to disclose the Defect, by concealing the Defect, by marketing its vehicles as safe, reliable, easily operable, efficient, and of high quality, and by presenting itself as a reputable

manufacturer that valued safety, cleanliness, performance and efficiency, and stood behind its vehicles after they were sold, Volvo knowingly and intentionally misrepresented and omitted material facts in connection with the sale or lease of the Class Vehicles. Volvo systematically misrepresented, concealed, suppressed, or omitted material facts relating to the Class Vehicles and Defect in the course of its business.

759.   In purchasing or leasing the Class Vehicles, New York Plaintiff and the New York Sub-Class Members were deceived by Volvo's failure to the Defect.

760.   New York Plaintiff and the New York Sub-Class Members had no way of knowing that Volvo's representations and omissions were false and misleading, that an internal component part of the Class Vehicles is defective and causes a safety hazard, that the engine will fail under normal and intended use of the Class Vehicles, or that Volvo would refuse to repair, replace, or compensate New York Plaintiff and the New York Sub-Class Members for the failure of the defective engines and the known consequences of that failure to the Class Vehicles.

761.   Volvo also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale of the Class Vehicles.

762.   Volvo's unfair and deceptive acts or practices occurred repeatedly in Volvo's trade or business, were capable of deceiving a substantial portion of the purchasing public and imposed a serious safety risk on the public.

763.   Volvo knew that the Class Vehicles suffered from an inherent defect, were defectively designed and/or manufactured, and were not suitable for their intended use.

764.   Volvo knew or should have known that its conduct violated the New York FAA.

765.   Volvo's unfair or deceptive acts or practices, fraud, misrepresentations, suppression or omission of material facts were likely to and did in fact deceive reasonable consumers.

766.   Volvo intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead New York Plaintiff and the New York Sub-Class Members.

767.   New York Plaintiff and the New York Sub-Class Members reasonably relied on Volvo's misrepresentations and omissions of material facts in its advertisements of the Class Vehicles and in the purchase of the Class Vehicles.

768.   Volvo was under a duty to New York Plaintiff and the New York Sub-Class Members to disclose the defective nature of the Class Vehicles because:

     a.   Volvo was in a superior position to know the true state of facts about the safety defect in the Class Vehicles;

     b.   Volvo made partial disclosures about the quality of the Class Vehicles without revealing the defective nature of the Class Vehicles; and

     c.   Volvo actively concealed the defective nature of the Class Vehicles from New York Plaintiff and the New York Sub-Class

Members at the time of sale and thereafter.

769.   By failing to disclose Defect, Volvo knowingly and intentionally concealed material facts and breached its duty not to do so.

770.   The facts concealed or not disclosed by Volvo to New York Plaintiff and the New York Sub-Class Members are material because a reasonable person would have considered them to be important in deciding whether or not to purchase or lease Volvo's Class Vehicles, or to pay less for them. Whether an engine installed in a vehicle will exhibit excessive oil consumption causing sudden shut off, premature engine wear, damage, and failure, is a material safety concern. Had New York Plaintiff and the New York Sub-Class Members known that the Class Vehicles suffered from the Defect described herein, they would not have purchased or leased the Class Vehicles or would have paid less for them.

771.   New York Plaintiff and the New York Sub-Class Members are reasonable consumers who do not expect that their vehicles will suffer from the Defect. That is the reasonable and objective consumer expectation for vehicles.

772.   As a result of Volvo's misconduct, New York Plaintiff and the New York Sub-Class Members have been harmed and have suffered actual damages in that the Class Vehicles are defective and require repairs or replacement.

773.   As a direct and proximate result of Volvo's unfair or deceptive acts or practices, New York Plaintiff and the New York Sub-Class Members have suffered and will continue to suffer actual damages.

774.   Volvo's violations present a continuing risk to New York Plaintiff and the New York Sub-Class Members as well as to the general public.   Volvo's unlawful acts and practices complained of herein affect the public interest.

775.   New York Plaintiff and the New York Sub-Class Members are entitled to recover their actual damages or $500, whichever is greater. Because Volvo acted willfully or knowingly, New York Plaintiff and the New York Sub-Class Members are entitled to recover three times actual damages, up to $10,000.

**Claims on Behalf of the Pennsylvania Sub-Class**

<u>**COUNT XXV**</u>
**Breach of Express Warranty**
**13 PA. CONS. STAT. §§ 2313 and 2A210**
**(On Behalf of the Pennsylvania Sub-Class against Defendants VCNA and Volvo AB)**

776.   Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 314 above as if fully set forth herein.

777.   Plaintiffs Robert Hoffman, Davin Card, and Donna Urben ("Pennsylvania Plaintiffs") bring this count on behalf of themselves and the Pennsylvania Sub-Class against Defendants VCNA and Volvo AB.

778.   Defendants VCNA and Volvo AB are and were at all relevant times "merchants" with respect to motor vehicles under 13 Pa. Cons. Stat. §§ 2104 and 2A103(a), and "sellers" of motor vehicles under § 2103(a).

779.   With respect to leases, Defendants VCNA and Volvo AB are and were at all relevant times "lessors" of motor vehicles under 13 Pa. Cons. Stat. § 2A103(a).

780.   The Class Vehicles are and were at all relevant times "goods" within the meaning of 13 Pa. Cons. Stat. § 2105(a) and 2A103(a).

781.   The engines were manufactured and/or installed in the Class Vehicles by Volvo and are covered by the express warranty.

782.   Defendants VCNA and Volvo AB provided all purchasers and lessees of the Class Vehicles with an express warranty described herein, which became a material part of the bargain. Accordingly, Defendants VCNA and Volvo AB's express warranty is an express warranty under Pennsylvania state law.

783.   In a section entitled "Warranty Repairs," Defendants VCNA and Volvo AB's express warranty (or New Vehicle Limited Warranty ("NVLW")) provides in relevant part that "[w]arranty repairs which are required as a result of defects in material or workmanship, and are brought to the attention of an authorized Volvo retailer by an owner, will be performed by an authorized Volvo retailer only at no charge during the warranty period."

784.   According to Volvo, the NVLW coverage is for "4 years/50,000 miles[.]"

785. Defendants VCNA and Volvo AB also provide a maintenance warranty, the Complimentary Factor Scheduled Maintenance Program ("Factory Maintenance Program"), which provides that all new vehicles will have "the first

three (3) regularly scheduled maintenance services at 10,000, 20,000 and 30,000 miles for the first three (3) years or up to 36,000 miles provided free of charge."

786.   Defendants VCNA and Volvo AB's NVLW, Factory Maintenance Program, and other warranties regarding the Class Vehicles formed a basis of the bargain that was breached when Pennsylvania Plaintiffs and members of the Pennsylvania Sub-Class purchased or leased the Class Vehicles with the defective engine and/or related components.

787.   Pennsylvania Plaintiffs and members of the Pennsylvania Sub-Class experienced defects within the warranty period. Despite the existence of the NVLW, Defendants VCNA and Volvo AB failed to inform Pennsylvania Plaintiffs and members of the Pennsylvania Sub-Class that the Class Vehicles were equipped with defective engines and related components.   When providing repairs under the express warranty, these repairs were ineffective and incomplete and did not provide a permanent repair for the Defect.

788.   Defendants VCNA and Volvo AB breached the express warranty through the acts and omissions described above, including by promising to repair or adjust defects in materials or workmanship of any part supplied by Volvo and then failing to do so. Defendants VCNA and Volvo AB have not repaired or adjusted, and have been unable to repair or adjust, the Class Vehicles materials and workmanship defects.

789.   Pennsylvania Plaintiffs and members of the Pennsylvania Sub-Class have had sufficient direct dealings with either Defendants VCNA and Volvo AB or their agents (*i.e.*, dealerships and technical support) to establish privity of contract between Defendants VCNA and Volvo AB, on one hand, and Pennsylvania Plaintiffs and each member of the Pennsylvania Sub-Class on the other hand. Nonetheless, privity is not required here because Pennsylvania Plaintiffs and members of the Pennsylvania Sub-Class are intended third-party beneficiaries of contracts between Defendants VCNA and Volvo AB and their distributors and dealers, and specifically, of Defendants VCNA and Volvo AB's express warranties, including the NVLW, the Powertrain Warranties, and any warranties provided with certified pre-owned vehicles.   The dealers were not intended to be the ultimate consumers of the Class Vehicles and have rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumer only.

790.   Any attempt by Defendants VCNA and Volvo AB to disclaim or limit recovery to the terms of the express warranty is unconscionable and unenforceable here.   Specifically, the warranty limitation is unenforceable because Volvo knowingly sold or leased defective products without informing consumers about the Defect.   The time limits are unconscionable and inadequate to protect Pennsylvania Plaintiffs and the members of the Pennsylvania Sub-Class.   Among other things,

Pennsylvania Plaintiffs and members of the Pennsylvania Sub-Class did not determine these time limitations and/or did not know of other limitations not appearing in the text of the warranties, the terms of which were drafted by Defendants VCNA and Volvo AB and unreasonable favored Defendants VCNA and Volvo AB. A gross disparity in bargaining power and knowledge of the extent, severity, and safety risk of the Defect existed between Defendants VCNA and Volvo AB and members of the Pennsylvania Sub-Class.

791.  Further, the limited warranty promising to repair and/or correct a manufacturing or workmanship defect fails of its essential purpose because the contractual remedy is insufficient to make Pennsylvania Plaintiffs and the members of the Pennsylvania Sub-Class whole, because Defendants VCNA and Volvo AB have failed and/or have refused to adequately provide the promised remedies, *i.e.*, a permanent repair, within a reasonable time.

792.  Pennsylvania Plaintiffs was not required to notify Defendants VCNA and Volvo AB of the breach because affording Defendants VCNA and Volvo AB a reasonable opportunity to cure their breach of written warranty would have been futile. Defendants VCNA and Volvo AB were also on notice of the Defect from the complaints and service requests it received from Class Members, including those formal complaints submitted to NHTSA, and through other internal sources.

793.   Nonetheless, Pennsylvania Plaintiffs and members of the Pennsylvania Sub-Class provided notice to Defendants VCNA and Volvo AB of the breach of express warranties when they took their vehicles to Volvo-authorized providers of warranty repairs.  Pennsylvania Plaintiffs also provided notice to Defendants VCNA and Volvo AB of their breach of express warranty by letters dated February 16, 2022 and March 2, 2022.

794.   As a result of Defendants VCNA and Volvo AB's breach of the applicable express warranties, owners and/or lessees of the Class Vehicles suffered, and continue to suffer, an ascertainable loss of money, property, and/or value of their Class Vehicles.

795.   As a direct and proximate result of Defendants VCNA and Volvo AB's breach of express warranties, Pennsylvania Plaintiffs and members of the Pennsylvania Sub-Class have been damaged in an amount to be determined at trial.

796.   As a result of Defendants VCNA and Volvo AB's breach of the express warranty, Pennsylvania Plaintiffs and Pennsylvania Sub-Class Members are entitled to legal and equitable relief against Volvo, including actual damages, specific performance, attorney's fees, costs of suit, and other relief as appropriate.

**COUNT XXVI**
**Breach of The Implied Warranty of Merchantability**
**13 PA. CONS. STAT. §§ 2314 and 2A212**
**(On Behalf of the Pennsylvania Sub-Class against all Defendants)**

797.   Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 314 as if fully set forth herein.

798.   Pennsylvania Plaintiffs brings this count on behalf of himself and the Pennsylvania Sub-Class against all Defendants.

799.   Volvo is and was at all relevant times a "merchant" with respect to motor vehicles under 13 Pa. Cons. Stat. §§ 2104 and 2A103(a), and a "seller" of motor vehicles under § 2103(a).

800.   With respect to leases, Volvo is and was at all relevant times a "lessor" of motor vehicles under 13 Pa. Cons. Stat. § 2A103(a).

801.   The Class Vehicles are and were at all relevant times "goods" within the meaning of 13 Pa. Cons. Stat. § 2105(a) and 2A103(a).

802.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law under 13 Pa. Cons. Stat. §§ 2314 and 2A212.

803.   Volvo knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased. Volvo directly sold and marketed Class Vehicles to customers through authorized dealers, like those from whom Pennsylvania Plaintiffs and members of the Pennsylvania Sub-Class bought or

leased their vehicles, for the intended purpose of consumers purchasing the vehicles. Volvo knew that the Class Vehicles would and did pass unchanged from the authorized dealers to Pennsylvania Plaintiffs and members of the Pennsylvania Sub-Class, with no modification to the defective Class Vehicles.

804.   Volvo provided Pennsylvania Plaintiffs and members of the Pennsylvania Sub-Class with an implied warranty that the Class Vehicles and their components and parts are merchantable and fit for the ordinary purposes for which they were sold.  However, the Class Vehicles are not fit for their ordinary purpose of providing reasonably reliable and safe transportation because, *inter alia*, the Class Vehicles and their engine suffered from an inherent defect at the time of sale and thereafter and are not fit for their particular purpose of providing safe and reliable transportation.

805.   This implied warranty included, among other things: (i) a warranty that the Class Vehicles that were manufactured, supplied, distributed, and/or sold by Volvo were safe and reliable for providing transportation; and (ii) a warranty that the Class Vehicles would be fit for their intended use while the Class Vehicles were being operated.

806.   Contrary to the applicable implied warranties, the Class Vehicles at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiffs and Class Members with reliable, durable, and safe

transportation. Instead, the Class Vehicles were and are defective at the time of sale or lease and thereafter as more fully described above. Volvo knew of this defect at the time these sale or lease transactions occurred.

807.   As a result of Volvo's breach of the applicable implied warranties, Pennsylvania Plaintiffs and members of the Pennsylvania Sub-Class suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Defect, Pennsylvania Plaintiffs and members of the Pennsylvania Sub-Class were harmed and suffered actual damages in that the Class Vehicles are substantially certain to fail before their expected useful life has run.

808.   Volvo's actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use in violation of the Uniform Commercial Code and relevant state law.

809.   Pennsylvania Plaintiffs and members of the Pennsylvania Sub-Class have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of Volvo's conduct described herein.

810.   Pennsylvania Plaintiffs and members of the Pennsylvania Sub-Class have had sufficient direct dealings with either Volvo or its agents (*i.e.*, dealerships and technical support) to establish privity of contract between Volvo, on one hand, and Pennsylvania Plaintiffs and members of the Pennsylvania Sub-Class on the other

hand.  Nonetheless, privity is not required here because Pennsylvania Plaintiffs and members of the Pennsylvania Sub-Class are intended third-party beneficiaries of contracts between Volvo and its distributors and dealers, and specifically, of Volvo's express warranties, including the NVLW, the Powertrain Warranties, and any warranties provided with certified pre-owned vehicles.  The dealers were not intended to be the ultimate consumers of the Class Vehicles and have rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumer only.

811.   Pennsylvania Plaintiffs and members of the Pennsylvania Sub-Class were not required to notify Volvo of the breach because affording Volvo a reasonable opportunity to cure its breach of warranty would have been futile. Volvo was also on notice of the Defect from the complaints and service requests it received from Pennsylvania Plaintiffs and the Class Members and through other internal sources.

812.   Nonetheless, Pennsylvania Plaintiffs and members of the Pennsylvania Sub-Class provided notice to Volvo of the breach of express warranties when they took their vehicles to Volvo-authorized provider of warranty repairs.  Pennsylvania Plaintiffs also provided notice to Volvo of its breach of express warranty by letters dated February 16, 2022 and March 2, 2022.

813.   As a direct and proximate cause of Volvo's breach, Pennsylvania Plaintiffs and members of the Pennsylvania Sub-Class suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, Pennsylvania Plaintiffs and members of the Pennsylvania Sub-Class have incurred or will incur economic damages at the point of repair in the form of the cost of repair as well as additional losses.

814.   As a direct and proximate result of Volvo's breach of the implied warranty of merchantability, Pennsylvania Plaintiffs and members of the Pennsylvania Sub-Class have been damaged in an amount to be proven at trial.

**<u>COUNT XXVII</u>**
**Violation of the Pennsylvania Unfair Trade Practices and Consumer Protection Law**
**73 P.S. § 201-1, *et seq.***
**(On Behalf of the Pennsylvania Sub-Class against all Defendants)**

815.   Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 314 above as if fully set forth herein.

816.   Pennsylvania Plaintiffs brings this cause of action on behalf of himself and on behalf of the members of the Pennsylvania Sub-Class against all Defendants.

817.   Pennsylvania Plaintiffs and the Pennsylvania Sub-Class Members purchased or leased their Class Vehicles primarily for personal, family or household purposes within the meaning of 73 P.S. § 201-9.2.

818.   All of the acts complained of herein were perpetrated by Volvo in the course of trade or commerce within the meaning of 73 P.S. § 201-2(3).

819.   The Pennsylvania Unfair Trade Practices and Consumer Protection Law ("Pennsylvania CPL") prohibits unfair or deceptive acts or practices, including: (a) "Representing that goods or services have . . . characteristics, . . . [b]enefits or qualities that they do not have;" (b) "Representing that goods or services are of a particular standard, quality or grade . . . if they are of another;" (c) "Advertising goods or services with intent not to sell them as advertised;" and (d) "Engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or misunderstanding." 73 P.S. § 201-2(4).  Volvo engaged in unlawful trade practices, and unfair or deceptive acts or practices that violated the Pennsylvania CPL.

820.   Volvo participated in unfair or deceptive trade practices that violated the Pennsylvania CPL.  As described below and alleged throughout the Complaint, by failing to disclose the Defect, by concealing the Defect, by marketing its vehicles as safe, reliable, well-engineered, and of high quality, and by presenting itself as a reputable manufacturer that valued safety, performance and reliability, and stood behind its vehicles after they were sold, Volvo knowingly and intentionally misrepresented and omitted material facts in connection with the sale or lease of the Class Vehicles. Volvo systematically misrepresented, concealed, suppressed, or

omitted material facts relating to the Class Vehicles and the Defect in the course of its business.

821.   Volvo also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale of the Class Vehicles.

822.   Volvo's unfair and deceptive acts or practices occurred repeatedly in Volvo's trade or business, were capable of deceiving a substantial portion of the purchasing public and imposed a serious safety risk on the public.

823.   Volvo knew that the Class Vehicles suffered from an inherent defect, were defectively designed and/or manufactured, and were not suitable for their intended use.

824.   Volvo knew or should have known that its conduct violated the Pennsylvania CPL.

825.   Volvo was under a duty to Pennsylvania Plaintiffs and the Pennsylvania Sub-Class Members to disclose the defective nature of the Class Vehicles because:

> (a)   Volvo was in a superior position to know the true state of facts about the safety defect in the Class Vehicles;

       (b)    Volvo made partial disclosures about the quality of the Class Vehicles without revealing the defective nature of the Class Vehicles; and

       (c)    Volvo actively concealed the defective nature of the Class Vehicles from Pennsylvania Plaintiffs and the Pennsylvania Sub-Class Members at the time of sale and thereafter.

826.   By failing to disclose the Defect, Volvo knowingly and intentionally concealed material facts and breached its duty not to do so.

827.   The facts concealed or not disclosed by Volvo to Pennsylvania Plaintiffs and the Pennsylvania Sub-Class Members are material because a reasonable person would have considered them to be important in deciding whether or not to purchase or lease Volvo's Class Vehicles, or to pay less for them. Whether an engine installed in a vehicle will exhibit excessive oil consumption causing sudden shut off, premature engine wear, damage, and failure, is a material safety concern. Had Pennsylvania Plaintiffs and the Pennsylvania Sub-Class Members known that the Class Vehicles suffered from the Defect described herein, they would not have purchased or leased the Class Vehicles or would have paid less for them.

828.   Pennsylvania Plaintiffs and the Pennsylvania Sub-Class Members are reasonable consumers who do not expect that their vehicles will suffer from the Defect. That is the reasonable and objective consumer expectation for vehicles.

829.   As a result of Volvo's misconduct, Pennsylvania Plaintiffs and the Pennsylvania Sub-Class Members have been harmed and have suffered actual damages in that the Class Vehicles are defective and require repairs or replacement.

830.   As a direct and proximate result of Volvo's unfair or deceptive acts or practices, Pennsylvania Plaintiffs and the Pennsylvania Sub-Class Members have suffered and will continue to suffer actual damages.

831.   Volvo's violations present a continuing risk to Pennsylvania Plaintiffs and the Pennsylvania Sub-Class Members as well as to the general public.  Volvo's unlawful acts and practices complained of herein affect the public interest.

832.   Pennsylvania Plaintiffs provided notice of their claims, by letters dated February 16, 2022 and March 2, 2022.

833.   Volvo liable to Plaintiffs and the Pennsylvania Class members for treble their actual damages or $100, whichever is greater, and attorneys' fees and costs under 73 P.S. § 201-9.2(a). Pennsylvania Plaintiffs and the Pennsylvania Sub-Class members are also entitled to an award of punitive damages given that Volvo's conduct was malicious, wanton, willful, oppressive, or exhibited a reckless indifference to the rights of others.

212

**Claims on Behalf of the South Carolina Sub-Class**

<u>COUNT XXVIII</u>
**Breach of Express Warranty**
**S.C. CODE ANN. § §§ 36-2-313 and 36-2A-210**
**(On Behalf of the South Carolina Sub-Class against Defendants VCNA and Volvo AB)**

834.   Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 314 above as if fully set forth herein.

835.   Plaintiff Kim and Fred Martin Ferguson ("South Carolina Plaintiffs") bring this count on behalf of themselves and the South Carolina Sub-Class against Defendants VCNA and Volvo AB.

836.   Defendants VCNA and Volvo AB are and were at all relevant times "merchants" with respect to motor vehicles under S.C. Code Ann. § §§ 36-2-104(1) and 36-2A-103(1)(t), and "sellers" of motor vehicles under § 36-2-103(1)(d).

837.   With respect to leases, Defendants VCNA and Volvo AB are and were at all relevant times "lessors" of motor vehicles under S.C. Code Ann. § § 36-2A-103(1)(p).

838.   The Class Vehicles are and were at all relevant times "goods" within the meaning of S.C. Code Ann. § §§ 36-2-105(1) and 36-2A-103(1)(h).

839.   The engines were manufactured and/or installed in the Class Vehicles by Volvo and are covered by the express warranty.

840.   Defendants VCNA and Volvo AB provided all purchasers and lessees of the Class Vehicles with an express warranty described herein, which became a

material part of the bargain. Accordingly, Defendants VCNA and Volvo AB's express warranty is an express warranty under South Carolina state law.

841. In a section entitled "Warranty Repairs," Defendants VCNA and Volvo AB's express warranty (or New Vehicle Limited Warranty ("NVLW")) provides in relevant part that "[w]arranty repairs which are required as a result of defects in material or workmanship, and are brought to the attention of an authorized Volvo retailer by an owner, will be performed by an authorized Volvo retailer only at no charge during the warranty period."

842. According to Volvo, the NVLW coverage is for "4 years/50,000 miles[.]"

843. Defendants VCNA and Volvo AB also provide a maintenance warranty, the Complimentary Factor Scheduled Maintenance Program ("Factory Maintenance Program"), which provides that all new vehicles will have "the first three (3) regularly scheduled maintenance services at 10,000, 20,000 and 30,000 miles for the first three (3) years or up to 36,000 miles provided free of charge."

844. Defendants VCNA and Volvo AB's NVLW, Factory Maintenance Program, and other warranties regarding the Class Vehicles formed a basis of the bargain that was breached when South Carolina Plaintiffs and members of the South Carolina Sub-Class purchased or leased the Class Vehicles with the defective engine and/or related components.

845.   South Carolina Plaintiffs and members of the South Carolina Sub-Class experienced defects within the warranty period. Despite the existence of the NVLW, Defendants VCNA and Volvo AB failed to inform South Carolina Plaintiffs and members of the South Carolina Sub-Class that the Class Vehicles were equipped with defective engines and related components.  When providing repairs under the express warranty, these repairs were ineffective and incomplete and did not provide a permanent repair for the Defect.

846.   Defendants VCNA and Volvo AB breached the express warranty through the acts and omissions described above, including by promising to repair or adjust defects in materials or workmanship of any part supplied by Volvo and then failing to do so. Defendants VCNA and Volvo AB have not repaired or adjusted, and have been unable to repair or adjust, the Class Vehicles materials and workmanship defects.

847.   South Carolina Plaintiffs and members of the South Carolina Sub-Class have had sufficient direct dealings with either Defendants VCNA and Volvo AB or their agents (*i.e.*, dealerships and technical support) to establish privity of contract between Defendants VCNA and Volvo AB, on one hand, and South Carolina Plaintiffs and each member of the South Carolina Sub-Class on the other hand. Nonetheless, privity is not required here because South Carolina Plaintiffs and members of the South Carolina Sub-Class are intended third-party beneficiaries of

215

contracts between Defendants VCNA and Volvo AB and their distributors and dealers, and specifically, of Defendants VCNA and Volvo AB's express warranties, including the NVLW, the Powertrain Warranties, and any warranties provided with certified pre-owned vehicles.  The dealers were not intended to be the ultimate consumers of the Class Vehicles and have rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumer only.

848.  Any attempt by Defendants VCNA and Volvo AB to disclaim or limit recovery to the terms of the express warranty is unconscionable and unenforceable here.  Specifically, the warranty limitation is unenforceable because Volvo knowingly sold or leased defective products without informing consumers about the Defect.  The time limits are unconscionable and inadequate to protect South Carolina Plaintiffs and the members of the South Carolina Sub-Class.  Among other things, South Carolina Plaintiffs and members of the South Carolina Sub-Class did not determine these time limitations and/or did not know of other limitations not appearing in the text of the warranties, the terms of which were drafted by Defendants VCNA and Volvo AB and unreasonable favored Defendants VCNA and Volvo AB. A gross disparity in bargaining power and knowledge of the extent, severity, and safety risk of the Defect existed between Defendants VCNA and Volvo AB and members of the South Carolina Sub-Class.

849.   Further, the limited warranty promising to repair and/or correct a manufacturing or workmanship defect fails of its essential purpose because the contractual remedy is insufficient to make South Carolina Plaintiffs and the members of the South Carolina Sub-Class whole, because Defendants VCNA and Volvo AB have failed and/or have refused to adequately provide the promised remedies, *i.e.*, a permanent repair, within a reasonable time.

850.   South Carolina Plaintiffs was not required to notify Defendants VCNA and Volvo AB of the breach because affording Defendants VCNA and Volvo AB a reasonable opportunity to cure their breach of written warranty would have been futile. Defendants VCNA and Volvo AB were also on notice of the Defect from the complaints and service requests it received from Class Members, including those formal complaints submitted to NHTSA, and through other internal sources.

851.   Nonetheless, South Carolina Plaintiffs and members of the South Carolina Sub-Class provided notice to Defendants VCNA and Volvo AB of the breach of express warranties when they took their vehicles to Volvo-authorized providers of warranty repairs.  South Carolina Plaintiffs also provided notice to Defendants VCNA and Volvo AB of their breach of express warranty by letter dated March 9, 2022.

852.   As a result of Defendants VCNA and Volvo AB's breach of the applicable express warranties, owners and/or lessees of the Class Vehicles suffered,

and continue to suffer, an ascertainable loss of money, property, and/or value of their Class Vehicles.

853.   As a direct and proximate result of Defendants VCNA and Volvo AB's breach of express warranties, South Carolina Plaintiffs and members of the South Carolina Sub-Class have been damaged in an amount to be determined at trial.

854.   As a result of Defendants VCNA and Volvo AB's breach of the express warranty, South Carolina Plaintiffs and South Carolina Sub-Class Members are entitled to legal and equitable relief against Volvo, including actual damages, specific performance, attorney's fees, costs of suit, and other relief as appropriate.

## COUNT XXIX
### Breach of The Implied Warranty of Merchantability
### S.C. CODE ANN. § §§ 36-2-314 and 36-2A-212
### (On Behalf of the South Carolina Sub-Class against all Defendants)

855.   Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 314 above as if fully set forth herein.

856.   South Carolina Plaintiffs bring this count on behalf of themselves and the South Carolina Sub-Class against all Defendants.

857.   Volvo is and was at all relevant times a "merchant" with respect to motor vehicles under S.C. Code Ann. § §§ 36-2-104(1) and 36-2A-103(1)(t), and a "seller" of motor vehicles under § 36-2-103(1)(d).

858.   With respect to leases, Volvo is and was at all relevant times a "lessor" of motor vehicles under S.C. Code Ann. § § 36-2A-103(1)(p).

218

859.   The Class Vehicles are and were at all relevant times "goods" within the meaning of S.C. Code Ann. § §§ 36-2-105(1) and 36-2A-103(1)(h).

860.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law under S.C. Code Ann. §§ 36-2-314 and 36-2A-212.

861.   Volvo knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased. Volvo directly sold and marketed Class Vehicles to customers through authorized dealers, like those from whom South Carolina Plaintiffs and members of the South Carolina Sub-Class bought or leased their vehicles, for the intended purpose of consumers purchasing the vehicles. Volvo knew that the Class Vehicles would and did pass unchanged from the authorized dealers to South Carolina Plaintiffs and members of the South Carolina Sub-Class, with no modification to the defective Class Vehicles.

862.   Volvo provided South Carolina Plaintiffs and members of the South Carolina Sub-Class with an implied warranty that the Class Vehicles and their components and parts are merchantable and fit for the ordinary purposes for which they were sold.  However, the Class Vehicles are not fit for their ordinary purpose of providing reasonably reliable and safe transportation because, *inter alia*, the Class Vehicles and their engine suffered from an inherent defect at the time of sale and

thereafter and are not fit for their particular purpose of providing safe and reliable transportation.

863.   This implied warranty included, among other things: (i) a warranty that the Class Vehicles that were manufactured, supplied, distributed, and/or sold by Volvo were safe and reliable for providing transportation; and (ii) a warranty that the Class Vehicles would be fit for their intended use while the Class Vehicles were being operated.

864.   Contrary to the applicable implied warranties, the Class Vehicles at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiffs and Class Members with reliable, durable, and safe transportation. Instead, the Class Vehicles were and are defective at the time of sale or lease and thereafter as more fully described above. Volvo knew of this defect at the time these sale or lease transactions occurred.

865.   As a result of Volvo's breach of the applicable implied warranties, South Carolina Plaintiffs and members of the South Carolina Sub-Class suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Defect, South Carolina Plaintiffs and members of the South Carolina Sub-Class were harmed and suffered actual damages in that the Class Vehicles are substantially certain to fail before their expected useful life has run.

866.   Volvo's actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use in violation of the Uniform Commercial Code and relevant state law.

867.   South Carolina Plaintiffs and members of the South Carolina Sub-Class have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of Volvo's conduct described herein.

868.   South Carolina Plaintiffs and members of the South Carolina Sub-Class have had sufficient direct dealings with either Volvo or its agents (*i.e.*, dealerships and technical support) to establish privity of contract between Volvo, on one hand, and South Carolina Plaintiffs and members of the South Carolina Sub-Class on the other hand.   Nonetheless, privity is not required here because South Carolina Plaintiffs and members of the South Carolina Sub-Class are intended third-party beneficiaries of contracts between Volvo and its distributors and dealers, and specifically, of Volvo's express warranties, including the NVLW, the Powertrain Warranties, and any warranties provided with certified pre-owned vehicles.   The dealers were not intended to be the ultimate consumers of the Class Vehicles and have rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumer only.

869.   South Carolina Plaintiffs and members of the South Carolina Sub-Class were not required to notify Volvo of the breach because affording Volvo a reasonable opportunity to cure its breach of warranty would have been futile. Volvo was also on notice of the Defect from the complaints and service requests it received from South Carolina Plaintiffs and the Class Members and through other internal sources.

870.   Nonetheless, South Carolina Plaintiffs and members of the South Carolina Sub-Class provided notice to Volvo of the breach of express warranties when they took their vehicles to Volvo-authorized provider of warranty repairs. South Carolina Plaintiffs also provided notice to Volvo of its breach of express warranty by letter dated March 9, 2022.

871.   As a direct and proximate cause of Volvo's breach, South Carolina Plaintiffs and members of the South Carolina Sub-Class suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, South Carolina Plaintiffs and members of the South Carolina Sub-Class have incurred or will incur economic damages at the point of repair in the form of the cost of repair as well as additional losses.

872.   As a direct and proximate result of Volvo's breach of the implied warranty of merchantability, South Carolina Plaintiffs and members of the South Carolina Sub-Class have been damaged in an amount to be proven at trial.

**COUNT XXX**
**Violation of the South Carolina Unfair Trade Practices Act**
**S.C. CODE ANN. § 39-5-10, *et seq.***
**(On Behalf of the South Carolina Sub-Class against all Defendants)**

873.   Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 314 above as if fully set forth herein.

874.   South Carolina Plaintiffs bring this cause of action on behalf of themselves and on behalf of the members of the South Carolina Sub-Class against all Defendants.

875.   Volvo is a "person" under S.C. Code Ann. § 39-5-10.

876.   The South Carolina Unfair Trade Practices Act ("South Carolina UTPA") prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce." S.C. Code Ann. § § 39-5-20(a). Volvo engaged in unlawful trade practices, and unfair or deceptive acts or practices that violated the South Carolina UTPA.

877.   Volvo participated in unfair or deceptive trade practices that violated the South Carolina UTPA.  As described below and alleged throughout the Complaint, by failing to disclose the Defect, by concealing the Defect, by marketing its vehicles as safe, reliable, well-engineered, and of high quality, and by presenting

itself as a reputable manufacturer that valued safety, performance and reliability, and stood behind its vehicles after they were sold, Volvo knowingly and intentionally misrepresented and omitted material facts in connection with the sale or lease of the Class Vehicles. Volvo systematically misrepresented, concealed, suppressed, or omitted material facts relating to the Class Vehicles and the Defect in the course of its business.

878.   Volvo also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale of the Class Vehicles.

879.   Volvo's unfair and deceptive acts or practices occurred repeatedly in Volvo's trade or business, were capable of deceiving a substantial portion of the purchasing public and imposed a serious safety risk on the public.

880.   Volvo knew that the Class Vehicles suffered from an inherent defect, were defectively designed and/or manufactured, and were not suitable for their intended use.

881.   Volvo knew or should have known that its conduct violated the South Carolina UTPA.

882.   Volvo was under a duty to South Carolina Plaintiffs and the South Carolina Sub-Class Members to disclose the defective nature of the Class Vehicles because:

> (a)   Volvo was in a superior position to know the true state of facts about the safety defect in the Class Vehicles;
>
> (b)   Volvo made partial disclosures about the quality of the Class Vehicles without revealing the defective nature of the Class Vehicles; and
>
> (c)   Volvo actively concealed the defective nature of the Class Vehicles from South Carolina Plaintiffs and the South Carolina Sub-Class Members at the time of sale and thereafter.

883.   By failing to disclose the Defect, Volvo knowingly and intentionally concealed material facts and breached its duty not to do so.

884.   The facts concealed or not disclosed by Volvo to South Carolina Plaintiffs and the South Carolina Sub-Class Members are material because a reasonable person would have considered them to be important in deciding whether or not to purchase or lease Volvo's Class Vehicles, or to pay less for them. Whether an engine installed in a vehicle will exhibit excessive oil consumption causing sudden shut off, premature engine wear, damage, and failure, is a material safety concern. Had South Carolina Plaintiffs and the South Carolina Sub-Class Members

known that the Class Vehicles suffered from the Defect described herein, they would not have purchased or leased the Class Vehicles or would have paid less for them.

885.   South Carolina Plaintiffs and the South Carolina Sub-Class Members are reasonable consumers who do not expect that their vehicles will suffer from the Defect. That is the reasonable and objective consumer expectation for vehicles.

886.   As a result of Volvo's misconduct, South Carolina Plaintiffs and the South Carolina Sub-Class Members have been harmed and have suffered actual damages in that the Class Vehicles are defective and require repairs or replacement.

887.   As a direct and proximate result of Volvo's unfair or deceptive acts or practices, South Carolina Plaintiffs and the South Carolina Sub-Class Members have suffered and will continue to suffer actual damages.

888.   Volvo's violations present a continuing risk to South Carolina Plaintiffs and the South Carolina Sub-Class Members as well as to the general public.  Volvo's unlawful acts and practices complained of herein affect the public interest.

889.   South Carolina Plaintiffs provided notice of their claims, by letter dated March 9, 2022.

890.   Pursuant to S.C. Code Ann. § 39-5-140(a), South Carolina Plaintiffs and the South Carolina Sub-Class Members seek monetary relief against Volvo to recover for economic losses, reasonable attorney's fees and costs. Because Volvo's actions were willful and knowing, damages should be trebled.

891.   South Carolina Plaintiffs and the South Carolina Sub-Class Members further allege that Volvo's malicious and deliberate conduct warrants an assessment of punitive damages because Volvo carried out despicable conduct with willful and conscious disregard of the rights and safety of others, subjecting Plaintiffs and the Class to cruel and unjust hardship as a result.

**Claims on Behalf of the Texas Sub-Class**

**COUNT XXXI**
**Breach of Express Warranty**
**Tex. Bus. & Com. Code §§ 2.313 AND 2A.210**
**(On Behalf of the Texas Sub-Class against Defendants VCNA and Volvo AB)**

892.   Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 314 above as if fully set forth herein.

893.   Plaintiffs Eric and Mariela Kotoun and Robert and Toni Tubbe ("Texas Plaintiffs") bring this count on behalf of themselves and the Texas Sub-Class against Defendants VCNA and Volvo AB.

894.   Defendants VCNA and Volvo AB are and were at all relevant times "merchants" with respect to motor vehicles under Texas Bus. & Com. Code §§ 2.104(1) and 2A.103(a)(20), and "sellers" of motor vehicles under § 2.103(a)(4).

895.   With respect to leases, Defendants VCNA and Volvo AB are and were at all relevant times "lessors" of motor vehicles under Texas Bus. & Com. Code § 2A.103(a)(16).

896.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Texas Bus. & Com. Code §§ 2.105(a) and 2A.103(a)(8).

897.   The engines were manufactured and/or installed in the Class Vehicles by Volvo and are covered by the express warranty.

898.   Defendants VCNA and Volvo AB provided all purchasers and lessees of the Class Vehicles with an express warranty described herein, which became a material part of the bargain. Accordingly, Defendants VCNA and Volvo AB's express warranty is an express warranty under Texas state law.

899.   In a section entitled "Warranty Repairs," Defendants VCNA and Volvo AB's express warranty (or New Vehicle Limited Warranty ("NVLW")) provides in relevant part that "[w]arranty repairs which are required as a result of defects in material or workmanship, and are brought to the attention of an authorized Volvo retailer by an owner, will be performed by an authorized Volvo retailer only at no charge during the warranty period."

900.   According to Volvo, the NVLW coverage is for "4 years/50,000 miles[.]"

901.  Defendants VCNA and Volvo AB also provide a maintenance warranty, the Complimentary Factor Scheduled Maintenance Program ("Factory Maintenance Program"), which provides that all new vehicles will have "the first

three (3) regularly scheduled maintenance services at 10,000, 20,000 and 30,000 miles for the first three (3) years or up to 36,000 miles provided free of charge."

902.   Defendants VCNA and Volvo AB's NVLW, Factory Maintenance Program, and other warranties regarding the Class Vehicles formed a basis of the bargain that was breached when Texas Plaintiffs and members of the Texas Sub-Class purchased or leased the Class Vehicles with the defective engine and/or related components.

903.   Texas Plaintiffs and members of the Texas Sub-Class experienced defects within the warranty period. Despite the existence of the NVLW, Defendants VCNA and Volvo AB failed to inform Texas Plaintiffs and members of the Texas Sub-Class that the Class Vehicles were equipped with defective engines and related components.  When providing repairs under the express warranty, these repairs were ineffective and incomplete and did not provide a permanent repair for the Defect.

904.   Defendants VCNA and Volvo AB breached the express warranty through the acts and omissions described above, including by promising to repair or adjust defects in materials or workmanship of any part supplied by Volvo and then failing to do so. Defendants VCNA and Volvo AB have not repaired or adjusted, and have been unable to repair or adjust, the Class Vehicles materials and workmanship defects.

905.   Texas Plaintiffs and members of the Texas Sub-Class have had sufficient direct dealings with either Defendants VCNA and Volvo AB or their agents (*i.e.*, dealerships and technical support) to establish privity of contract between Defendants VCNA and Volvo AB, on one hand, and Texas Plaintiffs and each member of the Texas Sub-Class on the other hand.   Nonetheless, privity is not required here because Texas Plaintiffs and members of the Texas Sub-Class are intended third-party beneficiaries of contracts between Defendants VCNA and Volvo AB and their distributors and dealers, and specifically, of Defendants VCNA and Volvo AB's express warranties, including the NVLW, the Powertrain Warranties, and any warranties provided with certified pre-owned vehicles.   The dealers were not intended to be the ultimate consumers of the Class Vehicles and have rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumer only.

906.   Any attempt by Defendants VCNA and Volvo AB to disclaim or limit recovery to the terms of the express warranty is unconscionable and unenforceable here.   Specifically, the warranty limitation is unenforceable because Volvo knowingly sold or leased defective products without informing consumers about the Defect.   The time limits are unconscionable and inadequate to protect Texas Plaintiffs and the members of the Texas Sub-Class.   Among other things, Texas Plaintiffs and members of the Texas Sub-Class did not determine these time

230

limitations and/or did not know of other limitations not appearing in the text of the warranties, the terms of which were drafted by Defendants VCNA and Volvo AB and unreasonable favored Defendants VCNA and Volvo AB. A gross disparity in bargaining power and knowledge of the extent, severity, and safety risk of the Defect existed between Defendants VCNA and Volvo AB and members of the Texas Sub-Class.

907. Further, the limited warranty promising to repair and/or correct a manufacturing or workmanship defect fails of its essential purpose because the contractual remedy is insufficient to make Texas Plaintiffs and the members of the Texas Sub-Class whole, because Defendants VCNA and Volvo AB have failed and/or have refused to adequately provide the promised remedies, *i.e.*, a permanent repair, within a reasonable time.

908. Texas Plaintiffs was not required to notify Defendants VCNA and Volvo AB of the breach because affording Defendants VCNA and Volvo AB a reasonable opportunity to cure their breach of written warranty would have been futile. Defendants VCNA and Volvo AB were also on notice of the Defect from the complaints and service requests it received from Class Members, including those formal complaints submitted to NHTSA, and through other internal sources.

909. Nonetheless, Texas Plaintiffs and members of the Texas Sub-Class provided notice to Defendants VCNA and Volvo AB of the breach of express

warranties when they took their vehicles to Volvo-authorized providers of warranty repairs. Texas Plaintiffs also provided notice to Defendants VCNA and Volvo AB of their breach of express warranty by letters dated February 16, 2022 and March 2, 2022.

910. As a result of Defendants VCNA and Volvo AB's breach of the applicable express warranties, owners and/or lessees of the Class Vehicles suffered, and continue to suffer, an ascertainable loss of money, property, and/or value of their Class Vehicles.

911. As a direct and proximate result of Defendants VCNA and Volvo AB's breach of express warranties, Texas Plaintiffs and members of the Texas Sub-Class have been damaged in an amount to be determined at trial.

912. As a result of Defendants VCNA and Volvo AB's breach of the express warranty, Texas Plaintiffs and Texas Sub-Class Members are entitled to legal and equitable relief against Volvo, including actual damages, specific performance, attorney's fees, costs of suit, and other relief as appropriate.

## COUNT XXXII
### Breach of The Implied Warranty of Merchantability
### Tex. Bus. & Com. Code §§ 2.314 and 2A.212
### (On Behalf of the Texas Sub-Class against all Defendants)

913. Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 314 above as if fully set forth herein.

914.   Texas Plaintiffs brings this count on behalf of themselves and the Texas Sub-Class against all Defendants.

915.   Volvo is and was at all relevant times a "merchant" with respect to motor vehicles under Texas Bus. & Com. Code §§ 2.104(1) and 2A.103(a)(20), and a "seller" of motor vehicles under § 2.103(a)(4).

916.   With respect to leases, Volvo is and was at all relevant times a "lessor" of motor vehicles under Texas Bus. & Com. Code § 2A.103(a)(16).

917.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Texas Bus. & Com. Code §§ 2.105(a) and 2A.103(a)(8).

918.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law under Texas Bus. & Com. Code §§ 2.314 and 2A.212.

919.   Volvo knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased. Volvo directly sold and marketed Class Vehicles to customers through authorized dealers, like those from whom Texas Plaintiffs and members of the Texas Sub-Class bought or leased their vehicles, for the intended purpose of consumers purchasing the vehicles. Volvo knew that the Class Vehicles would and did pass unchanged from the authorized dealers to Texas Plaintiffs and members of the Texas Sub-Class, with no modification to the defective Class Vehicles.

920.   Volvo provided Texas Plaintiffs and members of the Texas Sub-Class with an implied warranty that the Class Vehicles and their components and parts are merchantable and fit for the ordinary purposes for which they were sold.  However, the Class Vehicles are not fit for their ordinary purpose of providing reasonably reliable and safe transportation because, inter alia, the Class Vehicles and their engine suffered from an inherent defect at the time of sale and thereafter and are not fit for their particular purpose of providing safe and reliable transportation.

921.   This implied warranty included, among other things: (i) a warranty that the Class Vehicles that were manufactured, supplied, distributed, and/or sold by Volvo were safe and reliable for providing transportation; and (ii) a warranty that the Class Vehicles would be fit for their intended use while the Class Vehicles were being operated.

922.   Contrary to the applicable implied warranties, the Class Vehicles at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiffs and Class Members with reliable, durable, and safe transportation. Instead, the Class Vehicles were and are defective at the time of sale or lease and thereafter as more fully described above. Volvo knew of this defect at the time these sale or lease transactions occurred.

923.   As a result of Volvo's breach of the applicable implied warranties, Texas Plaintiffs and members of the Texas Sub-Class suffered an ascertainable loss

of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Defect, Texas Plaintiffs and members of the Texas Sub-Class were harmed and suffered actual damages in that the Class Vehicles are substantially certain to fail before their expected useful life has run.

924.   Volvo's actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use in violation of the Uniform Commercial Code and relevant state law.

925.   Texas Plaintiffs and members of the Texas Sub-Class have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of Volvo's conduct described herein.

926.   Texas Plaintiffs and members of the Texas Sub-Class have had sufficient direct dealings with either Volvo or its agents (*i.e.*, dealerships and technical support) to establish privity of contract between Volvo, on one hand, and Texas Plaintiffs and members of the Texas Sub-Class on the other hand. Nonetheless, privity is not required here because Texas Plaintiffs and members of the Texas Sub-Class are intended third-party beneficiaries of contracts between Volvo and its distributors and dealers, and specifically, of Volvo's express warranties, including the NVLW, the Powertrain Warranties, and any warranties provided with certified pre-owned vehicles.  The dealers were not intended to be the ultimate consumers of the Class Vehicles and have rights under the warranty

agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumer only.

927.   Texas Plaintiffs and members of the Texas Sub-Class were not required to notify Volvo of the breach because affording Volvo a reasonable opportunity to cure its breach of warranty would have been futile. Volvo was also on notice of the Defect from the complaints and service requests it received from Texas Plaintiffs and the Class Members and through other internal sources.

928.   Nonetheless, Texas Plaintiffs and members of the Texas Sub-Class provided notice to Volvo of the breach of express warranties when they took their vehicles to Volvo-authorized providers of warranty repairs.  Texas Plaintiffs also provided notice to Volvo of its breach of express warranty by letters dated February 16, 2022 and March 2, 2022.

929.   As a direct and proximate cause of Volvo's breach, Texas Plaintiffs and members of the Texas Sub-Class suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, Texas Plaintiffs and members of the Texas Sub-Class have incurred or will incur economic damages at the point of repair in the form of the cost of repair as well as additional losses.

930.   As a direct and proximate result of Volvo's breach of the implied warranty of merchantability, Texas Plaintiffs and members of the Texas Sub-Class have been damaged in an amount to be proven at trial.

## COUNT XXXIII
### Violations of the Texas Deceptive Trade Practices Act – Consumer Protection Act, Texas Bus. & Com. Code § 17.41, *et seq.* (On Behalf of the Texas Sub-Class against all Defendants)

931.   Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 314 above as if fully set forth herein.

932.   Texas Plaintiffs bring this cause of action on behalf of themselves and on behalf of the members of the Texas Sub-Class against all Defendants.

933.   Volvo is a "person" as that term is defined in Tex. Bus. & Com. Code § 17.45(3).

934.   Texas Plaintiffs and the members of the Texas Sub-Class are individuals, partnerships, or corporations with assets of less than $25 million (or are controlled by corporations or entities with less than $25 million in assets), see Tex. Bus. & Com. Code § 17.41, and are therefore "consumers" pursuant to Tex. Bus. & Com. Code § 17.45(4).

935.   Volvo is engaged in "trade" or "commerce" or "consumer transactions" within the meaning Tex. Bus. & Com. Code § 17.46(a).

936.   The Texas Deceptive Trade Practices – Consumer Protection Act ("Texas DTPA") prohibits "false, misleading, or deceptive acts or practices in the conduct of any trade or commerce," Tex. Bus. & Com. Code § 17.46(a), and an "unconscionable action or course of action," which means "an act or practice which, to a consumer's detriment, takes advantage of the lack of knowledge, ability, experience, or capacity of the consumer to a grossly unfair degree." Tex. Bus. & Com. Code §§ 17.45(5) and 17.50(a)(3). Volvo engaged in unlawful trade practices, and unfair or deceptive acts or practices that violated the Texas DTPA.

937.   Volvo participated in unfair or deceptive trade practices that violated the Texas DTPA.  As described below and alleged throughout the Complaint, by failing to disclose the Defect, by concealing the Defect, by marketing its vehicles as safe, reliable, well-engineered, and of high quality, and by presenting itself as a reputable manufacturer that valued safety, performance and reliability, and stood behind its vehicles after they were sold, Volvo knowingly and intentionally misrepresented and omitted material facts in connection with the sale or lease of the Class Vehicles. Volvo systematically misrepresented, concealed, suppressed, or omitted material facts relating to the Class Vehicles and the Defect in the course of its business.

938.   Volvo also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment,

suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale of the Class Vehicles.

939.   Volvo's unfair and deceptive acts or practices occurred repeatedly in Volvo's trade or business, were capable of deceiving a substantial portion of the purchasing public, and imposed a serious safety risk on the public.

940.   Volvo knew that the Class Vehicles suffered from an inherent defect, were defectively designed and/or manufactured, and were not suitable for their intended use.

941.   Volvo knew or should have known that its conduct violated the Texas DTPA.

942.   Volvo was under a duty to Texas Plaintiffs and the Texas Sub-Class Members to disclose the defective nature of the Class Vehicles because:

a.   Volvo was in a superior position to know the true state of facts about the safety defect in the Class Vehicles;

b.   Volvo made partial disclosures about the quality of the Class Vehicles without revealing the defective nature of the Class Vehicles; and

c.   Volvo actively concealed the defective nature of the Class Vehicles from Texas Plaintiffs and the Texas Sub-Class Members at the time of sale and thereafter.

239

943.    By failing to disclose the Defect, Volvo knowingly and intentionally concealed material facts and breached its duty not to do so.

944.    The facts concealed or not disclosed by Volvo to Texas Plaintiffs and the Texas Sub-Class Members are material because a reasonable person would have considered them to be important in deciding whether or not to purchase or lease Volvo's Class Vehicles, or to pay less for them. Whether an engine installed in a vehicle will exhibit excessive oil consumption causing sudden shut off, premature engine wear, damage, and failure, is a material safety concern. Had Texas Plaintiffs and the Texas Sub-Class Members known that the Class Vehicles suffered from the Defect described herein, they would not have purchased or leased the Class Vehicles or would have paid less for them.

945.    Texas Plaintiffs and the Texas Sub-Class Members are reasonable consumers who do not expect that their vehicles will suffer from the Defect. That is the reasonable and objective consumer expectation for vehicles.

946.    As a result of Volvo's misconduct, Texas Plaintiffs and the Texas Sub-Class Members have been harmed and have suffered actual damages in that the Class Vehicles are defective and require repairs or replacement.

947.    As a direct and proximate result of Volvo's unfair or deceptive acts or practices, Texas Plaintiffs and the Texas Sub-Class Members have suffered and will continue to suffer actual damages.

948.   Volvo's violations present a continuing risk to Texas Plaintiffs and the Texas Sub-Class Members as well as to the general public.  Volvo's unlawful acts and practices complained of herein affect the public interest.

949.   Texas Plaintiffs provided notice of their claims by letters dated February 16, 2022 and March 2, 2022.

950.   Pursuant to Tex. Bus. & Com. Code § 17.50, Texas Plaintiffs and members of the Texas Sub-Class seek an order enjoining Volvo from engaging in unfair and/or deceptive acts or practices, damages, multiple damages for knowing and intentional violations, pursuant to § 17.50(b)(1), punitive damages, and attorneys' fees, costs, and any other just and proper relief available under the Texas DTPA.

## RELIEF REQUESTED

951.   Plaintiffs, on behalf of themselves and all others similarly situated, request the Court to enter judgment against Defendant, as follows:

A.  An order certifying the proposed Class and Sub-Classes, designating Plaintiffs as named representatives of the Class and Sub-Classes, and designating the undersigned as Class Counsel;

B.  A declaration that Defendants are financially responsible for notifying all Class Members about the defective nature of the Subject Engines, including the need for replacement of the piston rings, piston heads and/or other damaged engine components;

C.  An order enjoining Defendants from further deceptive distribution, sales, and lease practices with respect to Class Vehicles; compelling Defendants to issue a voluntary recall for the Class Vehicles pursuant to 49 U.S.C. § 30118(a); compelling Defendants to remove, repair, and/or replace the Class Vehicles' defective Subject Engines and/or their components with suitable alternative product(s) that do not contain the defects alleged herein; enjoining Defendants from selling the Class Vehicles with the misleading information; and/or compelling Defendants to reform its warranty, in a manner deemed to be appropriate by the Court, to cover the injury alleged and to notify all Class Members that such warranty has been reformed;

D.  An award to Plaintiff and the Class for compensatory, exemplary, and statutory damages, including interest, in an amount to be proven at trial;

E.  Any and all remedies provided pursuant to the Magnuson-Moss Warranty Act;

F.  Any and all remedies provided pursuant their various state law claims;

G.  A declaration that Defendants must disgorge, for the benefit of the Class, all or part of the ill-gotten profits it received from the sale or lease of its Class Vehicles or make full restitution to Plaintiffs and Class Members;

H.  An award of attorneys' fees and costs, as allowed by law;

I.  An award of pre-judgment and post-judgment interest, as provided by law;

J.  Leave to amend the Complaint to conform to the evidence produced at

trial; and

K. Such other relief as may be appropriate under the circumstances.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of all issues in this action so triable.

Respectfully submitted,

/s/Russell D. Paul

Dated: July 22, 2022

Russell D. Paul (NJ Bar. No. 037411989)
Abigail J. Gertner (NJ Bar. No. 019632003)
Natalie Lesser (NJ Bar No. 017882010)
Amey J. Park (NJ Bar. No. 070422014)
**BERGER MONTAGUE PC**
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Telephone:   (215) 875-3000
Fax:   (215) 875-4604
rpaul@bm.net
agertner@bm.net
nlesser@bm.net
apark@bm.net


Tarek H. Zohdy (*pro hac vice* forthcoming)
Cody R. Padgett (*pro hac vice* forthcoming)
Laura E. Goolsby (*pro hac vice* forthcoming)
**CAPSTONE LAW APC**
1875 Century Park East, Suite 1000
Los Angeles, California 90067
Tel.:   (310) 556-4811
Fax:   (310) 943-0396
Tarek.Zohdy@capstonelawyers.com
Cody.Padgett@capstonelawyers.com
Laura.Goolsby@capstonelawyers.com

***Attorneys for Plaintiffs and the Proposed Classes***

243